UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GLENN TIBBLE, et al., | ) | CV 07-5359 SVW (AGRx) |
| | ) | |
| | ) | ORDER DENYING PLAINTIFFS' |
| Plaintiffs, | ) | MOTION FOR SUMMARY JUDGMENT; |
| | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY JUDGMENT IN |
| v. | ) | PART[143][145][146][147][156] |
| | ) | [186][188] |
| | ) | |
| EDISON INTERNATIONAL, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**I.   INTRODUCTION**

Plaintiffs filed this Motion for Partial Summary Judgment seeking a judgment in their favor with regard to certain alleged prohibited transactions and alleged violations of the Plan documents.  In response, Defendants have moved for Summary Judgment as to all of Plaintiffs' claims.  For the reasons stated below, Plaintiffs' Motion

is DENIED, and Defendants' Motion is GRANTED with regard to several claims.  The Court finds that triable issues remain with regard to whether certain fiduciaries breached their duty of loyalty by choosing mutual funds in order to maximize the amount of revenue sharing for SCE's benefit, instead of for the benefit of the Plan participants.  In addition, because Plaintiffs have not adequately described their prohibited transaction claims arising out of State Street's retention of float, the Court ORDERS further briefing on those issues.

**II.  FACTS**

Plaintiffs Glenn Tibble, William Bauer, William Izral, Henry Runowiecki, Frederick Sohadolc, and Hugh Tinman, Jr. ("Plaintiffs") are current or former employees and participants in the Edison 401(k) Savings Plan (the "Plan").  The Plan is a "defined contribution plan" within the meaning of 29 U.S.C. § 1102(34).  (Def.'s Statement of Uncontroverted Facts ("SUF") ¶ 1.)  As of 2007, the Plan held $3.8 billion in assets for the benefit of approximately 20,000 participants.  (Pl.'s Statement of Uncontroverted Facts ("PSUF") ¶ 7.)

Plaintiffs have named as defendants in this action several different entities and individuals, all of whom are alleged to have been Plan fiduciaries during the relevant time period.  Defendant Edison International ("Edison") is the parent corporation of Defendant Southern California Edison ("SCE").  (SUF ¶ 5.)  Plaintiffs allege that Edison and SCE are the Plan sponsors.  (Second Am. Compl. ("SAC") ¶ 12.)  Another Defendant is the SCE Benefits Committee ("Benefits Committee"), which is a named fiduciary under the Plan, the Plan

Administrator, and comprised of individuals appointed by SCE's Chief
Executive Officer ("CEO"). (Id. ¶ 15.)  Also named as a Defendant is
the Edison International Trust Investment Committee ("TIC"), which is a
named fiduciary under the Plan and is comprised of individuals also
appointed by SCE's CEO. (Id. ¶ 16.)  The Secretary of the Benefits
Committee, who as of 2005 was Aaron Whitely, is a named defendant.
(Id. ¶ 17.)  Plaintiffs also name SCE's Vice President of Human
Resources as a defendant. (Id. ¶ 18.)  Finally, Plaintiffs name SCE's
Manager of the Human Resource Service Center as a defendant given her
position as a named fiduciary of the Plan. (Id. ¶ 19.)

In 1998, SCE and the unions representing SCE employees began
collective bargaining negotiations. (SUF ¶ 10.)  As a result of these
negotiations, the investment options included in the Plan were altered
significantly. (Id. ¶ 12.)  Before these changes occurred, the Plan
offered employees the following six investment options: (1) Bond Fund,
(2) Balanced Fund, (3) Global Stock Fund, (4) Money Market Fund, (5)
Common Stock Fund, and (6) the Edison Stock Fund. (Id. ¶ 6.)  After
the negotiations were completed, however, and changes were made to the
Plan, it offered a much broader array of up to fifty investment options
including the following: (1) Edison Stock Fund; (2) Conservative Growth
Fund; (3) Balanced Moderate Growth Fund; (4) Aggressive Growth Fund;
(5) Money Market Fund; (6) Bond Fund; (7) U.S. Stock Index Fund; (8)
U.S. Large Company Stock Fund; (9) International Stock Fund; and (10)
the Mutual Fund Menu, which included approximately forty "retail"
mutual funds. (Decker Decl., Ex. N.)

The Conservative Growth Fund, the Balanced Moderate Growth Fund,
and the Aggressive Growth Fund were "pre-mixed" portfolios consisting

of a combination of stocks and bonds, which allow the participants to diversify within one investment option.  (SUF ¶ 24.)  The U.S. Stock Index Fund, U.S. Large Company Stock Fund, and International Stock Fund were low-cost index funds provided by the Frank Russell Trust Company ("Russell").  (See Niden Rep., Ex. C.)  The Mutual Fund Menu consisted of so-called "retail" mutual funds – that is, mutual funds that were also available to the general public – such as Vanguard, T. Rowe Price, and Fidelity.  (Id.)

In February 2000, as a result of the collective bargaining process, the Plan was amended to reflect the agreement reached between the parties.  (Decker Decl., Ex. K.)  One component of this amendment was that SCE agreed to provide a "[b]roader range of investment options," including "a mutual fund window with access to 40 additional funds."  (Id.)  The amendment also provided that SCE would allow for "[m]ore frequent and timely transactions," including the ability to make daily fund transfers.  (Id.)

The Benefits Committee and TIC perform defined roles with respect to the Plan.  The Benefits Committee is responsible for overseeing how the Plan is operated and administered, and is responsible for adopting Plan amendments.  (SUF ¶¶ 41-42.)  The TIC is responsible for establishing investment guidelines and for making other investment decisions for the Plan.  (Id. ¶ 45.)  The TIC has also delegated certain investment responsibilities to the TIC Chairman's Subcommittee ("Sub-TIC"), which focuses on the selection of specific investment options.  (Id. ¶ 47.)  The Sub-TIC also receives advice on investment options and their performance from the Investments Staff.  (Id. ¶ 49.)

**A.   Hewitt**

Even before the changes to the Plan in 1999, the Plan's recordkeeping services had been provided by Hewitt Associates LLC ("Hewitt").  (PSUF ¶ 14.)  Beginning in at least 1997, the Plan stated that SCE would pay "the cost of the administration of the Plan."  (See Pl.'s, Ex. 1, at 48.)  This language remained in the Plan until 2006, when the Plan was amended to state that SCE would pay "the cost of the administration of the Plan, *net of any adjustments* by service providers."  (Decker Decl., Ex. MM, at 33 (emphasis added).)

Before the addition of the mutual funds in 1999, SCE paid the entire cost of Hewitt's recordkeeping services.  With the addition of the retail mutual funds to the Plan, however, certain "revenue sharing" was made available that could be used in order to pay for part of Hewitt's recordkeeping expenses.  Revenue sharing is a general term that refers to the practice by which mutual funds collect fees from mutual fund assets and distribute them to service providers, such as recordkeepers and trustees – services that the mutual funds would otherwise provide themselves.  (See Niden Rep. ¶ 18.)[1]  Revenue sharing comes from so-called "12b-1" fees, which are fees that mutual fund investment managers charge to investors in order to pay for distribution expenses and shareholder service expenses.  See Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861, 863 (2d Cir. 1990).  12b-1 fees

---

[1] In a recent report from the Department of Labor ("DOL"), the Working Group noted that "in the employee benefit community, the term 'revenue sharing' is used loosely to describe virtually any payment that a plan service provider receives from a party other than the plan."  Report of the Working Group on Fiduciary Responsibilities & Revenue Sharing Practices, Department of Labor (June 18, 2009), available at http://www.dol.gov/ebsa/publications/AC-1107b.html.

receive their name from SEC Rule 12b-1, which was promulgated pursuant to the Investment Company Act of 1940 ("ICA").  See 17 C.F.R. § 270.12b-1(b).  The ICA generally bans the use of fund assets to pay the costs of fund distribution.  In 1980, however, the SEC adopted Rule 12b-1 which specifies certain conditions that must be met in order for mutual fund advisers to be able to make payments from fund assets for the costs of marketing and distributing fund shares.  See Meyer, 895 F.2d at 863.  Other fees included under the umbrella of revenue sharing are "sub-transfer agency" fees.  These fees are similar in many respects to 12b-1 fees but are paid to third parties in order to track the accounts of individual participants.  (Niden Rep. ¶ 18.)

Each type of fee is collected out of the mutual fund assets, and is included as a part of the mutual fund's overall expense ratio.  (See Pomerantz Rep. ¶ 2.)  The expense ratio is the overall fee that the mutual fund charges to investors for investing in that particular fund.[2] The expense ratio is essentially a flat fee, which has a component for 12b-1 or sub-transfer agency fees, as well as other aspects such as a management fee, which is essentially the fee investors pay for the manager's expertise.  (Pomerantz Rep. ¶ 2.)  These fees are deducted from the mutual fund assets before any returns are paid out to the investors.

In 1999, when retail mutual funds were added to the Plan, Hewitt already had contracts with certain mutual fund companies, whereby Hewitt received a portion of the revenue sharing to pay for Hewitt's recordkeeping services.  As a result, when the retail mutual funds were

---

[2] See Fact Sheet: Report on Mutual Fund Fees & Expenses, Securities & Exchange Commission (January 10, 2001), available at http://www.sec.gov/news/extra/mfeefaq.htm.

added to the Plan, some of the revenue sharing was used to pay for Hewitt's recordkeeping costs. (SUF ¶ 30.) Hewitt then billed SCE for Hewitt's services after having deducted the amount received from the mutual funds from revenue sharing. (See Pl.'s Ex. BB.) Hewitt did not have preexisting relationships with certain mutual funds, however, and as a result, contracts were entered into so that the revenue sharing could be captured from the mutual funds and be directed to offset the cost of Hewitt's services. (See Pl.'s Ex. P.) Oftentimes, these contracts provided that an increasing percentage of revenue sharing would be paid to Hewitt, if the Plan invested increasing assets in mutual funds provided by that specific company. (Id.)

The use of revenue sharing to offset Hewitt's recordkeeping costs was discussed during the collective bargaining with the employee unions. (SUF ¶ 38.) Furthermore, this arrangement was disclosed to the Plan participants on approximately seventeen occasions after the practice began in 1999. (See id. ¶ 32.)

### B.  State Street

State Street Bank ("State Street") became the Plan trustee in 1999. (SUF ¶ 85.) The "Trust Agreement" entered into between State Street and SCE provided that State Street would be compensated at a flat rate of $150,000 per year for its services. (Id. ¶ 89.) As part of its duties, State Street was responsible for making disbursements to the Plan participants when they sought to remove assets from the Plan. (See Ertel Decl., Ex. J, at 6.) In the time between when the cash was sent to State Street for disbursement, and when the Plan participant

actually deposited the check, State Street earned interest on the cash in its possession.  (SUF ¶ 91.)  This interest is referred to as "float."  The Trust Agreement did not expressly address who should receive the benefit of such float.  (<u>See</u> Ertel Decl., Ex. J.)  In 2006 alone, State Street retained $383,637 from float on cash from the Plan.

## III.  ANALYSIS

### A.  Legal Standard

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); <u>Tarin v. County of Los Angeles</u>, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  That burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  <u>Id.</u> at 325.  Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial.  See <u>id.</u> at 323-34; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1968).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material

fact." Addisu v. Fred Meyer, 198 F.3d 1130, 1134 (9th Cir. 2000).
Only genuine disputes – where the evidence is such that a reasonable
jury could return a verdict for the nonmoving party – over facts that
might affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment. See Anderson, 477
U.S. at 248; Aprin v. Santa Clara Valley Transp. Agency, 261 F.3d 912,
919 (9th Cir. 2001) (the nonmoving party must identify specific
evidence from which a reasonable jury could return a verdict in its
favor).

///

///

///


**B.   ERISA's Fiduciary Duties**


     Plaintiffs bring this action pursuant to § 502(a) of ERISA, which
allows "a participant, beneficiary or fiduciary" to bring an action for
breach of fiduciary duty.[3]  29 U.S.C. § 1132(a)(2).  Specifically, the
statute provides:

     Any person who is a fiduciary with respect to a plan who breaches

     any of the responsibilities, obligations, or duties imposed upon

     fiduciaries by this subchapter shall be personally liable to make

     good to such plan any losses to the plan resulting from each such

     breach, and to restore to such plan any profits of such fiduciary

_____

     [3] Plaintiffs also allege a claim pursuant to 29 U.S.C. § 1132(a)(3),
which allows a participant to bring an action to enjoin any act that
violates the terms of the plan, to enforce the terms of the plan, or
to obtain other appropriate equitable relief.

which have been made through use of assets by the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Id. § 1109(a).

ERISA details the general duty of loyalty and care owed by a plan fiduciary to its participants. See 29 U.S.C. § 1104. The statute requires a plan fiduciary to discharge his duties solely in the interest of the plan participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan. Id. § 1104(a)(1)(A). The fiduciary shall use the amount of "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(B). Furthermore, a plan fiduciary must discharge his duties "in accordance with the documents and instruments governing the plan." Id. § 1104(a)(1)(D).

ERISA also lists a number of "prohibited transactions," which are pre se prohibited. See id. § 1106. The statute provides:

(a) Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he or she knows or should know such transaction constitutes a direct or indirect –

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B)  lending of money or other extension of credit between the plan and a party in interest:

(C)  furnishing of goods, services, or facilities between the plan and a party in interest;

(D)  transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

. . .

(b)  A fiduciary with respect to a plan shall not –

(1)  deal with the assets of the plan in his own interest or for his own account,

(2)  in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3)  receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

Id. § 1106(a)-(b).

A "party in interest" is defined broadly to include "any fiduciary, a person providing services to the plan, an employer whose employees are covered by the plan, and certain shareholders and relatives." Chao v. Hall Holding Co., Inc., 285 F.3d 415, 424 (6th Cir. 2002); Kanawi v. Bechtel Corp., 590 F. Supp. 2d 1213, 1222 (N.D. Cal. 2008) (Citing Hall).  Section 1106(b) "creates a per se ERISA violation; even the absence of bad faith, or in the presence of a fair and reasonable transaction, [§ 1106(b)] establishes a blanket

prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans." Patelco Credit Union v. Sahni, 262 F.3d 897, 911 (9th Cir. 2001).

With regard to certain prohibited transactions, ERISA includes a number of different exemptions from liability, which are found at § 1108(b).  See id.  These exemptions include one for "reasonable arrangements with a party in interest" for "services necessary for the establishment or operation of the plan" so long as "no more than reasonable compensation is paid therefor."  29 U.S.C. § 1108(b)(2). ///

C. Statute of Limitations

A brief discussion of the statute of limitations is necessary as a preliminary matter because it is relevant to many of Plaintiffs' claims.  For claims alleging breach of fiduciary duty, ERISA provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of –
>
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of a breach or violation; except that in the case of fraud or concealment, such action

1  may be commenced no later than six years after the date of
2  discovery for such breach or violation.
3  29 U.S.C. § 1113.

4      Under this framework, the default statute of limitations is six
5  years.  In order to extend the statute of limitations beyond six years,
6  the plaintiff must prove that the defendant "made knowingly false
7  misrepresentations with the intent to defraud the plaintiffs," or took
8  "affirmative steps" to conceal its own alleged breaches.  Barker v. Am.
9  Mobil Power Corp., 64 F.3d 1397, 1401 (9th Cir. 1995) (per curiam).  On
10 the other hand, in order to shorten the statute of limitations to three
11 years, the defendant has to prove that the plaintiff had "actual
12 knowledge" of the violation.  Under this actual knowledge standard,
13 "[t]he statute of limitations is triggered by defendants' knowledge of
14 the transaction that constituted the alleged violation, not by their
15 knowledge of the law."  Blanton v. Anzalone, 760 F.2d 989, 992 (9th
16 Cir. 1985).

17     There is no "continuing violation" theory to claims subject to
18 ERISA's statute of limitations.  Phillips v. Alaska Hotel & Rest.
19 Employees Pension Fund, 944 F.2d 509, 520 (9th Cir. 1991).  In
20 Phillips, the court rejected the notion that after the first alleged
21 breach of fiduciary duty, that any failure to rectify the breach
22 constituted another discrete breach.  Id.  The court said that although
23 the trustee's conduct could be viewed as a series of breaches, the
24 statute of limitations did not begin anew because each breach was "of
25 the same character."  Id.

26     Here, neither party has satisfied its burden to alter the statute
27 of limitations from the standard six year time limit.  Plaintiffs have

28

not shown that Defendants made any misstatements or actively concealed any breaches of fiduciary duty, which would toll the statute beyond six years.  In fact, the evidence shows that Defendants disclosed the existence of the revenue sharing with Plaintiffs on several occasions. (See SUF ¶ 32.)  With regard to Plaintiffs' claims for breach of the duty of loyalty, Plaintiffs have not presented evidence that Defendants actively concealed such breaches.  See Kanawi, 590 F. Supp. 2d at 1226 ("The failure of a fiduciary to disclose a self-interest in transactions that were allegedly harmful to a plan 'does not rise to the level of active concealment, which is more than merely a failure to disclose.'" (quoting Schaefer v. Arkansas Med. Soc., 853 F.2d 1487, 1491 (8th Cir. 1988)).

Defendants have similarly failed to present undisputed evidence that Plaintiffs had actual knowledge of the alleged breaches of fiduciary duty.  As a result, for the most part, Plaintiffs' claims will be limited to those that accrued within six years of the filing of this suit, which was August 16, 2001.  In the context of a prohibited transactions, the statute of limitations typically begins when the "transaction" takes place.  See Martin, 828 F. Supp. at 1431.  The Court will address statute of limitations issues as they arise in the following analysis of Plaintiffs' claims.

## D.  Prohibited Transactions – Hewitt

Plaintiffs argue that Defendants' fee arrangement with Hewitt amounted to a prohibited transaction under § 1106(b) in two ways.

First, Plaintiffs argue that Defendants violated § 1106(b)(3) by receiving consideration on Defendants' personal account from a party dealing with such plan in connection with a transaction involving the assets of the Plan.  Second, Plaintiffs argue that Defendants violated § 1106(b)(2) by acting in a transaction involving the Plan on behalf of a party whose interests are adverse to the interests of the plan.

### 1.   § 1106(b)(3)

The statute makes it per se illegal for any fiduciary to "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b)(3).  Plaintiffs contend that SCE, as a fiduciary, was receiving consideration from the mutual funds in the form of a credit to SCE's monthly account with Hewitt.  In the language of the statute therefore, Plaintiffs allege that SCE (the "fiduciary") was receiving revenue sharing offsets ("consideration") from the mutual funds ("party dealing with such plan").  With regard to the "transaction" involving assets of the plan, Plaintiffs propose two possible transactions: (1) the contracts between the Plan and the mutual funds directing the mutual funds to pay revenue sharing to Hewitt, or (2) the transactions whereby the mutual funds were added as investment options in the Plan.

Plaintiff's theory fails, however, because in order to be liable for a violation of § 1106(b)(3), the fiduciary receiving the "consideration" must have had control over the "transaction" in

question.  See Lockheed Corp. v. Spink, 517 U.S. 882, 888 (1996) (noting that in order for there to be a violation of § 1106, "a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction"); Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1101 (9th Cir. 2005) (citing Spink and rejecting prohibited transaction claim because the defendant's actions did "not constitute those of a fiduciary or even a de facto fiduciary").

For example, in Martin v. National Bank of Alaska, 828 F. Supp. 1427 (D. Alaska 1992), the plaintiff alleged that the defendant fiduciary, a bank, was receiving loan origination fees from loans to third parties made out of the plan assets.  Id. at 1437.  The court had little trouble finding that the loans were transactions involving assets of the plan because the fiduciary bank was making the loans out of the plan assets.  Id. at 1438.  Moreover, the fiduciary bank was receiving consideration – the loan origination fees – in connection with making the loans out of the plan assets to the third parties.  Id. Since there was no applicable exemption, the court found that the fiduciary bank had violated § 1106(b)(3).  Id.

Similarly, in Stuart Park Associates L.P. v. Ameritech Pension Trust, 846 F. Supp. 701 (N.D. Ill. 1994), the issue was whether the plan fiduciary, Thompson, was personally receiving fees from Bennett in exchange for Thompson's influencing the plan to invest in a real estate project promoted by Bennett.  Id. at 706.  The court found that there was "an illegal kickback scheme" whereby Thompson exercised his influence to get the plan to invest in transactions involving Bennett and, in exchange, Bennett paid Thompson approximately $40,000.  Id.

Thus, the court found that Thompson had violated § 1106(b)(3) by receiving consideration for his influence from a party dealing with the plan.  Id.[4]

Martin and Stuart Park are classic examples of a fiduciary exercising his control over the assets of the plan, and, as a direct result, receiving consideration from a third party.  These cases fall squarely within the scope of the statute, which prohibits fiduciaries from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b)(3).  Indeed, such a self-dealing transaction is precisely the type of transaction that § 1106(b)(3) was designed to prevent.  See Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1212 (2d Cir. 1987); Patelco, 262 F.3d at 909.

Here, however, unlike the defendants in both Martin and Stuart Park, the party receiving the benefit from the transaction was SCE.[5] Yet SCE was not the party engaging in the transactions that resulted in the "consideration" (revenue sharing) being generated.  Plaintiffs have presented no evidence that SCE made the decisions that resulted in the generation of revenue sharing from the mutual funds.  There is no

---

[4] The district court's decision was affirmed on appeal without much discussion of this issue.  See Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Trust, 51 F.3d 1319, 1325 (7th Cir. 1995).

[5] The alleged "consideration" according to Plaintiffs was a "credit to [the] monthly service account with Hewitt."  (Mot., at 16.)  The only party to contract with Hewitt was SCE.  (See Pl.'s Ex. L1.)  Plaintiffs have not presented any evidence that any other fiduciary received "consideration" from these mutual fund revenue sharing offsets.

evidence, for example, that SCE itself influenced whether to enter into the service contracts with the mutual funds or whether certain mutual funds would become investment options for the fund.  Rather, the evidence presented indicates that these decisions were made by the TIC or the Benefits Committee, both of which were independent committees whose purpose was to provide prudent and wise investment options for the exclusive benefit of the Plan participants.  (See Pl.'s Exs. N & P; SUF ¶ 45.)[6]  Thus, because Plaintiffs have not presented any evidence that SCE made the decisions that brought about the revenue sharing, Plaintiffs are not entitled to summary judgment on this claim.

Both Martin and Stuart Park relied on an earlier Second Circuit opinion Lowen, 829 F.2d 1209.  There, the court found that a group of related companies (Tower Asset, Tower Capital, and Tower Securities (collectively, the "Tower entities")), along with their principals, had engaged in numerous prohibited transactions in violation of § 1106(b)(3).  Id. at 1213.  Tower Asset was a fiduciary to the plan and provided the plan with investment advice.  Id. at 1219.  The prohibited transactions typically involved one of the sister companies, either Tower Capital or Tower Securities, which entered into a contract with new company to advise the company and to provide the start-up capital that the company needed.  Id. at 1214.  These new companies were typically also owned either in whole or in part by the principals of the Tower entities.  Id.  Tower Capital or Tower Securities then

---

[6] The contracts with the mutual funds were entered into by the Benefits Committee on behalf of the Plan.  (See Pl.'s Ex. N & P.) The contracts with Fidelity and T. Rowe Price were both signed by A. Lou Whitely as Secretary of the Benefits Committee.  (Id.)

arranged for Tower Assets to invest the assets of the plan in the start-up company, thereby generating fees and commissions for Tower Capital and Tower Securities.  Id.  The court declined to decide whether Tower Asset's sister companies were fiduciaries of the plan, because the court simply disregarded the corporate form of the separate companies.  Id. at 1220-21.  The court found that "[t]he record demonstrates beyond dispute extensive intermixing of assets among the corporations, and among the corporations and individual defendants, without observing the appropriate formalities."  Id. at 1221.  Thus, the court found that all of the defendants were effectively liable for breach of § 1106(b)(3) because they all received consideration in the form of fees, commissions, and stock from the companies who were using the plan assets as start-up capital.  See id.

Much like the defendants in Martin and Stuart Park, in Lowen, the defendants who received the benefits from the transactions involving the plan were also the entities that were exerting influence on the plan to enter into those transactions.  Although Tower Capital and Tower Securities were typically the entities orchestrating the transaction, Tower Asset was deeply involved as well.  Furthermore, the court disregarded the distinctions between the different entities and essentially consolidated the entities into one by virtue of the complete overlap between them and the fact that the individual defendants "personally and actively dominated those firms."  As a result, the court found that the Tower entities were collectively engaging in the transactions with the plan assets, while at the same time benefitting from those transactions.

<u>Lowen</u> supports a finding that SCE is not liable for violating § 1106(b)(3) because, on the evidence presented by Plaintiffs, SCE was simply a recipient of the benefit from the revenue sharing, but it was the Benefits Committee and the TIC that caused the Plan to transact with the mutual funds.  Plaintiffs have not pointed to any evidence similar to that in <u>Lowen</u> that would justify disregarding the separate legal structures of SCE, the TIC, the Sub-TIC, and/or the Benefits Committee.  <u>See</u> <u>Collins v. Pension & Ins. Comm. of S. Cal. Rock Prods. & Ready Mix Concrete Ass'ns</u>, 144 F.3d 1279, 1282 (9th Cir. 1998) ("The existence of an alter ego relationship . . . is not presumed without proof of specific facts to support these theories.").

The requirement that the fiduciary receiving the benefit from the transaction also be the fiduciary exercising control over the transaction is also supported by Department of Labor ("DOL") Advisory Opinions interpreting the scope of § 1106(b)(3).[7]  The DOL issued two Advisory Opinions in 1997 involving the question of whether a fiduciary receiving revenue sharing from mutual funds violated § 1106(b)(3).  In the first, the party seeking advice was a company called ALIAC, which provided recordkeeping services for pension plans that received 12b-1 fees from the mutual funds that ALIAC made available to the plan participants for investment.  <u>See</u> DOL Advisory Opinion 97-16A (May 22, 1997).  ALIAC represented that the plan fiduciaries were completely independent from ALIAC, and that the plan fiduciaries made the ultimate

---

[7] Advisory Opinions from the DOL are not binding on the Court.  <u>See</u> <u>Patelco</u>, 262 F.3d at 908 (citing ERISA treatise which states that "[o]nly the parties described in the request for opinion may rely on the opinion").  Nonetheless, the Court finds the DOL Advisory Opinions helpful to understand the scope of § 1106(b)(3).

decisions regarding what mutual funds would be made available to the plan participants.  Id.  The Secretary noted that the first question that must be answered is whether ALIAC was a fiduciary.  Id.  The Secretary said that "whether a person is a fiduciary with respect to a plan requires an analysis of the types of functions performed and the actions taken by the person on behalf of the plan to determine whether particular functions or actions are fiduciary in nature and therefore subject to ERISA's fiduciary responsibility provisions."  Id.  As a result, whether a person is a "fiduciary" is "inherently factual and will depend on the particular actions or functions ALIAC performs on behalf of the Plans."  Id.  The Secretary opined that ALIAC would not be a fiduciary with respect to the selection of the mutual funds "provided that the appropriate plan fiduciary in fact makes the decision to accept or reject the change."  Id.

In another Advisory Opinion, the Secretary opined that a similar arrangement did not violate § 1106(b)(3).  See DOL Advisory Opinion 97-15A (May 22, 1997).  The party requesting advice was a trustee company named Frost, which provided various administrative services to pension plan clients.  Id.  Frost had also entered into arrangements with mutual funds whereby Frost made the mutual funds available to the plans, and, in return, received 12b-1 fees.  Id.  The Secretary said that so long as the trustee "does not exercise any authority or control to cause a plan to invest in a mutual fund, the mere receipt by the trustee of a fee or other compensation from a mutual fund in connection with such investment would not in and of itself violate section 406(b)(3)."  Id.  However, because Frost had some ability to add or

remove mutual funds from the plan lineup, the Secretary was unable to
conclude that it "would not exercise any discretionary authority or
control to cause the Plans to invest in mutual funds that pay a fee or
other compensation to Frost." Id. Nonetheless, because Frost's
trustee agreements were structured so that the 12b-1 fees were used to
offset the costs that the plans would be obligated to pay for Frost's
services, the Secretary opined that Frost was not receiving payments
for its own personal account in violation of § 1106(b)(3). Id.

Finally, in a 2003 Advisory Opinion, the Secretary again addressed
whether a trust company violated § 1106(b)(3) by offering bundled
services which included certain mutual funds. See DOL Advisory Opinion
2003-09A (June 25, 2003). The trust company involved was called AATSC
that provided "bundled service" arrangement to its clients, which
included trustee service, recordkeeping, tax compliance, and
participant communications. Id. AATSC stated that it made certain
mutual funds available to the plan participants and that those mutual
funds then paid AATSC a portion of the 12b-1 fees that were generated
from the plan participants' investments in those funds. Id.
Consistent with its earlier opinions, the Secretary wrote that AATSC's
receipt of 12b-1 fees from the mutual funds would not violate §
1106(b)(3) "when the decision to invest in such funds is made by a
fiduciary who is independent of AATSC and its affiliates, or by
participants of such employee benefit plans." Id.

All three Advisory Opinions suggest that SCE should not be liable
merely for receiving some benefit from revenue sharing from the mutual
funds, because Plaintiffs have not presented evidence that SCE made the

decisions to invest in those mutual funds.  These Advisory Opinions emphasize that it is permissible for an entity to receive some compensation in the form of revenue sharing so long as that entity is not the one deciding whether to add or delete certain mutual funds. Here, the evidence reveals that the decisions to invest in the mutual funds were made by fiduciaries other than SCE.  Thus, SCE cannot be liable for violating § 1106(b)(3).[8]

The fact that a fiduciary must be involved in the transaction in order to be liable under § 1106(b)(3) stems from the fundamental question here, which is whether SCE is in fact a fiduciary with respect to the transactions that generated the revenue sharing.  As courts have repeatedly recognized, just because a person is a fiduciary in one respect, does not mean that the person is a fiduciary in all respects. See Acosta v. Pacific Enters., 950 F.2d 611, 618 (9th Cir. 1991) ("[A] person's actions, not the official designation of his role, determine whether he enjoys fiduciary status.").  ERISA "does not make a person who is a fiduciary for one purpose a fiduciary for every purpose." Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1188 (7th Cir. 1994). The statute provides:

---

[8] This interpretation of § 1106(b)(3) is also consistent with Haddock v. Nationwide Financial Services Inc., 419 F. Supp. 2d 156 (D. Conn. 2006).  The allegation in Haddock was that "Nationwide receives payments from mutual funds in exchange for offering the funds as an investment option to the Plans and participants, i.e., as a result of its fiduciary status or function." Id. at 170.  Thus, it was clear in that case that the fiduciary who was alleged to have received the revenue sharing payments from the mutual funds had control over which mutual funds were included among the options to the plan participants.

> [A] person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1103(21)(A) (emphasis added).  The key part of this statutory provision is the phrase "to the extent."  The inclusion of this phrase "means that a party is a fiduciary only as to the activities which bring the person within the definition." Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir. 1992).  "The statutory language plainly indicates that the fiduciary function is not an indivisible one.  In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue." Id.; see also Landry v. Airline Pilots Ass'n Int'l AFL-CIO, 901 F.2d 404, 418 (5th Cir. 1990) ("[F]iduciary status is to be determined by looking at the actual authority or power demonstrated, as well as the formal title and duties of the party at issue.").

Here, Plaintiffs have not presented evidence that SCE had control over the decisions that resulted in the generation of the revenue sharing.  Instead, the evidence presented by the Plaintiffs shows that different fiduciaries, the TIC or Benefits Committee, conducted the transactions in question.  Plaintiffs have not pointed to evidence

24

showing that these committees were somehow controlled by SCE.  In fact, the evidence shows that the TIC and Benefits Committee were separate entities who performed their fiduciary function independently from SCE. (See Decker Decl., Exs. M & DD.)  Without the necessary control, SCE cannot be a fiduciary with respect to those decisions, and therefore, cannot be liable for simply receiving the consideration from those transactions.

Plaintiffs mention that the individual members of the TIC and Benefits Committee are appointed by the SCE CEO.  However, merely appointing individuals to be members of the Committees is insufficient evidence to show that SCE exercised the requisite control over specific transactions involved in the alleged prohibited transactions.

For example, in Kanawi v. Bechtel Corp., 590 F. Supp. 2d 1213 (N.D. Cal. 2008), the analogous company to SCE here, Bechtel, argued that it was not a fiduciary with respect to the specific investment decisions that were made on behalf of the plan.  Id. at 1224.  The court noted that "[f]iduciaries can be held liable only for claims arising out of the exercise of their fiduciary duties."  Id. (citing Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1325 (9th Cir. 1985)). The court found no evidence that Bechtel had placed people on the investment committee who would serve Bechtel's interest.  Id. "Furthermore, the evidence does not suggest that Bechtel itself exercised power over the investment decisions related to the Plan."

Id. (emphasis added).  Thus, the court found that Bechtel could only be liable on a theory of co-fiduciary liability under § 1105(a).[9]

Much like Kanawi, here, there is no evidence that SCE placed people on the Benefits Committee or TIC in order to serve SCE's interests.  Nor is there evidence that SCE itself exercised power over the investment decisions.  In light of the absence of evidence that SCE had any control over the transactions that generated the revenue sharing, SCE cannot be liable for violating § 1106(b)(3).  Plaintiffs' motion for summary judgment on this claim is therefore denied.

The Court will also enter judgment in favor of Defendants on this claim because the undisputed evidence shows that the transactions in question were executed by the Benefits Committee or the TIC, yet neither received consideration as a result of those transactions.  As discussed infra, while there may be some ambiguity with regard to the role that the Investments Staff played in the decisions of which mutual funds to add as options in the Plan, Plaintiffs have not sustained their burden of producing evidence that the actions of the Investments Staff can be attributed to SCE generally.  Furthermore, even if the Investments Staff had significant control over those decisions, Plaintiffs have identified no evidence that the Investments Staff, either collectively or individually, received consideration in exchange for the decisions they made.  Without some evidence that the relevant fiduciaries received consideration for decisions made with respect to

---

[9] Plaintiffs also cite to the unpublished case Chao v. Linder, 2007 WL 1655254 (N.D. Ill. 2007).  Even in that case, however, the defendants were alleged to have violated § 1106(b)(3) by receiving motorcycles "because of their actions, decisions and other duties relating to the questions and matters concerning their respective plans."  Id. at *5.

the Plan, there can be no violation of § 1106(b)(3).  Thus, summary judgment will be granted for Defendants on this claim.

As an independent basis, Plaintiffs' claim for violation of § 1106(b)(3) is barred, at least in part, by the statute of limitations.  To some extent, Plaintiffs' claim is premised on the contracts between the Plan and the mutual funds, which were entered into before August 16, 2001.  (See Pl.'s Exs. N & P.)  By contrast, however, some of the transactions whereby the mutual funds were selected for inclusion in the Plan occurred after August 16, 2001.  Thus, to the extent that these transactions occurred before August 16, 2001, Plaintiffs' claim are barred by the statute of limitations.

### 2.  § 1106(b)(2)

Plaintiffs move for summary judgment on the basis that SCE's arrangement with Hewitt was a prohibited transaction pursuant to § 1106(b)(2).  This section states that a fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."  Id.

Specifically with regard to this allegation, Plaintiffs contend that the TIC, a named Plan fiduciary, was also acting on behalf of SCE when deciding which mutual funds to include among the menu of options for the Plan.  Plaintiffs argue that SCE's interests were directly adverse to the Plan's interests because the amount of money that SCE was obligated to pay for Hewitt's recordkeeping service depended on how

much revenue sharing was received from the mutual funds.  Under the language of the statute therefore, Plaintiffs' theory is that the TIC ("a fiduciary") was choosing mutual funds that generated revenue sharing for inclusion in the investment menu ("act[ing] in any transaction involving the plan") for the benefit of the parent corporation SCE ("on behalf of a party (or represent a party)") who stood to benefit from the revenue sharing that originally came from the assets of the plan ("whose interests are adverse to the interests of the plan").

The operative transactions that Plaintiffs identify are the decisions whereby the TIC selected the mutual funds for inclusion as an investment option for the Plan participants.  These transactions involved the TIC (on behalf of the Plan) on one side, and the mutual funds on the other side of the transaction.  However, there is no allegation that the TIC represented the mutual funds in those transactions; that is, there is no allegation that the fiduciary was acting on both sides of the transaction.  In fact, the adverse party which the TIC was alleged to have represented – SCE – was not involved in those transactions at all.  Rather, Plaintiffs' theory appears to be that although the TIC was acting in the transactions with the mutual funds purportedly on the Plan's behalf, in reality (and secretly), the TIC was acting on behalf of SCE.  This, however, is not a prohibited transaction under § 1106(b)(2), but more accurately characterized as a claim for breach of the duty of loyalty under § 1104(a)(1)(A).

Section 1106(b)(2) is commonly understood to "prohibit[] a fiduciary from engaging in a self-dealing transaction."  <u>Wilson v.</u>

28                                              28

Perry, 470 F. Supp. 2d 610, 623 (E.D. Va. 2007).  Indeed, in each of the cases Plaintiffs cite where a violation of § 1106(b)(2) was found, the defendant fiduciary was acting on behalf of a party standing on the other side of the transaction.  In Donovan v. Mazzola, 716 F.2d 1226 (9th Cir. 1983), for example, there were two funds, the Convalescent Fund and the Pension Fund, both of which shared the same trustees.  Id. at 1237.  The plaintiffs alleged that the trustees had engaged in a prohibited transaction under § 1106(b)(2) by making loans between the two funds.  Id.  The Ninth Circuit found a violation of § 1106(b)(2) because "'[f]iduciaries acting on both sides of a loan transaction cannot negotiate the best terms for either plan.  . . . Each plan must be represented by trustees who are free to exert the maximum economic power manifested by their fund whenever they are negotiating a commercial transaction.'"  Id. at 1238 (quoting Cutaiar v. Marshall, 590 F.2d 523 (3rd Cir. 1979)).

Similarly, in Freund v. Marshall & Ilsley Bank, 485 F. Supp. 629 (W.D. Wisc. 1979), the court found that fiduciaries for the plan had engaged in a prohibited transaction by loaning money from the plan to the sponsoring companies, where the fiduciaries were members of the top management of the sponsoring companies.  Id. at 638.  The court said that "because the interests of a lender and a borrower are, by definition, adverse, a fiduciary cannot act in a loan transaction on behalf of a party borrowing from the plan without violating § [1106(b)(2)]."  Id. at 637-38.  In making the loans from the pension plan to the companies, the plan documents required the trustees to approve the transaction, resulting in the trustees acting on behalf of

the plan in the transaction.  Id. at 638.  Furthermore, the evidence
showed that certain trustees were also members of the top management of
the sponsor companies, and those trustees had been involved in the
approval process for the transaction on behalf of the companies.  Id.
Thus, the court found that the trustees had "in effect, represented
both sides of the transaction," and therefore violated § 1106(b)(2).
Id.

In Parker v. Bain, 68 F.3d 1131 (9th Cir. 1995), the court found
that Parker, the vice president of the sponsoring company Pac Ship, was
a fiduciary of the company pension plan because he exercised
"discretionary authority" over plan assets.  Id. at 1139.  During a
period of financial difficulty for Pac Ship, Parker transferred money
from the funds of the pension plan to the company's general account.
Id. at 1140.  The court found a prohibited transaction in violation of
§ 1106(b)(2) because "[i]n transferring those funds into Pac Ship's
account, Parker acted on behalf of Pac Ship in a transaction in which
Pac Ship's interests were clearly adverse to the interests of the
Plan."  Id.

Unlike these cases, here, Plaintiffs do not allege that the TIC
stood on both sides of the transaction by representing the mutual funds
in connection with the transactions whereby the mutual funds became
investment options for the Plan participants.  Instead, Plaintiffs
allege that TIC represented SCE – yet SCE was not engaged in any of the
transactions between the Plan and the mutual funds.  Although SCE may

have had an interest adverse to the Plan in connection with those transactions,[10] SCE was not a party to those transactions.

In <u>Donovan v. Bierwirth</u>, 680 F.2d 263 (2d Cir. 1982), the Second Circuit declined to apply § 1106(b)(2) in a case similar to ours. There, a company made a tender offer in an attempt to buy out the plan sponsor, a company named Grumman. <u>Id.</u> at 266.  The plan trustees voted not to tender the plan's Grumman shares and, in fact, even decided to purchase more Grumman stock in the face of the tender offer. <u>Id.</u> at 268-69.  The plaintiffs alleged that the trustees of the Grumman pension plan had engaged in a § 1106(b)(2) prohibited transaction in connection with these decisions because the trustees had acted on Grumman's behalf in an effort to defeat the tender offer in connection with the additional purchase of stock. <u>Id.</u> at 270.  The Second Circuit found § 1106(b)(2) inapplicable, however, stating that "[w]e read this section of the statute as requiring a transaction between the plan and a party having an adverse interest." <u>Id.</u>  Thus, presumably, since the transactions at issue – the purchase of stock – were between the plan and an individual stockholder, not the plan and Grumman, whom the trustees were alleged to have been representing, there was no § 1106(b)(2) violation. <u>See id.</u>  The court further noted that the cases

---

[10] "An 'adverse party' is one whose interests conflict with those of the plan and its members." <u>Donovan v. Walton</u>, 609 F. Supp. 1221, 1246 (S.D. Fla. 1985).  "[T]he interests need not directly conflict but must be sufficiently different." <u>Int'l Bhd. of Painters & Allied Trades Union & Indus. Pension Fund v. Duval</u>, 925 F. Supp. 815, 825 (D.D.C. 1996).  Here, the interests of SCE could have conflicted with the interests of the plan Participants, if SCE had an interest in choosing mutual funds that offered revenue sharing, if those mutual funds were of poorer quality than others available in the market.

cited by the plaintiff involved "self-dealing clearly prohibited" by the statute.  Id.  Thus, the court declined to extend § 1106(b)(2) to the facts of the case "particularly in light of the inclusion of the sweeping requirements of prudence and loyalty contained in [§ 1104]." Id.

Similarly, here, the transactions at issue do not involve a transaction between the Plan and SCE, on who's behalf the TIC is alleged to have been acting.  Thus, § 1106(b)(2) does not apply.  As recognized by the Second Circuit in Bierwirth, Plaintiffs' claim is one for breach of the duty of loyalty under § 1104(a)(1)(A), but is not a per se prohibited transaction.  As discussed infra, to the extent there is evidence to suggest that the TIC chose mutual funds depending on the amount of revenue sharing that they offered, Plaintiffs may have a claim for breaching their duty of loyalty by not acting exclusively in the interests of the Plan participants.

Plaintiffs' § 1106(b)(2) claim fails for an additional reason as well.  As part of their claim, Plaintiffs would have to prove that the TIC acted "on behalf of" or "represented" SCE in connection with the mutual fund transactions.  See id.  In each of the cases applying § 1106(b)(2), the required relationship between the fiduciary and the adverse party has been more than a secret loyalty to the adverse party, but rather, has consisted of a formal employer-employee or agency-type relationship.  In Mazzola, the fiduciaries were also trustees of a different pension plan, 716 F.2d at 1237; in Freund, the fiduciaries were upper-level managers at the adverse company, 485 F. Supp. at 638; and in Parker, the fiduciary was the vice president of the adverse

company, 68 F.3d at 1139.  Each of these fiduciaries held an official position with the adverse party, which allowed each court to find that the fiduciary was acting "on behalf of" or "representing" the adverse party.  Here, however, Plaintiffs have identified no evidence that the TIC had a similar formal role with SCE.  Plaintiffs mention that some of the members of the TIC were appointed by SCE's CEO, but Plaintiffs do not point to evidence that would support a formal relationship similar to those present in the cases cited above.

Furthermore, even in those cases where the fiduciary held an official position in an adverse party, the plaintiff was required to prove that the fiduciary was actually acting on behalf of the adverse party in connection with that transaction.  For example, in <u>Reich v. Compton</u>, 57 F.3d 270 (3rd Cir. 1995), the Third Circuit remanded the case to the district court to determine whether certain plan fiduciaries who also had positions in the adverse parties to a loan transaction "acted on behalf of or represented" the adverse parties in connection with that transaction.  <u>Id.</u> at 290.  The court noted that the fiduciaries could have acted on behalf of the adverse parties because the fiduciaries were also officers in the adverse parties, they did not recuse themselves when the transaction was being considered by the adverse parties, and they actually participated in the discussions among officers of the adverse parties with respect to the transactions.  <u>Id.</u>  The court suggested that these facts in themselves may have actually been sufficient to justify summary judgment for the plaintiffs, but remanded to the district court to determine whether, during the adverse parties' deliberations concerning the transactions,

the "trustees took any action" in their capacities as officers for the adverse parties.  Id.  "If they did, then they took actions in this transaction on behalf of . . . parties with interests adverse to the Plan, and they therefore violated section [1106(b)(2)]."  Id.

Here, Plaintiffs have not produced sufficient evidence that the TIC actually acted on SCE's behalf in selecting the mutual funds. Plaintiffs point to no evidence, for example, that the members of the TIC were also officers of SCE, or that they played any role on behalf of SCE in connection with the mutual fund selection process.  Thus, for this separate reason, Plaintiffs' are not entitled to summary judgment on this claim.

The plaintiff in Compton advanced a theory that is nearly identical to the theory advance by Plaintiffs' in this case.  The court noted that the plaintiff argued that the trustees had violated § 1106(b)(2) because, "while acting in their capacities as plan trustees during the consideration of the [transaction], they were actually serving the interests of the [adverse parties]."  Id. at 290 n.29.  In essence, the plaintiff in Compton argued the exact same "secret loyalty" theory that Plaintiffs advance here – that even though the fiduciaries were purportedly acting on behalf of the Plan when selecting the mutual funds for inclusion as investment options, in reality they were acting on behalf of a party with an adverse interest. The Third Circuit noted that "[t]his theory, although based on section [1106(b)(2)], seems to resemble the [plaintiff's] claim against all the trustees under section [1104(a)(1)(A)]," for breach of the duty of

loyalty.  Id.  Thus, the court declined to address such a theory within the context of the § 1106(b)(2) framework.  Id.

Similarly, here, as the Third Circuit noted in Compton, while Plaintiffs' theory based on a secret loyalty to SCE in connection with the selection of the mutual funds could be considered a claim for breach of the duty of loyalty under § 1104(a)(1)(A), such a theory does not form the basis for a per se prohibited transaction.  Thus, the Court finds Plaintiffs'§ 1106(b)(2) theory inapplicable as a matter of law and grants summary judgment for Defendants on this claim.[11]

**E.  Violation of the Plan Document – § 1104(a)(1)(D)**

Plaintiffs move for summary judgment on the basis that SCE violated the terms of the Plan by failing to pay the full extent of Hewitt's recordkeeping costs, and instead, allowed revenue sharing to be used to offset the costs of Hewitt's recordkeeping service.  The statute requires a fiduciary to "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan."  29 U.S.C. § 1104(a)(1)(D).

Before addressing the merits of Plaintiffs' claim, a brief recap of the relevant facts may be helpful.  The Master Plan document

---

[11] In light of the Court's conclusion that Defendants are entitled to summary judgment for violation of § 1106(b)(2) and (b)(3), the Court need not resolve Defendants' argument that the safe harbor provision of § 1108(c)(2) applies.  The Court notes, however, that § 1108(c)(2) appears not to apply to such violations in light of the Ninth Circuit's decision in Patelco Credit Union v. Sahni, 262 F.3d 897, 911 (9th Cir. 2001) ("§ 1108(c)(2) does not provide a safe harbor to fiduciaries who self-deal.").

provided that "[t]he cost of the administration of the Plan will be paid by [SCE]." (Decker Decl., Ex. GG, at 48.)  Plaintiffs contend, however, that SCE did not pay the costs of administering the Plan because some of Hewitt's recordkeeping costs were offset with fees that Hewitt received directly from certain mutual funds.  When retail mutual funds were added to the Plan in 1999, Hewitt already had preexisting contractual relationships with certain retail mutual funds whereby, if one of Hewitt's pension plan clients invested in those mutual funds, then Hewitt would receive a proportion of the revenue sharing that was generated as a result of those investments.  To the extent that Hewitt received revenue sharing as a result of the Plan investing in those retail mutual funds, Hewitt used at least 80% of those fees to offset the amount that SCE owed Hewitt for Hewitt's recordkeeping services. Hewitt did not have revenue sharing arrangements with all retail mutual funds however, and as a result, contractual arrangements were made whereby the revenue sharing that was generated as a result of Plan assets being invested in those mutual funds was to be passed along to Hewitt, and used to offset the amount that SCE owed Hewitt for Hewitt's recordkeeping service.

One important fact, however, is that the amount of fees actually charged to the Plan participants in connection with their investment in the retail mutual funds was not connected to the proportion of the revenue sharing that was paid to Hewitt.  Rather, the mutual funds charged individual investors a fee, which was characterized as the overall expense ratio for the mutual fund.  The expense ratio was charged to all investors that invested in the mutual fund and was

deducted before any returns were actually paid to the investor.  As a result, even if Hewitt had not received any portion of the fees from the mutual funds, the individual Plan participant would have been charged the same fee for investing with that mutual fund.  If a portion of that fee had not gone to Hewitt for its recordkeeping services, then presumably it would have gone somewhere else, but there is no indication that the mutual funds would have refunded the fee back to the Plan participants.  The result therefore is that even though SCE may not have paid the full cost of Hewitt's services due to the offsets from revenue sharing, even if SCE had paid the full amount of Hewitt's recordkeeping services before the revenue sharing offsets, the Plan participants would not have realized any savings.

In light of this factual summary, the Court must decide whether Defendants violated the Plan documents by using revenue sharing from the mutual funds to offset Hewitt's recordkeeping costs.  At first blush, it seems somewhat peculiar that Plaintiffs would be able to bring this claim given that the Plan has suffered no economic loss simply because revenue sharing was used to pay for the cost of Hewitt's recordkeeping service.  Courts, however, have allowed plaintiffs to bring suits for violation of the plan documents by a fiduciary even in the absence of damage to the plan.  In LaScala v. Scrufari, 479 F.3d 213 (2d Cir. 2007), the Second Circuit reversed the district court's decision that there could be no § 1104(a)(1)(D) violation because the plan suffered no loss.  Id. at 221.  The defendant fiduciary had violated the terms of the plan by giving his son a raise without the proper approval from the other plan trustees.  Id.  The court said that

"[t]he fact that the Funds may not have suffered any loss as a result of Russell's salary increases may bear on the question of damages, but has no bearing on whether [the defendant] breached his fiduciary duties in the first place." <u>Id.</u>  Thus, the court held that a claim for violation of § 1104(a)(1)(D) can be brought even in the absence of a loss to the plan.

Furthermore, the statute provides that injunctive relief may be an appropriate remedy for such a breach of fiduciary duty.  29 U.S.C. § 1109(a) provides that "[a]ny person who is a fiduciary with respect to the plan who breaches any of the responsibilities, obligations, or duties imposed by this subchapter shall be . . . subject to *such other equitable or remedial relief* as the court may deem appropriate, including removal of such fiduciary." <u>Id.</u> (emphasis added). Similarly, § 1132(a)(3) allows a participant to bring an action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to *enforce any . . . terms of the plan*." <u>Id.</u> (emphasis added).  These provisions contemplate that declaratory or injunctive relief may be appropriate even in the absence of any economic loss to the plan.

Indeed, the Ninth Circuit has rejected the argument that there must be a loss to the plan in order to bring an action for breach of fiduciary duty seeking injunctive relief.  <u>See</u> <u>Shaver v. Operating Eng'r Local 428 Pension Trust Fund</u>, 332 F.3d 1198, 1203 (9th Cir. 2003).  In <u>Shaver</u>, the Ninth Circuit noted that some courts have required the plaintiff to show a loss to the plan.  <u>Id.</u>  The Ninth

Circuit, however, limited the loss requirement to cases where the plaintiff was seeking monetary relief.  Id. (citing Friend v. Sanwa Bank of California, 35 F.3d 466, 469 (9th Cir. 1994)).  The court noted that the plaintiff was seeking injunctive relief in the form of enjoining future misconduct or having the trustees removed.  Id.  The court concluded:

> Requiring a showing of loss in such a case would be to say that the fiduciaries are free to ignore their duties so long as they do no tangible harm, and that the beneficiaries are powerless to rein in the fiduciaries' imprudent behavior until some actual damage has been done.  This result is not supported by the language of ERISA, the common law, or common sense.

Id.

Here, Plaintiffs seek injunctive relief for the alleged violations of the Plan documents.  Thus, in light of Shaver, the Court finds that Plaintiffs are not barred from pursuing their claim for breach of the Plan documents even in the absence of some loss to the Plan.

A fiduciary's failure to discharge its duties in accordance with the plan documents is an independent basis for finding a breach of fiduciary duty under § 1104(a)(1).  See Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1241 (2d Cir. 1989).  Indeed, "[a] fiduciary's failure to meet the[] specific requirements of section 1104(a)(1) is not merely evidence of imprudent action but may, in itself, be a basis for liability under section 1109."  Id.

Although a fiduciary has an obligation to act in accordance with the terms of the plan document, ERISA "does not require . . . that a

fiduciary resolve every issue of interpretation in favor of the plan beneficiaries." O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 61 (2d Cir. 1994); see also Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1100 (9th Cir. 2004) (quoting O'Neil); Collins, 144 F.3d at 1282 (same).  In fact, when a plan explicitly grants a fiduciary the authority to interpret the language of the plan, the fiduciary's interpretation is entitled to deference. See O'Neil, 37 F.3d at 61.

In O'Neil, the plan "explicitly granted the [fiduciary] the authority to interpret the plan terms." Id. at 59.  As a result, the court applied an "arbitrary and capricious standard" of review.  Id. Other courts have similarly applied a deferential standard of review to a fiduciary's interpretation of the plan documents under § 1104(a)(1)(D) when the Plan explicitly provides for such discretion. See, e.g., Hunter v. Caliber Sys., Inc., 220 F.3d 702, 711-12 (6th Cir. 2000) (applying the arbitrary and capricious standard to breach of fiduciary duty claims); Moench v. Robertson, 62 F.3d 553, 565 (3rd Cir. 1995) ("[W]e believe that after Firestone, trust law should guide the standard of review over claims, such as those here, . . . filed pursuant to 29 U.S.C. § 1132(a)(2) based on violations of the fiduciary duties set forth in section 1104(a)."); but see In re Gulf Pension Litig., 764 F. Supp. 1149, 1206 (S.D. Tex. 1991) ("When a plaintiff sues to enforce an express statutory fiduciary duty under § 406(a)(1)(D) and to challenge acts of the employer, as a fiduciary, that advance the employer's own economic interest, the abuse of discretion standard does not apply." (citing Struble v. New Jersey

<u>Brewery Employees' Welfare Trust Fund</u>, 732 F.2d 325, 333 (3rd Cir. 1984)).

Even in the absence of express discretionary language, courts have not applied a standard of strict liability such that any technical violation of the plan constitutes a per se violation of § 1104(a)(1)(D).  See <u>LaScala</u>, 479 F.3d at 221.  In <u>LaScala</u>, the court found that the defendant had breached his fiduciary duty by failing to comply with the terms of the plan documents because "[a] prudent person in Scrufari's position, bound by the highest duty known to law, would have known that he could not raise his compensation without a majority vote of the trustees."  <u>Id.</u>  This language from <u>LaScala</u> reveals that in order to be liable for a violation under § 1104(a)(1)(D), the plan document must put a reasonable fiduciary on notice that the conduct in question is prohibited.  It makes sense for some inquiry to be made as to the reasonableness of the fiduciary's interpretation of the plan before a fiduciary can be held liable for breaching his fiduciary duties pursuant to § 1104(a)(1)(D).  Section 1104(a) by its very nature outlines standards of fiduciary conduct that are not necessarily per se violations – per se violations are found at § 1106.

Here, beginning on November 29, 2001, the Master Plan document gave the Benefits Committee "full discretion to construe and interpret the terms and provisions of this Plan, which interpretation and construction shall be final and binding on all parties, including but not limited to the Company and any Participant or Beneficiary." (Decker Decl., Ex. AA, at 31.)  This language from the Master Plan document is of obvious importance because it unambiguously gives the

41

Benefits Committee discretion to interpret the language of the Plan. Thus, any such interpretations are subject to a more deferential standard of review.

The threshold question in the analysis is whether there is any ambiguity in the Plan documents with respect to whether revenue sharing could be used to defray the costs of Hewitt's recordkeeping service. See O'Neil, 37 F.3d at 58.  Indeed, summary judgment may be appropriate if the Plan documents unambiguously proscribe certain conduct, yet the fiduciary pursues such conduct.  See Dardaganis, 889 F.2d at 1241. Even under a deferential standard of review, it is an abuse of discretion to interpret the language of plan in a way that conflicts with its unambiguous plain language.  See Boyd v. Bert Bell/Pete Rozell NFL Players Retirement Plan, 410 F.3d 1173, 1178 (9th Cir. 2005) ("An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) *construes provisions of the plan in a way that conflicts with the plain language of the plan*, or (3) relies on clearly erroneous findings of fact." (emphasis added)).

Summary judgment for the plaintiff, however, is only appropriate in cases where the plan documents make it clear that the conduct in question is unambiguously prohibited.  See O'Neil, 37 F.3d at 58.  For example, in O'Neil, the plaintiffs argued that the fiduciary had violated the plan document by failing to classify certain "SICP payments" as "earnings" within the meaning of the plan document.  Id. The court said that "[s]ummary judgment would have been proper *only if* the [Plan] unambiguously included SICP payments as 'Earnings.'"  Id. (emphasis added).  Looking to the four corners of the plan alone, the

court noted that the "core definition" of "earnings" was the regular salary paid to a participant during the calendar year.  Id.  However, the SICP payments had deferred vesting periods and contingent valuations, which the court found made it "not clear that such payments were regular salary."  Id.  Furthermore, the court noted that certain terms were capitalized, which implied that they were defined terms. Id.

Applying the reasoning from O'Neil here, summary judgment would be properly granted in Plaintiffs' favor only if the Plan documents unambiguously prohibited the use of revenue sharing from the mutual funds to offset Hewitt's recordkeeping costs.  The operative language from the Master Plan document states that "[t]he cost of administration of the Plan will be paid by the Company."  (See Decker Decl., Ex. GG, at 48.)  The Plan document does not define the term "cost."  Presumably, however, Hewitt's services as the Plan recordkeeper would be considered part of the "cost of administration of the Plan."  Even so, there is nothing in the Master Plan document that prohibits Hewitt's recordkeeping services from being paid by a third party such as the mutual funds.  Plaintiffs have not identified any specific language from the Master Plan document that would have put members of the Benefits Committee on notice that the use of revenue sharing from the mutual funds to offset the costs of Hewitt's recordkeeping was prohibited.  Thus, in the absence of any unambiguous language prohibiting such an arrangement, the Court finds that Plaintiffs are not entitled to summary judgment for breach of the Plan document.

In the absence of a breach of an unambiguous plan provision, it is necessary to go beyond the four corners of the Plan document and evaluate the interpretation given to the Plan by Defendants.  As noted above, beginning in November 29, 2001, the Plan documents gave the Benefits Committee "full discretion to construe and interpret the terms and provisions of this Plan."  In light of this language, the Benefits Committee's interpretation from November 29, 2001 forward should be reviewed under an abuse of discretion standard.  See O'Neil, 37 F.3d at 59.

There is a brief period of time, however, just before the Plan was restated in November 29, 2001, where there does not appear to have been any such express discretionary language in the Plan.  The statute of limitations began on August 16, 2001.  This period of time, therefore, amounts to only about three and half months.  Nevertheless, during this time, there was no express discretion given to Defendants to interpret the Plan.

Without the discretionary language, the Benefits Committee's interpretation should be reviewed under a de novo standard of review.  See O'Neil, 37 F.3d at 59.  Under such review, the Court must render its own independent judgment as to whether Defendants' interpretation of the Plan was correct.  See Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1125 (9th Cir. 2002).  Because the Plan does not expressly prohibit the conduct in question, the Court may consider extrinsic evidence and determine the intent of the parties.  See O'Neil, 37 F.3d at 61.  Specifically, the question here is whether Defendants were

correct to interpret the Plan to allow the use of the revenue sharing from the mutual funds to offset Hewitt's recordkeeping costs.

Applying a de novo standard of review, the Court finds that Defendants were correct to interpret the Plan as allowing the use of revenue sharing to offset Hewitt's recordkeeping costs.  First, the undisputed facts show that during the course of the collective bargaining with the unions in 1998 and 1999, there were extensive discussions with regard to how revenue sharing from the mutual funds would be used to offset the costs of Hewitt's recordkeeping services. (SUF ¶ 38.)  The undisputed evidence shows that Ms. Decker personally walked the union representatives through the process by which the revenue sharing was generated, and how the revenue sharing from the mutual funds would be used to pay for Hewitt's recordkeeping services. (Id.)  The union representatives had no objection to this arrangement. (Id. ¶ 39.)  Thus, not only did the Plan not prohibit the use of revenue sharing to pay for Hewitt's services, but in fact, Defendants had a reasonable belief that the Plan participant consented to the use of revenue sharing to pay for Hewitt's services.

Second, between 1999 and 2006, Defendants informed the Plan participants at least seventeen times either through Summary Plan Descriptions or other benefits brochures that fees from the mutual funds were being used to reduce Hewitt's recordkeeping costs.  (Id. ¶ 32.)  One such SPD states: "Mutual funds pay fees to recordkeepers that provide the above administrative services to 401(k) plan participants. Most of the fees received by Edison's 401(k) plan recordkeeper are used to reduce the recordkeeping and communication expenses of the plan paid

by the company." (Decker Decl., Ex. A, at 50).  Defendants received no objection to this arrangement despite the numerous disclosures.

Finally, the accuracy of the Benefits Committee's interpretation is further bolstered by the fact that the use of revenue sharing to offset Hewitt's recordkeeping costs did not directly harm the Plan participants.  The mutual funds charged the Plan participants the standard expense ratio for investing in the retail mutual funds; this expense ratio was charged to all investors (SCE employees or otherwise) in the mutual funds.  If the revenue sharing that was generated as a result had not been used to pay Hewitt's recordkeeping costs, there is no indication that those fees would have been returned to the Plan participants.  In light of the fact that the Plan participants would have been charged the same fee regardless, Defendants were correct to interpret the Plan to allow those fees to be used to pay for the Plan's recordkeeping costs, even if such an arrangement did inure to SCE's benefit.

Plaintiffs may argue that such an interpretation did harm the Plan participants because it created a conflict of interest, whereby SCE had an interest in selecting mutual funds with higher revenue sharing, which could have motivated the Plan fiduciaries to choose poorer performing mutual funds for inclusion in the Plan.  Such alleged harm, however, does not stem from the interpretation given to the Plan, but from the subsequent events of the fiduciaries.  It was entirely possible for the Plan fiduciaries to operate under such a conflict of interest without having ever taken action to harm the Plan.  Indeed, it may in fact be the case that the Plan fiduciaries chose high quality

mutual funds for inclusion in the Plan despite this potential conflict of interest.  Thus, the Court rejects any argument that by simply giving the Plan an interpretation that created the *potential* for a fiduciary to make a conflicted decision, that the original interpretation of the Plan was incorrect.

Thus, when applying a de novo review to Defendants' interpretation of the Plan documents, the Court finds that the interpretation was correct and did not constitute a violation of § 1104(a)(1)(D).  Summary judgment will be granted in favor of Defendants on this claim.[12]

Plaintiffs cite to the Ninth Circuit case <u>Bergt v. Retirement Plan for Pilots Employed by Markair, Inc.</u>, 293 F.3d 1139 (9th Cir. 2002), in support of their argument that the defendant fiduciaries failed to execute their duties in accordance with the Plan documents.  In <u>Bergt</u>, the Ninth Circuit held that if a plan master document unambiguously qualifies an employee for benefits, but a summary plan document ("SPD") unambiguously disqualifies an employee for benefits, then the court does not consider extrinsic evidence to interpret the intent of the parties, but rather, the more favorable plan master document controls. <u>Id.</u> at 1146.  <u>Bergt</u> was a benefits denial case brought under § 1132(a)(1)(B), not a breach of fiduciary duty case brought under §

---

[12] Applying a more deferential standard of review, the Court would reach the same conclusion.  Furthermore, even if the Court was somehow mistaken with respect to its de novo review of Defendants' interpretation, it is unlikely that significant damages would be at issue because there was no loss to the Plan.  In addition, to the extent that the Court's decision would be upheld on an abuse of discretion review, the brief three and half month time period would not justify any significant equitable relief given that the Plan now contains the operative discretionary language and will presumably continue to do so going forward.

1132(a)(2), and therefore, _Bergt_ is distinguishable in an important

way.

Nonetheless, even applying the rule from _Bergt_ here, it would not change the analysis.  By analogy to the fiduciary duty context, _Bergt_ would hold that if the plan master document unambiguously prohibits a given course of conduct, and the SPD unambiguously allows a given course of conduct, then a fiduciary is required to pursue the course of conduct that is more favorable to the plan participants.  Here, however, the plan master document does not unambiguously prohibit the use of revenue sharing from the mutual funds to offset Hewitt's recordkeeping costs.  Thus, even on the assumption that _Bergt_ applies in the fiduciary duty context, it would not alter the outcome in this case.

In sum, the Court finds that the Plan documents do not unambiguously prohibit revenue sharing from the mutual funds to be used to pay for Hewitt's recordkeeping costs.  Furthermore, Defendants' interpretation of the Plan allowing such an arrangement was correct when applying a de novo standard of review.  Thus, Defendants' Motion for Summary Judgment is granted on this claim.

///

///

///

///

**F.  State Street Bank**

Plaintiffs also bring a number claims for breach of fiduciary duty arising out of the fact that State Street retained interest, or "float," that was earned on cash before the cash was distributed to the Plan participants.  SCE paid State Street a flat fee of $150,000 per year for its trustee services rendered to the Plan.  State Street also retained the interest on the money it held pending distribution to the Plan participants.  Plaintiffs alleged that, on average, cash was held in State Street's possession for twelve days before it was actually paid out to Plan participants, and as a result, State Street retained substantial sums of money through the float.

### 1.   § 1104(a)(1)(D)

Plaintiffs contend that Defendants failed to discharge their duties in accordance with the Plan documents because Defendants allowed State Street to retain float as part of State Street's compensation.  Section 1104(a)(1)(D) requires a fiduciary to "discharge his duties . . . in accordance with the documents and instruments governing the plan."  Plaintiffs contend that the Master Plan document, as discussed earlier, required SCE to pay the costs of administering the Plan, and that Defendants violated the Plan documents by allowing some of State Street's compensation to be paid from float.

Plaintiffs' claim in this regard is similar to Plaintiffs' claim with regard to the use of revenue sharing from the mutual funds to offset costs of Hewitt's recordkeeping service.  As a result, the analysis is quite similar, and the first question is whether there was

anything in the Master Plan document that unambiguously prohibited Defendants from permitting State Street to retain float.  See O'Neil, 37 F.3d at 58.  Again, Plaintiffs point to the provision in the Master Plan document that says "[t]he cost of the administration of the Plan will be paid by [SCE]."  (See Decker Decl., Ex. GG, at 48.)  Again, the term "cost" is not a defined term in the contract, but State Street's trustee service would presumably be considered a "cost of the administration of the Plan."  Nevertheless, Plaintiffs have not identified anything in the Master Plan document that unambiguously prohibits State Street from receiving float.  Thus, the Court finds that Plaintiffs are not entitled to summary judgment on this claim.

Furthermore, the Court finds that any decision by Defendants decision to allow State Street to retain float was an accurate interpretation of the Plan under a de novo standard of review.  Much like the revenue sharing from the mutual funds, the fact that State Street retained the float did not necessarily inure to the detriment of the Plan participants; State Street simply earned interest on the cash it held until the Plan participant cashed its check.  Plaintiffs have presented no evidence that State Street unreasonably delayed issuing the checks so that it could further capitalize on the float. Furthermore, Plaintiffs have not identified any evidence that State Street's retention of float was inconsistent with the accepted practice in the industry at the time.  Thus, in light of the fact that there is no evidence of loss to the Plan participants, any decision by

Defendants to allow State Street to retain float was not a violation of the Plan documents.[13]

### 2.   § 1106(a)(1)(D)

Plaintiffs also contend that by permitting State Street to retain the float, SCE entered into a prohibited transaction under § 1106(a). Specifically, the statute prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  Id. § 1106(a)(1)(D).  Plaintiffs contend that by retaining State Street as the Plan's trustee, and allowing State Street to retain float, Defendants allowed State Street to use assets of the Plan for State Street's own benefit.

First, the parties do not dispute that State Street is a party in interest.  A "party in interest" is defined broadly to include "any fiduciary, a person providing services to the plan, an employer whose employees are covered by the plan, and certain shareholders and relatives."  Chao v. Hall Holding Co., Inc., 285 F.3d 415, 424 (6th Cir. 2002).  Under this definition, as the Plan trustee, State Street would qualify as a party in interest.

It is unclear, however, what transaction Plaintiffs challenge, and which fiduciary Plaintiffs claim caused the plan to engage in such

---

[13] Again, if the Court were to apply an abuse of discretion standard to Defendants' interpretation, the Court would reach the same conclusion.

transaction.  It appears that Plaintiffs challenge the overall relationship between SCE and State Street.  The only relevant transaction identified in this regard, however, would be the Trust Agreement entered into between SCE and State Street.  If this is the relevant transaction, then Plaintiffs' claim would appear to be barred by the six year statute of limitations because the Trust Agreement was signed in 1999.  In claims for prohibited transactions, the statute of limitations typically begins when the transaction in question occurs.  See Martin, 828 F. Supp. at 1431.  Thus, Plaintiffs' claim for violation of § 1106(a)(1)(D) would appear to be barred.

Plaintiffs may allege that there was some subsequent transaction involved here.  Depending on which transaction Plaintiffs identify, however, there could be questions of whether the fiduciary caused the Plan to engage in that transaction.  Thus, the Court invites further briefing on this claim.  Plaintiffs should identify which specific transaction or transactions they challenge, and which specific fiduciary caused the Plan to engage in those transactions.

In addition to these issues, there are also issues with regard to Defendants' affirmative defense.  Defendants contend that they have an absolute defense to a violation under § 1106(a)(1)(D) because they are protected by the safe harbor in § 1108(b)(2).  Section 1108(b)(2) provides an exemption for "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."  Id.  Defendants contend that because float was part of

State Street's compensation, allowing State Street to retain float was a "reasonable arrangement . . . for . . . services necessary for the . . . operation of the plan," and that "no more than reasonable compensation [was] paid therefor."  <u>See</u> <u>id.</u>

In order for there safe harbor to apply, however, the defendant must have actually "contracted" or made "reasonable arrangements" for services necessary for the operation of the plan.  <u>See</u> <u>F.H. Krear & Co. v. Nineteen Named Trustees</u>, 810 F.2d 1250, 1258 (2d Cir. 1987); <u>Whitfield v. Tomaso</u>, 682 F. Supp. 1287, 1303 (E.D.N.Y. 1988).  Here, however, there is a conspicuous lack of evidence that float was ever considered as part of State Street's compensation.  The Trust Agreement, which was the contract that defined the compensation State Street would receive for its services, did not mention float at all. The only evidence in support of Defendants' claim that float was considered is the testimony of Mr. Ertel, who said it was his "understanding" that State Street was allowed to retain the float. There is an email, however, from an employee at State Street, which suggests that State Street did not even record how much float it earned until 2002.  (Pl.'s Ex. X1.)  Thus, there may be a triable issue as to whether Defendants ever actually "contracted" or "made reasonable arrangements" for State Street's services to include float.

Defendants point to a portion in the contract which states that State Street shall be "paid such reasonable compensation as shall be from time to time agreed upon by the Sponsor and the Trustee."  (Pl.'s Ex. U, at 27.)  It would appear therefore, that the Trust Agreement leaves open the possibility that future agreements could be reached

regarding additional compensation.  Whether any such further agreement was reached addressing float as part of compensation, however, is unclear on the current record.

In addition, there is a dispute as to whether the amount of float State Street retained was "reasonable compensation" for the services State Street rendered.  Defendants argue that the amount of compensation that State Street earned from float was reasonable because it was consistent with the other offers SCE received and never exceeded .03% of the total assets of the Plan.  The significance and source of the .03% number, however, is unclear on the current record.  In response, Plaintiffs contend that the amount of float retained could not be reasonable because in 2006 alone, State Street retained $383,000 in float, which was more than twice the rate for State Street's annual services under the Trust Agreement.  Neither party appears to have offered any expert opinion on this issue.  As a result, the Court will accept further briefing on this issues.  The parties should cite with specificity to evidence already in the record.

### 3.  § 1106(b)(1)

Plaintiffs allege that by allowing State Street to retain float, Defendants violated § 1106(b)(1), which prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."  Id.  Plaintiffs appear to argue that SCE dealt with the assets of the Plan by entering into a Trust Agreement with State Street, whereby SCE paid State Street a flat fee of $150,000, which was

artificially low on account of the fact that State Street would be able
to keep the float.  In light of the fact that SCE was otherwise
obligated to pay the cost of State Street's trustee service, by
negotiating an artificially low price, one might be able to conclude
that SCE dealt with assets of the Plan for SCE's own interest or
account.

If it is the Trust Agreement that Plaintiffs challenge, however,
then this claim would appear to be barred by the six year statute of
limitations, given that the Trust Agreement was signed in 1999.
Plaintiffs may have other conduct in mind, however, which could
constitute a fiduciary dealing with the assets of the plan in his own
interest or for his own account.  Thus, the Court will invite
Plaintiffs to more fully brief this issue in order to clearly identify
what conduct is at issue and which specific fiduciaries Plaintiffs
believe are responsible.

The Court also notes that if the theory identified is an accurate
representation of Plaintiffs' claim, then the same question of fact
identified in the preceding section could be relevant.  That is,
whether float was ever even considered as part of State Street's
compensation in 1999, or any time thereafter, could be relevant to
whether any fiduciary dealt with the assets of the Plan in his or her
own interest.

Even assuming, however, that float was considered part of State
Street's compensation, Plaintiffs will have to "demonstrate that [the
fiduciary] *actually used* its power to deal with the assets of the plan
for its own benefit or account."  <u>Acosta v. Pacific Enters.</u>, 950 F.2d

611, 621 (9th Cir. 1991) (emphasis added).  Thus, Plaintiffs would have to prove that if float was part of State Street's compensation, that SCE actually obtained an artificially lowered annual rate for State Street's services.[14]

## G.  Breach of Fiduciary Duty

Section 1104(a) imposes on fiduciaries both a duty of loyalty and a duty of care.  First, fiduciaries must discharge their duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants.  29 U.S.C. § 1104(a)(1)(A).  Second, fiduciaries must act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.  Id. § 1104(a)(1)(B).

### 1.  Duty of Loyalty – § 1104(a)(1)(A)

Plaintiffs contend that the fiduciaries in charge of selecting which mutual funds became investment options for the Plan participants, failed to discharge those duties solely in the interest of the participants.  Plaintiffs contend that instead of choosing mutual funds that were the best investment options for the Plan participants, the

_____

[14] As mentioned supra, the Court is inclined to find that the reasonable compensation exception in § 1108 does not apply to alleged violations of § 1106(b).  See Patelco, 262 F.3d at 910.

fiduciaries chose mutual funds based on the amount of revenue sharing that was generated and to offset the amount that SCE owed for Hewitt's recordkeeping services.  Under Plaintiffs' theory, certain Plan fiduciaries sacrificed the quality of the investment options made available to the Plan participants in order to maximize the benefit to SCE.

ERISA provides that a "fiduciary must discharge is obligations solely in the interests of the participants and beneficiaries." Cunha v. Ward Foods, Inc., 804 F.2d 1418, 1432 (9th Cir. 1986).  In other words, a fiduciary must "act with complete and undivided loyalty to the beneficiaries of the trust, and with an eye single to the interest of the participants and beneficiaries." Leigh v. Engle, 727 F.2d 113, 123 (7th Cir. 1984) (quotations omitted).  This principle comes from the common law of trusts and has been called the "exclusive benefit" rule. See, e.g., Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co., 555 F. Supp. 257, 259 (D.D.C. 1983); DANIEL FISCHEL & JOHN H. LANGBEIN, ERISA'S FUNDAMENTAL CONTRADICTION: THE EXCLUSIVE BENEFIT RULE, 55 U. CHI. L. REV. 1105, 1128 (1988) [hereinafter THE EXCLUSIVE BENEFIT RULE] ("ERISA's exclusive benefit rule . . . imports into pension fiduciary law one of the most fundamental and distinctive principles of trust law, the duty of loyalty.").

Despite the rule's apparent absolute nature, however, courts have recognized that a fiduciary does not necessarily violate the rule by pursuing a course of action that "incidentally benefits" the plan sponsor.  See, e.g., Morse v. Stanley, 732 F.2d 1139, 1139 (2d Cir. 1984) ("It is no violation of a fiduciary's duties to take a course of

action which reasonably best promotes the interest of the plan participants simply because it incidentally also benefits the corporation."); Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir. 1982); Lynch v. J.P. Stevens & Co., Inc., 758 F. Supp. 976, 999 (D.N.J. 1991) (quoting Morse).  In one prominent case, the Second Circuit stated that "[a]lthough officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it *incidentally benefits* the corporation or, indeed, themselves, their decisions must be made with an eye single to the interests of the participants and beneficiaries." Bierwirth, 680 F.2d at 271 (emphasis added).  Thus, it is not necessarily a breach of fiduciary duty to act in the best interests of both the plan participants and the plan sponsor.  See Siskind v. Sperry Ret. Program, Unisys, 47 F.3d 498, 506 (2d Cir. 1995) (noting that it is not a breach of fiduciary duty to act "in the interest of both the plan's participants and the employer"); Donovan v. Walton, 609 F. Supp. 1221, 1246 (S.D. Fla. 1985) (finding no violation because the decisions were made to "primarily benefit" the participants despite the fact that the union benefitted as well and there was no evidence that the fiduciaries "intended to benefit the Union at the expense of the Fund members").

Indeed, in many circumstances, ERISA contemplates the fact that a fiduciary will "wear two hats," and may have conflicting loyalties. See Cunha, 804 F.3d at 1433 (citing Amato v. Western Union Int'l, Inc., 596 F. Supp. 963, 968 (S.D.N.Y. 1984)); Friend v. Sanwa Bank

California, 35 F.3d 466, 469 (9th Cir. 1994).  However, a conflict of interest is not a per se breach: "nowhere in the statute does ERISA explicitly prohibit a trustee from holding positions of dual loyalties."  Friend, 35 F.3d at 469; see also In re McKesson HBOC, Inc. ERISA Litig., 391 F. Supp. 2d 812, 834 (N.D. Cal. 2005).[15]  Instead, in order to prove a violation of the duty of loyalty, the plaintiff must go further and show "actual disloyal conduct."  McKesson, 391 F. Supp. 2d at 834-35.

Here, there is evidence in the record from which it may be possible to infer that certain fiduciaries chose mutual funds as investment options in order to maximize the pecuniary benefit to SCE, to the detriment of Plan participants.  Plaintiffs have identified certain internal documents, which suggest that those involved in the decisions of which mutual funds to select as investment options were aware of the effect of the revenue sharing on the amount Hewitt billed SCE for its recordkeeping services, and may have even improperly

---

[15] In Bierwirth, the court suggested that there may be circumstances where a conflict of interest is so pronounced that it would be impossible for the fiduciary to act in the best interests of the plan participants.  See 680 F.2d at 272.  There, the court said that, "[l]ooking at the matter realistically, we find it almost impossible to see how [the trustees] . . . could have voted to tender or even sell the Plan's stock, no matter how compelling the evidence for one or the other of those courses might have been."  Id.  Nonetheless, the court did not find that there was a per se breach, but rather that the trustees had acted imprudently in considering the correct course of action.  See id. at 273; see also Leigh v. Engle, 727 F.2d 113, 125 (7th Cir. 1984) ("Where the potential for conflicts is substantial, it may be virtually impossible for fiduciaries to discharge their duties with an 'eye single' to the interests of the beneficiaries, and the fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests.").  Such is not the case here however.

considered the revenue sharing when deciding whether to select certain mutual funds. For example, in one email David Ertel, a member of the Investments Staff, wrote to George Grana, to inform Mr. Grana that he was having Hewitt "look at fund share classes with lower expense ratios (even if there is no revenue sharing)." (Pl.'s Ex. 58.) Mr. Ertel further wrote: "if we delete funds that have a high revenue sharing with one that has none, is that still acceptable on an incremental basis?" (Id.) This email reveals that the existence and amount of revenue sharing offered by the mutual funds was taken into consideration when deciding what funds to add to the menu of investment options made available to Plan participants. When viewed in the light most favorable to Plaintiffs, this email could be interpreted to indicate that there was some hesitancy on the part of the fiduciaries to select mutual funds with lower expense ratios (and lower cost to the Plan participants) because the funds with lower expense ratios may not have offered revenue sharing.

In another email, an employee from Hewitt wrote to another member of the Investments Staff, Marvin Tong, regarding a number of investment options that could be made available to the Plan participants. (Pl.'s Ex. 56.) The employee from Hewitt, Josh Cohen, mentioned that he had "included the expense ratio and revenue sharing for several of the share classes that you will want to consider based on your needs." (Id.) Mr. Cohen further noted that there had been some "revenue sharing issues related to the Templeton Developing Markets Fund," and that Diane Kobashingwa "has been working with Franklin Templeton to resolve the issue." (Id.) Mr. Cohen further added that "[w]hile I

don't think this will have a bearing on your decision to add a Franklin
fund, you may want to let Diane know your intentions to do so." (Id.)
Later in the email thread, Mr. Cohen wrote to Mr. Ertel to recap the
"[c]riteria for selecting mutual funds per discussion with DFW and Mr.
Ertel." (Id.) That criteria included: (1) "[e]xpense ratio is
reasonable [b]etween classes," (2) "Morningstar rating is available,"
(3) "[w]orks in 3 main tracking sites (money.com; yahoo.com;
moneycentral.com)," and (4) "[r]evenue sharing is favorable." (Id.)
Again, this email suggests that the amount of revenue sharing was a
consideration when deciding whether to add a given mutual fund to the
Plan's menu of options.  Viewing the evidence in the light most
favorable to the Plaintiffs, a factfinder might even draw the inference
that revenue sharing was more important than the expense ratio because
the expense ratio was required to be "reasonable," whereas the revenue
sharing was required to be "favorable."

    In addition to these two emails, another fact supporting
Plaintiffs' theory is the arrangement between the Plan, the mutual
funds, and SCE, which created a structural conflict of interest, such
that SCE had an interest in maximizing the amount of revenue sharing
from the mutual funds.  This structural conflict of interest is
revealed in the contract that the SCE Benefits Committee entered into
with Fidelity Investments Institutional Services Company, Inc.
("FIRSCO").  (See Pl.'s Ex. P.)  This contract, the "Plan Expense
Reimbursement Agreement" ("Reimbursement Agreement"), memorializes an
arrangement whereby a portion of the revenue sharing generated from
Fidelity mutual funds was directed to pay for Hewitt's recordkeeping

services.  (Id.)  The Reimbursement Agreement recites that the Plan fiduciary had selected Fidelity mutual funds for inclusion in the Plan, and provides that some of the revenue sharing from the mutual funds would be used to pay for recordkeeping services to the Plan.  (Id.) The Reimbursement Agreement then sets forth a compensation schedule whereby the percentage of the revenue sharing paid to Hewitt increased in direct proportion to the amount of Plan assets that were invested in Fidelity mutual funds.  (Id.)  If the Plan invested $10 to $100 million with Fidelity mutual funds, Hewitt was paid .15% of the average daily balance; if the Plan invested $100 to $200 million with Fidelity, Hewitt was paid .20% of the average daily balance; and if more than $200 million was invested with Fidelity, then Hewitt was paid .25% of the average daily balance.  (Id.)

    This Reimbursement Agreement creates a structural arrangement whereby the amount of revenue sharing generated to offset Hewitt's recordkeeping expenses was directly linked to the type of mutual funds that were chosen for inclusion as Plan investment options.  Indeed, the amount of revenue sharing that SCE received actually increased depending on the amount that Plan participants invested in Fidelity mutual funds.  This structural arrangement gave SCE a financial interest in seeing that the amount of Plan assets invested in Fidelity mutual funds would increase, such that SCE could obtain a larger offset to what it would otherwise owe Hewitt.

    When viewing the emails identified above in combination with the incentive that SCE had to maximize the amount of revenue sharing from certain mutual funds, a rational trier of fact might be able to

conclude that certain fiduciaries elevated the interests of SCE above
those of the Plan participants when deciding which mutual funds to
offer as options to the Plan participants.  One might be able conclude
that those responsible for choosing mutual funds for inclusion in the
Plan were acting to maximize the amount of revenue sharing instead of
fulfilling their duty to provide the Plan participants with the best
investment options.

     While there may be a triable issue in this regard, the Court notes
that a breach of the duty of loyalty is not a necessary conclusion from
this evidence.  Indeed, there may be a perfectly innocent explanation
for some of the evidence, which could lead to the conclusion that the
fiduciaries actually were discharging their duties in the best
interests of both the Plan participants and SCE.  One internal email
communication reveals such a potentially innocent explanation.  (See
Pl.'s Ex. 50.)  In that email Mr. Grana wrote to Barbara Decker, the
Manager of Benefits for SCE, asking for her input on a draft response
to a question posed by Mr. Ertel.  (Id.)  Mr. Grana noted that Mr.
Ertel was "asking for clarification about fund selection and 12b1 fee
offsets."  (Id.)  In a draft response, Mr. Grana wrote that "revenue
sharing arrangements are only considered for fund selection when
competing funds are otherwise comparable – similar strategies,
objectives, performance expectations, expense loading, etc. (i.e. all
other things being equal)."  (Id.)  Mr. Grana concluded by noting that
SCE already factors the revenue sharing into SCE's administrative and
communication budgets and that this information is fully disclosed to
the Plan participants.  (Id.)  Thus, Mr. Grana wrote that "[w]e should

continue to use a share class which offers a reasonable revenue sharing arrangement." (<u>Id.</u>)

Mr. Grana's email appears to convey a theory that revenue sharing could be considered in the mutual fund selection process only when all other relevant investment factors were perfectly equal. That is, there could be no sacrifice in the quality of the investment options, but that if two investment options were perfectly equivalent, then it was permissible to choose the one that generated revenue sharing, which could then be used to offset recordkeeping expenses. As discussed above, there is nothing wrong with a fiduciary taking an action that incidentally benefits the sponsor company, so long as the fiduciary does not benefit the company at the expense of the plan participants. <u>See Morse</u>, 732 F.2d at 1139; <u>Bierwirth</u>, 680 F.2d at 271. If the method outlined by Mr. Grana was in fact how the relevant fiduciaries actually discharged their duties, then the Court would be reluctant to find that a breach of the duty of loyalty occurred.

Plaintiffs contend that further evidence of a breach of the duty of loyalty can be found in the fact that the retail mutual funds selected for inclusion as options for the Plan participants performed worse than the low-cost Russell funds that were previously included in the Plan. Plaintiffs' expert Mr. Pomerantz opines that if the Plan assets had been invested into low-cost Russell funds, the Plan would have saved $11.4 million to $14 million in fees and would have gained an additional $192 million in retirement savings. (Pomerantz Rep. ¶¶ 31, 43.) Plaintiffs contend that this poor performance shows that the fiduciaries were choosing retail mutual funds in order to maximize the

amount of revenue sharing and, at the same time, sacrificing the investment quality.

The Court is not convinced, however, that a comparison between the performance of retail mutual funds actually chosen on the one hand, and the Russell funds that had previously been included in the Plan on the other, is the relevant comparison for these purposes.  This is because there is undisputed evidence that during the course of the 1998 negotiations with the unions, the union representatives (on behalf of the employees) requested that retail mutual funds be made available to Plan participants.  (See Decker Decl., Ex. K, at 1.)  Ms. Decker testified at her deposition that the unions sought name-brand mutual funds, instead of the Russell funds that had previously been included in the Plan.  (See SUF ¶¶ 17-20.)  Mr. Ertel initially presented the unions with a selection of twenty retail mutual funds, but the unions wanted more, and the parties agreed to a selection of forty different retail mutual funds.  (Id. ¶¶ 18, 20.)  Ms. Decker states that she explained the differences between the low-cost Russell funds, and the retail funds, which charged higher fees to the investors.  (Decker Decl. ¶ 9.)   Despite these apparent disadvantages with the retail mutual funds, the union representatives requested that retail mutual funds be included as an investment option for the Plan participants.  (Id.)

In light of the fact that the Plan participants requested retail mutual funds as an investment options, and this was an integral part of the 1998-1999 collective bargaining agreement, there could be no disloyal conduct simply because the Russell funds that had been

included previously outperformed the retail mutual funds that were added.  In fact, in light of these demands from the Plan participants, it could be said that by including retail mutual funds, the Plan fiduciaries were actually fulfilling their duty to act with complete loyalty to their constituents.  The Plan participants made their desires known through their union bargaining representatives, and the Plan fiduciaries executed on those desires.

Particularly relevant to the issue of whether Defendants breached their duty of loyalty here is an article addressing the exclusive benefit rule written by Professors Daniel Fischel and John Langbein, and published in the University of Chicago Law Review.  See THE EXCLUSIVE BENEFIT RULE, 55 U. CHI. L. REV. 1105 (1988).  In the article, the authors express their view that the exclusive benefit rule is essentially a misnomer because it "misdescribes the reality of the modern pension and employee benefit trust" by oversimplifying the many relationships between the parties in interest.  Id. at 1107.  They write that the analogy to a simple trust model is not necessarily accurate because:

> In the employee benefit situation, the settlor's welfare is also maximized if the beneficiaries capture the benefits resulting from the trust.  The difference is that employers and employees act in both capacities.  The trust exists to maximize the joint welfare of both.  Moreover, because the employer and the employees continually monitor the performance of the trustee of an employee benefit plan, there may be less need for strict fiduciary duties that limit the discretion of the trustee to engage in conduct that may be mutually beneficial to both groups.

1  Id. at 1119.

2      In order to deal with some of the tension between the exclusive

3  benefit rule and the fact that, under ERISA, the relevant fiduciaries

4  often have interest in the outcome of the plan, the authors propose

5  that the duty of loyalty be analyzed from an ex ante, rather than

6  purely from an ex post perspective.  Id. at 1127.  They note that when

7  an fiduciary's action is examined from the ex post perspective, "a rule

8  allowing the employer's representative to make decisions on behalf of

9  the trust appears to be inconsistent with the exclusive benefit rule,"

10 because oftentimes, it appears that the action taken in fact benefitted

11 the employer.  Id.  If, however, the same action is viewed from the ex

12 ante perspective, and the question is posed in terms of what the

13 parties would have agreed to had they bargained beforehand, the authors

14 argue that this apparent inconsistency abates.  Id.

15     Analyzing the Second Circuit's decision in Bierwirth, the authors

16 argue that Judge Friendly "attempted to reconcile the exclusive benefit

17 rule with the nonneutral fiduciary [principle] by downplaying the

18 conflict," and by characterizing the benefit to the employer as

19 "incidental."  Id.  The authors write:

20     The device of characterizing the benefit to the employer as

21     "incidental" misses the point by confusing the ex ante and ex post

22     perspectives.  The relevant question is not whether the trustee's

23     conduct creates only an "incidental" benefit to the employer ex

24     post, a difficult and ultimately futile inquiry.  Rather, the

25     relevant question is whether the trustee's conduct is consistent

26

27

1   with the understanding that the employees and the employer would

2   have reached had they bargained over the issue ex ante.

3   Id. at 1128.

4       The authors do not fault Judge Friendly for the resulting

5   doctrinal confusion: "That so distinguished a jurist as Judge Friendly

6   could find no better rationale for self-interested behavior by

7   nonneutral fiduciaries than to call it incidental is a measure of the

8   power of the exclusive benefit rule to mislead courts about the reality

9   of pension and benefit plans." Id. Thus, the authors argue that by

10  shifting perspective from the ex post analysis to the ex ante analysis,

11  much of the confusion with regard to the meaning of the exclusive

12  benefit rule can be avoided. Id.

13      This thesis is especially relevant here because when applying the

14  ex ante perspective, instead of asking whether SCE incidentally

15  benefitted from the inclusion of retail mutual funds, the question is

16  whether the parties would have agreed beforehand to include retail

17  mutual funds that generated revenue sharing.  Indeed, not only is there

18  evidence that the parties *would have* agreed to the inclusion of retail

19  mutual funds, but that they *actually* agreed to their inclusion.  Thus,

20  under this rubric, the fiduciaries should not be liable for including

21  retail mutual funds because the Plan participants actually wanted

22  retail mutual funds.

23      This is consistent with Ninth Circuit law in this area, which

24  states that "ERISA does not create an exclusive duty to maximize

25  pecuniary benefits" to the Plan participants. See Collins, 144 F.3d at

26  1282.  The Court is not aware of any rule under ERISA that says a Plan

27

fiduciary must disregard Plan participants' wishes for certain investment options simply because better investment options may be available.  So long as the participants' requests are reasonable, a Plan fiduciary should not be liable for breach of fiduciary duty simply by offering an investment option that the Plan participants desire.[16]

Thus, the relevant inquiry does not appear to be the quality of the Russell funds versus the retail mutual funds that were included in the Plan.  Rather, it appears that the relevant inquiry is between the quality of the retail mutual funds that were included in the Plan, versus other comparable retail mutual funds that were available and that did not offer revenue sharing.  The evidence in this regard is not entirely clear on the current record.

Another particularly relevant indicator that appears to be missing is a comparison between the expense ratios of the mutual funds that were included in the Plan versus the expense ratios of other mutual funds.  Especially relevant in this regard would be whether the funds that did not offer revenue sharing had lower expense ratios than those included in the Plan.  Although the Plan participants may have asked for retail mutual funds, it is unlikely that they specifically asked for retail mutual funds that generated revenue sharing.  Thus, if it were to turn out that the mutual funds that offered revenue sharing had higher expense ratios, and those funds were chosen for selection over funds that did not offer revenue sharing and had lower expense ratios,

---

[16] There could be circumstances where an investment option requested by the participants is so clearly imprudent that to include it in the plan would constitute a breach of fiduciary duty.  Including an array of commonly used retail mutual funds, however, is not such a situation.

then this could be evidence that investment selections were being made to maximize the benefit to SCE instead of to the Plan participants.

Even if the retail mutual funds that were included in the Plan performed more poorly than other mutual funds or had higher expense ratios, these facts alone would not be sufficient to show a breach of the duty of loyalty.  Plaintiffs will have to go further and show that the Defendant fiduciaries chose a weaker retail mutual fund over a stronger retail mutual fund, *because of* the fact that the weaker retail mutual fund offered revenue sharing and the stronger retail mutual fund did not.  See McKesson, 391 F. Supp. 2d at 834 (noting that a breach of the duty of loyalty requires "actual disloyal conduct").  In the Court's view, it is only under such circumstances that a breach of the duty of loyalty would be shown.

Whether Defendants disclosed the revenue sharing arrangement to the Plan participants may also be circumstantial evidence of whether the fiduciaries acted in the best interests of the Plan participants. The Ninth Circuit has said that one component of a fiduciary's "core obligation" under § 1104(a)(1)(A) is "the duty not to make affirmative material misrepresentations to plan participants." Mathews v. Chevron Corp., 362 F.3d 1172, 1180 (9th Cir. 2004).  To the extent that a fiduciary does not disclose what he or she is doing with the plan assets, or actively conceals such information, the inference may be drawn that the fiduciary is not acting in exclusively in the plan participants' best interests.  See id. at 1182.

The undisputed evidence on this score, however, shows that Defendants disclosed the fact that revenue sharing from the mutual

funds was being used in order to offset Hewitt's recordkeeping costs. During the collective bargaining process with the unions, Ms. Decker personally walked the union representatives through the process by which revenue sharing would be used to pay for recordkeeping expenses. (SUF ¶ 38.)  Indeed, on approximately seventeen different occasions since 1999, Defendants disclosed to the Plan participants through SPDs and other informational documents that revenue sharing from the mutual funds was being used to offset Hewitt's recordkeeping expenses.  (Id. ¶ 32.)  In light of these undisputed facts, Plaintiffs are unlikely to gain much traction by arguing that the revenue sharing was concealed.

There is one final reason why the evidence in the record suggesting that revenue sharing was considered in choosing mutual funds does not necessarily lead to the conclusion that the fiduciaries breached their duty of loyalty.  Nearly all of the internal emails identified above involved members of the Investments Staff.  The Investments Staff, however, did not have final say over whether a certain mutual fund was approved for inclusion in the Plan – those decisions were made by the TIC or Sub-TIC.  (See Pl.'s Supp. Brief, at 1.)  It is unclear to what extent and how members of the TIC or Sub-TIC considered revenue sharing when making their final decisions. Furthermore, it is possible that the Investments Staff played such a predominant role in the mutual fund selection process, that by the time the options were presented to the TIC or Sub-TIC, they were only presented with mutual fund options that offered revenue sharing.  It is unclear whether the TIC or Sub-TIC ever considered investment options that were not put forth by the Investments Staff or whether the options

presented by the Investments Staff included mutual funds with no revenue sharing.[17]

In sum, the Court finds that certain internal communications, when viewed in the light most favorable to Plaintiffs, could be interpreted as revealing that individuals involved in the mutual fund selection process were impermissibly considering revenue sharing when deciding which mutual funds would become investment options for the Plan participants.  These emails in combination with the existing structural conflict of interest, whereby SCE directly benefitted from the selection of mutual funds that offered revenue sharing, create a triable issue as to whether certain fiduciaries acted disloyally when choosing certain mutual funds.  On the other hand, however, the evidence does not necessarily lead to the conclusion that there was a breach of the duty of loyalty.  Indeed, some of this evidence suggests that the fiduciaries were selecting funds for the permissible purpose of benefitting both the Plan participants and SCE.  Thus, it will be necessary to receive further evidence and to hear testimony from the relevant fiduciaries in order to determine whether they actually acted disloyally when making investment decisions for the Plan.

Defendants contend that the Seventh Circuit's decision in Hecker involved similar facts to our case, and there the court dismissed the plaintiff's case at the pleading stage.  See 556 F.3d at 597.  Indeed, in Hecker there was some mention of an arrangement whereby the plan sponsor, Deere & Company, used revenue sharing from the mutual funds in

---

[17] There may also be an issue with regard to whether the Investments Staff was a fiduciary depending on how much control it had over the investment selection process.

order to pay for certain administrative costs.  Id.  The court noted that the amount that Deere paid for administrative costs "decreased over time," as the plan administrator recovered most of its costs from the plan participants apparently through revenue sharing.  Id.  The court summarily dismissed any notion that such an arrangement could form the basis for a breach of fiduciary duty, stating that the plaintiffs' "case depends on the proposition that there is something wrong, for ERISA purposes, in that arrangement."  Id.  The Seventh Circuit agreed with the district court, however, and found that "such an arrangement (assuming at this stage that the Complaint accurately described it) violates no statute or regulation."  Id.  The court then went on to analyze the allegations in the complaint under a misrepresentation or failure to disclose theory of breach of fiduciary duty.  Id.  The court noted that the plaintiffs "feel misled because the SPD supplements left them with the impression that Deere was paying the administrative costs of the Plans, even though in reality the participants were paying through the revenue sharing system we have described."  Id.  The court found that the revenue sharing arrangement had been fully disclosed and that, while Deere may not have been behaving admirably by creating the impression that it was paying the administrative costs, the complaint did "not allege any particular dollar amount that was fraudulently stated."  Id.  Thus, the court found that there had been no intentionally misleading statement or material omission that could have formed the basis for liability.  Id.

The Court's decision in this case is consistent with the Seventh Circuit's opinion in Hecker.  The Court agrees with the Seventh Circuit

that there is nothing inherently wrong with using revenue sharing from mutual funds in order to offset some of the administrative costs that might otherwise be borne by the plan sponsor.  The problem occurs only when the relevant fiduciaries make investment decisions not because they are in the best interest of the Plan participants, but in order to maximize the amount of revenue sharing that is generated for the benefit of the plan sponsor.  Apparently no such allegation was made in Hecker because the court analyzed the case purely under a failure to disclose theory.  This case, however, is not simply about whether a conflict of interest was disclosed or not.  Rather, the issue is whether the relevant fiduciaries were actually acting in the best interests of the Plan participants.  As discussed above, there is evidence in this case that could reasonably be interpreted as demonstrating that such a breach of the duty of loyalty actually took place.  Thus, while this case is consistent with Hecker, at the same time it includes an additional allegation of disloyal conduct (arguably supported by some evidence) that was not addressed in Hecker.[18]

Furthermore, Plaintiffs' claims for breach of the duty of loyalty appear not to be barred in full by the statute of limitations because there was an independent breach each time a fiduciary chose a mutual fund for inclusion in the Plan in order to maximize revenue sharing to

---

[18] This case is also distinguishable as well from Taylor v. United Technologies Corp., 2009 WL 535779 (D. Conn. 2009).  There, the court granted summary judgment for the defendant in part because "plaintiffs['] evidence fails to evince that defendant was motivated by a potential discount to its recordkeeping fee when it selected three Fidelity mutual funds."  Id. at *10.  By contrast, here, there is some evidence that could be interpreted to reveal that the fiduciaries were motivated by the discount to the recordkeeping fee.

the detriment of the Plan participants.  Thus, to the extent that such decisions were made after August 16, 2001, these claims would not be barred by the statute of limitations.

### 2.  § 1104(a)(1)(B)

Plaintiffs contend that many of the investments options given to Plan participants were imprudently selected and/or imprudently managed. Section 1104(a)(1)(B) provides that a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  Id.

"When applying the prudence rule, the primary question is whether the fiduciaries, 'at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'"  California Ironworkers Field Pension Trust v. Loomis Sayles & Co., 259 F.3d 1036, 1043 (9th Cir. 2001) (quoting Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983)); see also Wright, 360 F.3d at 1097 (quoting Mazzola). Whether a fiduciary acted prudently cannot be measured solely from the perspective of hindsight; rather, the question is whether the fiduciary conducted himself in the appropriate manner and considered the appropriate factors when making his decisions.  See DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 424 (4th Cir. 2007); Kanawi v. Bechtel Corp., 590 F. Supp. 2d 1213, 1230 (N.D. Cal. 2008) ("Of course, the

test of prudence is one of conduct and not performance . . . .   It is easy to opine in retrospect that the Plan's managers should have made different decisions, but such 20/20 hindsight musings are not sufficient to maintain a cause of action alleging a breach of fiduciary duty.").

The DOL has issued regulations outlining what factors a fiduciary should consider in order to make a prudent investment decision.   The regulation states that a fiduciary discharges his fiduciary duties if the fiduciary:

Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in the portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and . . . has acted accordingly.

29 C.F.R. § 2550.404a-1(b)(1).

The regulation goes on to state that "appropriate consideration" shall include, but is not necessarily limited to:

(i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain

(or other return) associated with the investment or investment
course of action, and

(ii) Consideration of the following factors as they relate to such
portion of the portfolio:

> (A) The composition of the portfolio with regard to
> diversification;
> (B) The liquidity and current return of the portfolio
> relative to the anticipated cash flow requirements of the
> plan; and
> (C) The projected return of the portfolio relative to the
> funding objectives of the plan.

Id. § 2550.404a-1(b)(2).

Plaintiffs challenge the following investment decisions: (1) the
decision to include retail mutual funds as an investment option; (2)
the decision to include certain sector-specific mutual funds, and
failure to remove them once they began to underperform; (3) the
decision to include a money market fund rather than a stable value
fund; and (4) the allegedly poor management of the Edison stock fund.

### a.  Retail Mutual Funds

Plaintiffs contend that Defendants breached their fiduciary duties
by including retail mutual funds as investment options for the Plan
participants.  Plaintiffs contend that the decision to include retail
mutual funds is nearly per se imprudent, because retail mutual funds

deduct more fees and expenses from the investment assets than other low-cost alternatives.

Plaintiffs' critique of the mutual funds, however, is largely based on an ex post examination of how they performed in comparison to the Russell funds that had previously been included in the Plan.  For example, Plaintiffs' expert opines that the comparable Russell funds outperformed the retail mutual funds by $187.2 million during the relevant time period.  (Pomerantz Rep. ¶ 43.)

First, the reliability of this expert opinion is questionable because Mr. Pomerantz does not explain how he determined what were "comparable" Russell funds for the purpose of determining the mutual funds' underperformance.  (See Def.'s Mot. to Exclude Pomerantz Rep., at 10.)  Even assuming the reliability of Mr. Pomerantz's methodology, however, the Court finds that the relevant comparison here is not to the Russell funds that were previously included in the Plan.  As discussed earlier, the primary reason for including the retail mutual funds was the fact that the Plan participants expressed a desire to have such options during the collective bargaining process.  The undisputed evidence reveals that union representatives requested a total of forty name-brand retail mutual funds for inclusion in the Plan.  (SUF ¶¶ 17-20.)  Plaintiffs suggest that it was imprudent for Defendants to have complied with the union's demands, and should have denied the request for retail mutual funds.  There is nothing wrong, however, with a fiduciary giving Plan participants the reasonable investment options that they seek.[19]  Indeed, there is no requirement

---

[19] See supra note 16.

that fiduciaries override the wishes of the participants, especially under circumstances such as this, where retail mutual funds are common investment options available to the public at large.  See Collins, 144 F.3d at 1282 ("ERISA does not create an exclusive duty to maximize pecuniary benefits.").

Given that the Plan participants requested the inclusion of retail mutual funds, in order to prove underperformance, Plaintiffs would have to show that the retail mutual funds that were actually chosen for inclusion in the Plan underperformed as compared to other retail mutual funds that were available on the market.  Plaintiffs have not identified any evidence in this regard.  Indeed, Mr. Pomerantz's report focuses exclusively on a comparison of the retail mutual funds to "comparable" Russell funds.  (Pomerantz Rep. ¶ 43.)  Mr. Pomerantz does not explain whether, at the time the retail mutual funds were chosen for selection in the Plan, Russell funds had historically outperformed retail mutual funds, and if so, to what extent.  Thus, Plaintiffs have not met their burden to create a triable issue as to underperformance.

Even assuming that the retail funds underperformed, however, underperformance alone is insufficient to show a breach of the duty of prudence.  In Kanawi, the court rejected the plaintiff's claim that the inclusion of certain mutual funds were imprudent based in part on evidence that certain funds had underperformed.  590 F. Supp. 2d at 1229.  The court noted that despite the underperformance, the plan offered six different investment options at various levels of risk, the plan's structure was comparable to other defined contribution plans, the fiduciaries regularly reviewed the investment options and

considered alternatives, and the overall performance of the mutual funds were competitive with the industry standard.  Id. at 1230.

The evidence shows that these same factors are present here.  The Plan offered a wide variety of investment options including the forty retail mutual funds, along with three pre-mixed portfolios, commingled funds (including stock index funds), the Edison stock fund, and a money market fund.  (See SUF ¶¶ 24-26.)  Furthermore, the evidence reveals that the Plan was comparable to other defined contribution plans, which also regularly include retail mutual funds.  (See Peavy Rep., Ex. 5.)  The undisputed evidence also reveals that the fiduciaries regularly reviewed the mutual funds included in the Plan, and in fact removed certain funds when their performance was in question.  (See SUF ¶¶ 54-59, 61-68.)  Finally, the overall performance of the mutual funds compared favorably to other benchmarks.  (Peavy Rep. ¶¶ 79-87.)  Thus, Plaintiffs' claim that it was generally imprudent to include retail mutual funds as investment options is rejected.

Furthermore, the evidence shows that certain low-cost Russell funds were retained as part of the investment options given to Plan participants during the relevant time period.  Even after the retail mutual funds were added to the Plan, the various Russell index funds were included in the Plan, which gave the participants a low-cost alternative to the retail mutual funds.  (See Niden Rep., Ex. C.)  Thus, Plan participants had the option of investing in a low-cost Russell fund if they wished, and certainly were not compelled to invest in the retail mutual funds.

Plaintiffs also challenge the decision to include retail mutual funds because of the amount of fees that the retail mutual funds charged.  Plaintiffs contend that the Plan could have saved anywhere from $11 million to $15 million in fees alone by investing in a lower cost investment option.  (See Pomerantz Rep. ¶ 31.)  Again, Mr. Pomerantz focuses solely on an examination of the retail mutual funds as compared to the Russell funds.  (Id.)  As explained earlier, however, this is not the relevant comparison.  Plaintiffs have not identified any evidence comparing the fees charged by the retail mutual funds actually included in the Plan, with other retail mutual funds in the market.

Furthermore, in Hecker, the Seventh Circuit rejected a similar argument noting that the mutual funds selected for inclusion had a "wide range of expense ratios," from .07% at the low end, to 1% at the high end.  556 F.3d at 586.  The court also noted that all of the funds were offered to investors in the general public, and so the expense ratios were set against the backdrop of market competition.  Id.  The court concluded that "[t]he fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  Id.

Here, the funds included as options for the Plan participants had expense ratios from .03% at the low end, to 2% at the high end.  (See Niden Rep., Ex. C.)  In light of this broad range of expense ratios, the fact that funds with lower expense ratios could have been chosen,

is not especially persuasive.  Thus, Plaintiffs' claim that it was imprudent to select funds with such high fees is rejected.

Thus, Defendant's Motion for Summary Judgment is granted with regard to Plaintiffs' claim that it was imprudent to include retail mutual funds as investment options.

### b.  Sector Funds

Plaintiffs argue that it was generally imprudent for Defendants to add sector funds in 1999, and also that one fund in particular, the T. Rowe Price Science & Technology Fund, was an imprudent investment decision.  As to the first, the evidence shows that sector funds are a common component of many defined contribution plans.  (See Peavy Rep. ¶ 28 (noting that 30% of 401(k) plans offer sector-specific funds).)  Furthermore, the evidence reveals that the Plan participants demanded sector funds during the 1999 collective bargaining process.  (SUF ¶ 20.)  Thus, it is not imprudent under these circumstances to include sector funds as options for the Plan participants.

Plaintiffs are highly critical of the T. Rowe Price Science & Technology Fund.  Plaintiffs argue that it performed poorly for the three years before it was selected for inclusion in 1999, and that during the time that it was included as an investment option, its Morningstar rating dropped from four to two stars.  The evidence reveals, however, that although the Science & Technology Fund had experienced subpar returns in recent years, its ten-year performance rating was strong at the time it was selected.  (SUF ¶ 71.)  Indeed,

the Investments Staff appropriately relied on its four-star Morningstar rating when making its decision to offer the fund as an investment option.  (See id.)

As to the fund's subsequent performance, the evidence shows that once the Science & Technology Fund's performance began to deteriorate, it was placed on a watch list, participants were no longer allowed to invest new money into the fund, and it was ultimately removed from the Plan in 2003.  (See id. ¶¶ 73, 74.)  These management decisions reveal that the relevant fiduciaries chose and then managed the Science & Technology Fund in a prudent manner.

Plaintiffs argue that it took too long to remove the Science & Technology Fund from the Plan, and the reason for the delay was the fact that SCE was receiving revenue sharing from T. Rowe Price in connection to this fund.  Plaintiffs, however, have not presented any evidence to support this theory that retaining the fund was due to a conflict of interest.  None of the evidence cited earlier with regard to the possible selection of funds based on revenue sharing pertained specifically to this fund.  Therefore, Defendants' Motion for Summary Judgment is granted with respect to the claim for imprudent selection and management of the Science & Technology Fund.

### c.  Money Market

Plaintiffs contend that it was imprudent for Defendants to include a money market fund rather than a "stable value fund."  A "stable value fund" is a fund that seeks to provide income while at the same time

preventing price fluctuations. (See Peavy Rep. ¶ 53.) Most often, these funds consist of a diversified portfolio of bonds. (Id.) Plaintiffs argue that a stable value fund would have saved the Plan $2.1 million in fees and would have provided greater return to the Plan participants.

The undisputed evidence, however, reveals that Defendants considered the possibility of including a stable value fund, but instead decided on a money market because the money market fund would provide more consistent returns and have lower risk. (Eastus Decl., Ex. E, at 126-28.) Indeed, Defendants' expert states that in 2005 and 2006, 58% of defined contribution plans offered a money market fund. (Peavy Rep. ¶ 50.) A 2008 survey shows that 40% of funds offer only a money market fund, and no stable value fund. (Id.)

Plaintiffs argue that there is a question of fact as to whether Mr. Ertel ever actually considered including a stable value fund. Plaintiffs cite to an email from Pam Hess at Hewitt from 2007, in which Ms. Hess writes: "Now, I still want to make a plea for stable value!" (Pl.'s Ex. 87.) This email, however, actually supports Defendants' position because it suggests that there had been discussions between Ms. Hess and Mr. Ertel regarding the inclusion of a stable value fund. Plaintiffs also claim that there was no evidence that the possibility of including a stable value fund was ever brought to the attention of the TIC or Sub-TIC. Simply because the issue was not raised before the committees, however, does not create a triable issue of fact as to whether Mr. Ertel considered a stable value fund as an investment option. Rather, the undisputed evidence reveals that Mr. Ertel did

consider such an option, and based on the risk and return involved with such a stable value fund, he decided that a money market fund would be a better option.  Indeed, the evidence shows that the money market fund performed satisfactorily over the relevant time period.  (SUF ¶ 101.) Thus, Defendants' Motion for Summary Judgment with regard to the prudence of the money market fund is granted.

### d.  Edison Stock Fund

Plaintiffs also challenge the decision to structure the Edison stock fund as a unitized fund instead of a direct ownership fund, which allegedly resulted in the Edison stock fund holding too much cash.  The sale of a share of common stock typically does not settle until three days after the sale.  (See id.  ¶ 110.)  With a unitized stock fund, however, the Plan participants are allowed to essentially settle their stock trades within one business day, but as a result, the fund has to carry cash in order to cover those sales.  (See id.  ¶ 109.)  Holding a certain level of cash in the fund instead of investing it in stock, typically leads to some loss in return to the participants.  Plaintiffs rely on the expert opinion of Ross Miller, who opines that structuring the Edison stock fund as a unitized fund resulted in a loss of approximately $118 million in underperformance.  (Miller Rep., at 1.)

Here, the undisputed evidence reveals that the Plan participants wanted the ability to execute faster trades in Edison stock.  (SUF ¶ 11.)  Indeed, offering faster trades was expressly included as one of the additional terms to the Plan as a result of the collective

bargaining process.  (Decker Decl., Ex. K.)  Moreover, the Plan
fiduciaries monitored the amount of cash that was being held in the
Edison stock fund and made needed adjustments accordingly.  (SUF ¶
111.)

Two recent cases are relevant to this analysis.  First, in <u>Taylor
v. United Technologies Corp.</u>, 2009 WL 535779 (D. Conn. 2009), the court
rejected the plaintiffs' challenge to cash held in a unitized stock
fund.  The court found that the decision to provide a unitized stock
fund was not imprudent because "[a]lthough an expert may have proposed
a better alternative to UTC's unitized stock plan, UTC was not
obligated to proceed with that alternative since its decision to
proceed with the extant unitized stock plan was prudent."  <u>Id.</u> at *9.
The court further found that the defendants had evaluated and monitored
the amount of cash necessary to cover the sales of stock without having
a significantly adverse impact on the fund's returns.  <u>Id.</u>  The court
noted as an example one instance where, when faced with concerns of a
large stock sell-off the fiduciaries increased the amount of cash, only
to reduce the level of cash in the fund.  <u>Id.</u>  The court concluded that
"[t]he fact that plaintiffs may have been able to enjoy a greater Fund
performance without a cash retention is not sufficient to support a
claim of fiduciary breach where a defendant has engaged in prudent
analysis of its decision."  <u>Id.</u>

Similarly, here, the evidence shows that the Edison Stock Fund was
structured as a unitized fund in order to give the Plan participants
the ability to make faster trades.  Furthermore, the relevant
fiduciaries monitored the amount of cash in the Edison Stock Fund in

order to make sure that it was not holding more than was required at any given time.  For example, in July 2004, the issue of how much cash should be held in the Edison Stock Fund was raised at a Sub-TIC meeting.  (Ertel Decl., Ex. N.)  In light of the fact that there had been decreased levels of active trading in the Edison Stock Fund, the Sub-TIC reduced the cash target within the fund to four percent.  (Id.)  Thus, the evidence reveals that Defendants prudently managed the amount of cash that was in the Edison Stock Fund.

In Abbott v. Lockheed Martin Corp., 2009 WL 839099 (S.D. Ill. 2009), the court found a triable issue of fact as to whether the amount of cash held in the plan's unitized stock fund was prudent.  There was evidence that the amount of cash held in the fund "actually exceeded the 10% ceiling" that had previously been established in order to minimize the amount of cash in the fund.  Id. at *12.

Unlike Abbott, however, Plaintiffs have not identified any comparable evidence that the fiduciaries held more cash than was permitted under the Plan.  Instead, the evidence shows that the fiduciaries monitored the amount of cash and made adjustments when needed in order to accommodate the trading needs of the Plan participants.

Defendants' expert, Mr. Peavy, makes another point with regard to the benefits of having a unitized stock fund that carries some cash.  (Peavy Rep. ¶ 57.)  A unitized stock fund only underperforms if the value of the stock is increasing at a rate greater than the rate of return of the money market fund in which the cash is being held.  (Id.)  If, however, the value of the stock is on the decline or increasing at

a slower rate that the money market fund, the unitized stock fund will
actually outperform the Edison stock.  (Id.)  Thus, when deciding
whether to include a unitized stock fund, the fiduciaries could not be
sure that including a unitized fund would either benefit or harm the
Plan participants.  In fact, the inclusion of the unitized stock fund
could be considered a more conservative, and therefore prudent,
decision because having some cash component can actually decrease the
volatility of the fund.  (Id.)

Thus, Defendants' Motion for Summary Judgment with regard to the
prudence of the Edison Stock Fund is granted.


### 3.   Statute of Limitations


As an independent basis, Plaintiffs' claims for breach of the duty
of prudence are barred in many respects by the six year statute of
limitations, which began on August 16, 2001.  For example, it is
undisputed that the initial decision to add retail mutual funds,
including the sector funds, as an option in the Plan was made in 1999
and 2000.  (See Decker Decl., Ex. K.)  Mr. Ertel made the decision to
maintain the Money Market Fund instead of use a stable value fund in
1999.  (Eastus Decl., Ex. E, at 127.)  Furthermore, the Edison Stock
Fund was established as a unitized stock fund as early as January 25,
2001.  (See Peavy Rep. ¶ 60.)  Thus, the prudence claims arising out of
these decisions are barred by the statute of limitations.

///

///

### 4.  Safe Harbor – § 1104(c)

Defendants contend that Plaintiffs' claims for breach of fiduciary duty pursuant to § 1104(a) are barred by the safe harbor provision found at § 1104(c).  The safe harbor provides as follows:

> (1)(A)  In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account . . . –
>
> . . .
>
> (ii)  no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control . . . .

29 U.S.C. § 1104(c)(1)(A).

"The safe harbor provided by § 1104(c) is an affirmative defense to a claim for breach of fiduciary duty under ERISA." Hecker, 556 F.3d at 588.  In order for the safe harbor defense to apply, several different factors must be present.  First, the participant must have the right to exercise independent control over the assets in his or her account and must in fact exercise such control.  29 C.F.R. § 2550.404c-1(b)(1).  Next, the participant must be able to choose from a broad range of investment alternatives, which requires at least three investment options and the plan must permit the participant to given instructions to the plan with respect to those options once every three

months.  Id. § 2550.404c-1(b)(2).  Third, the participant must be given or have the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan.  Id.  Nine criteria must be met before the participant will be considered to have sufficient investment information.  Id.  These include (1) clear labeling of the plan as a § 1104(c) instrument, (2) a description of the investment alternatives available, (3) identification of designated investment managers, (4) explanation of how to give investment instructions, (5) a description of any transaction fees and expenses that affect the participant's balance in connection with purchases of sales of interests, (6) relevant names and addresses of plan fiduciaries, (7) special rules for employer securities, (8) special rules for investment alternatives subject to the Securities Act of 1933, and (9) material related to voting, tender, or other rights incidental to the holdings in the account.  Id.

        Even if all of these conditions are satisfied, there has been some dispute as to whether this safe harbor protects a fiduciary from his or her own imprudent or disloyal actions in connection with a plan.  The DOL has taken the position that § 1104(c) does not shield a fiduciary from liability for claims of imprudent or disloyal selection of investment options.  See Kanawi, 590 F. Supp. 2d at 1232.  Several courts have followed the DOL's lead and refused to apply the § 1104(c) safe harbor under such circumstances.  See, e.g., DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 418 n.3 (4th Cir. 2007); id.  In Kanawi, the court followed the DOL's interpretation noting that it comports with commonsense because "[w]here the options available to participants

are tainted by conflicts of interest or imprudent management, a party

should not be able to avoid liability simply by providing participants

the opportunity to exercise control over their accounts."  590 F. Supp.

2d at 1232.

In Hecker, however, the Seventh Circuit suggested that in some

circumstances, it may be appropriate for the § 1104(c) safe harbor to

completely shield fiduciaries from liability, even in the face of

imprudent and/or disloyal management.  556 F.3d at 589.  There, the

plan participants were offered a menu of 26 different investment

options, which included 23 mutual funds.  Id. at 578.  In addition, the

plan also provided a "mutual fund window" that made available 2,500

additional mutual funds to the participants.  Id.  In considering the §

1104(c) safe harbor, the court said that "[e]ven if § 1104(c) does not

always shield a fiduciary from an imprudent selection of funds under

every circumstance that can be imagined, it does protect a fiduciary

that satisfies the criteria of § 1104(c) and includes a sufficient

range of options so that the participants have control over the risk of

loss."  Id. at 589.  Thus, because the plan included the mutual fund

window that made 2,500 additional mutual funds available, the court

found that "[a]ny allegation that these options did not provide the

participants with a reasonable opportunity to accomplish the three

goals outlined in the regulation, or control the risk of loss from fees

is implausible."  Id.

In the Seventh Circuit's decision denying the petition for

rehearing en banc, the court appeared to limit somewhat the breadth of

its earlier ruling.  See Hecker v. Deere & Co., __ F.3d __, 2009 WL

1797441, at *1 (7th Cir. 2009).  The court noted the DOL's concern that "our opinion could be read as a sweeping statement that any Plan fiduciary can insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." Id. at *2.  The Seventh Circuit disavowed any endorsement of such a result, which could lead to approval of obvious and reckless imprudence in the selection of investments. Id.  Instead, the court noted that in the complaint, the plaintiffs never alleged that any of the 26 options in the plan, or the 2,500 options offered through the mutual fund window, were unsound or reckless. Id.  Thus, the court concluded that "*this* complaint, alleging that Deere chose *this* package of funds to offer for its 401(k) Plan participants, with this much variety and this much variation in associated fees, failed to state a claim upon which relief can be granted." Id. (emphasis in original).

As the court made clear in Hecker, especially in its order denying rehearing en banc, the facts of that case were quite unique because the plan offered the participants a choice of 2,500 mutual fund options with a wide range of fees.  By contrast, however, here the Plan included only forty different mutual funds.  Thus, this case does not justify the same broad application of the safe harbor provision as the Seventh Circuit used in Hecker.

Instead, because this case involves a possible breach of the duty of loyalty, the better view is that expressed by other courts, and supported by the DOL, that the fiduciaries should not be shielded from liability for offering the participants investment options that are the

result of a conflict of interest.  See DiFelice, 497 F.3d at 418 n.3; Kanawi, 590 F. Supp. 2d at 1232.  Thus, under these circumstances, the Court finds that the § 1104(c) safe harbor does not apply.

**IV.  CONCLUSION**

     For the reasons stated above, Plaintiffs' Motion for Partial Summary Judgment is DENIED.  Defendants' Motion for Summary Judgment is GRANTED with regard to all claims except (1) Plaintiffs' prohibited transaction claims arising out of State Street's retention of float, and (2) whether the Defendant fiduciaries breached their duty of loyalty by choosing retail mutual funds in order to maximize the amount of revenue sharing at the expense of the Plan participants.  Plaintiffs are ORDERED to file a supplemental brief further detailing their prohibited transaction claims based on State Street's retention of float.  Plaintiffs shall identify with specificity the transactions at issue and which fiduciary was allegedly responsible for such conduct.  Plaintiffs' supplemental brief shall not exceed seven (7) pages and shall be filed by noon on July 24, 2009.  Defendants shall file a seven page (7) response brief by July 29, 2009.  The parties shall not submit any additional evidence but must cite with specificity to the record already before the Court.

     IT IS SO ORDERED.

DATED: July 16, 2009

                                    STEPHEN V. WILSON
                                    UNITED STATES DISTRICT JUDGE