ORIGINAL

JEROME J. SCHLICHTER (SBN 054513)
jschlichter@uselaws.com
NELSON G. WOLFF (admitted *pro hac vice*)
nwolff@uselaws.com
JASON P. KELLY (admitted *pro hac vice*)
jkelly@uselaws.com
SCHLICHTER, BOGARD & DENTON
100 South Fourth Street, Suite 900
St. Louis, MO 63102
Telephone:  (314) 621-6115
Facsimile:  (314) 621-7151

*Lead Counsel for Plaintiffs*

WILLIAM A. WHITE (SBN 121681)
wwhite@hillfarrer.com
HILL, FARRER & BURRILL LLP
One California Plaza, 37th Floor
300 South Grand Avenue
Los Angeles, CA 90071-3147
Telephone: (213) 620-0460
Facsimile:  (213) 620-4840

*Local Counsel for Plaintiffs*

FILED
CLERK, U.S. DISTRICT COURT
OCT 1 4 2009
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLENN TIBBLE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EDISON INTERNATIONAL, *et al.*, <br><br> Defendants. | Case No. CV07-05359 SVW (AGRx) <br><br> **L.R. 43-1 DECLARATION OF STEVEN POMERANTZ, Ph.D.** <br><br> Pretrial Conference: October 5, 2009 <br><br> Trial Date:  October 13, 2009 <br><br> Judge: Hon. Stephen V. Wilson |

DECLARATION OF STEVEN POMERANTZ, PH.D.

## DECLARATION OF STEVEN POMERANTZ, Ph.D.

I, Steven Pomerantz, being of lawful age, hereby declare the following statements of fact and professional opinion:

### Qualifications:

1. I have been retained by Plaintiffs' counsel to provide expert testimony concerning matters raised in the management of the Southern California Edison Savings Plan (the "Plan").

2. I hold a Ph.D. in mathematics from the University of California at Berkeley (1986) and have taught courses in finance, operations research, statistics, and probability at the undergraduate and graduate levels.

3. I have over 20 years of experience in the investment community, including in the fields of investment research, financial modeling, derivative structuring, portfolio and risk management. I have managed fixed income and equity institutional account portfolios, including mutual funds and money market funds.

4. I have held positions in research and management for fixed income, equities, derivatives and alternative investments at several major investment management firms including Weiss Peck and Greer, New York Life Investment Management, Citibank, and Morgan Stanley. I have provided portfolio management services for mutual funds and institutional accounts. I have offered investment and asset allocation advice to a wide range of clients, including high net worth individuals and very large institutional clients (such as defined benefit, defined contribution, endowments, and insurance plans), which had several billion dollars in account values.

5. While at Weiss Peck and Greer, I served on Investment Policy Committees for both Fixed Income and Equity products and served on the firm-wide Product Review and Executive Committees. These Committees supported the

- 1 -

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

institutional accounts (separate accounts for specific institutional relationships or acting as a sub-advisor to other mutual funds) and mutual funds accounts. The mutual funds were offered by the firm for retail client distribution.

6. My experience managing equity and non-equity investment accounts included acting as investment manger of plan assets inside of my clients' 401(k) plans.

7. Currently, I am President of Steve Pomerantz LLC, a firm which provides financial consulting in legal cases involving securities and investment related damages, investment performance and suitability, investment management fees and practices, event studies, asset allocation analysis and options and derivative valuation.

8. I have authored numerous professional articles, including one titled, "Designing a 401k Plan". I co-authored an article titled, "Mutual Fund Advisory Fees: New Evidence and A Fair Fiduciary Duty Test", which was cited favorably by the United States Court of Appeals for the Eighth Circuit in Gallus v. Ameriprise Financial Inc., 561 F.3d 816, 820 (8th Cir. 2009). This research was also cited in an amicus brief filed in the United States Supreme Court by a group of distinguished law professors in Jones v. Harris, 527 F.3d 627 (7th Cir. 2008), cert. granted, 129 S.Ct. 1579 (2009). In that case, the Court is expected to review the reasonableness of fees in the mutual fund industry.

9. I was recently qualified to testify as an expert witness in another ERISA case involving breach of fiduciary duties in a 401(k) plan. Abbott v. Lockheed Martin Corp., No. 3:06-cv-701-MJR, Doc. 225 at 5-6 (S.D.Ill. March 31, 2009).

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

-2-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

10. I have delivered numerous professional presentations and investment seminars, on subjects that include portfolio management, risk management, asset allocation, hedge funds products, and securities pricing.

11. My curriculum vitae is attached as Exhibit A.

12. I am compensated for my work in this case at a rate of $450.00 per hour plus out of pocket expenses. My compensation is in no way contingent upon my opinions or the testimony I offer in this case. In considering the issues in this case, I reviewed a substantial volume of material obtained during the course of discovery, including the material identified in Exhibit B, attached hereto.

## Summary of Opinions

13. Mutual Funds – The Edison Plan fiduciaries breached the general duty of loyalty imposed upon them by ERISA by failing to secure less expensive institutional share classes of the otherwise identical mutual funds they included in the Plan. Instead, selection and retention of the more costly share classes served to financially benefit the Plan sponsor, to the detriment of the Plan participants and beneficiaries, because revenue sharing kickbacks were paid to Defendants out of the excess mutual fund fees. In other words, the fiduciaries did not discharge their obligations solely in the interests of the Plan participants and beneficiaries. The inclusion of the more expensive, revenue sharing classes of mutual funds depleted the Plan's assets by $867,011 in excess investment management fees.

14. Money Market Fund – The Edison Plan fiduciaries failed to exercise the care, skill, prudence, and diligence of an investment professional under similar circumstances with respect to the Plan's Money Market fund because they failed to secure readily available less expensive investment management fees. This breach of the general duty of prudence cost the Plan participants $2.09 million from 1999-2007.

-3-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

### Excess Mutual Fund Management Fees

1. The following is a brief review of mutual fund structures and the implications of including mutual funds in 401(k) Plans:

   a. A mutual fund is a company established for the direct purpose of pooling assets from a variety of individuals, thus allowing for the professional management of those assets. The fund is mutual in the sense that all of the investment returns, be they income realized or unrealized capital gains, minus expenses, are shared mutually by all of the investors. The shared expenses consist mainly of advisory fees for managing the assets, a transfer agency fee for servicing shareholders, and sometimes a distribution fee often called a 12b-1 fee.

   b. Mutual fund managers charge investors 12b-1 fees for administrative and distribution related services in their mutual funds. The 12b-1 fees, when charged, are a component of the total expense ratio, paid by Plan participants invested in the fund.

   c. In large 401(k) plans, like Edison's, these distribution services are already provided by the Plan. Therefore, when large plans invest in retail mutual funds, the plan participants are charged fees for distribution services that the mutual fund, in fact, does not provide.

   d. Mutual fund managers may engage in "revenue sharing" by paying a portion of the fund's expense ratio usually to a third-party which provides administrative or record-keeping services.

   e. Mutual funds typically offer their investors retail and institutional share classes. The institutional classes charge lower fees because the amount of assets invested is far greater than the typical individual investor. The investment management of all share classes within a single mutual fund is identical, and managed within the same pool of assets.

-4-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

f.  While the investment advisory fees are often identical between these share classes, the other fees levied can differ substantially. While all investors in a fund will pay the same advisory fee, the administrative fee or the administrative component of the total expense ratio, is lower for larger investors. Different share classes with progressively larger minimum account sizes will have lower administrative fees in turn. This feature is due to the fact that shareholder servicing costs are typically fixed independent of the size of an account, so larger accounts will pay a lower fee, on a percentage basis.

g.  In addition, some fund share classes impose a 12b-1 fee depending on the advisor's needs in distributing respective share classes. Some classes that require a broker for distribution will often charge a 12b-1 while other investors, in particular those captive within a DC plan have no need for these services.

h.  The other classes will typically charge different administrative and 12b-1 fees and may also have different loads. A load is a one-time fee charged to investors for the purchase and/or sale of their shares.

2.  Prior to mid-1999, actively managed assets in the Edison Plan were mainly invested through separately managed accounts, not mutual funds. These separate accounts were managed by Frank Russell Trust Company ("FRTC"), a major investment advisory and consulting firm. Those funds did not share revenue with the Plan sponsor. The Plan also offered a money market investment fund.[1]

3.  In 1998, Edison began adding investment options to the Plan.[2] The original FRTC offerings were augmented to include more actively managed options.[3]

---

[1] See Doc. 319-3, Stip. Fact 7.
[2] Deposition of David Ertel, Vol I, pp. 136-140; Deposition of Barbara Decker, Vol I. pp.124-127.
[3] Prior to the 1998/1999 changes, the 6 options were the Global, Bond and Balanced Funds (all Russell Managed), a Barclays S&P 500, a Money Market fund and the Company Stock Fund. (See Doc. 319-3, Stip. Fact 7)

-5-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

Edison added many mutual funds in the same investment categories as offered by the FRTC funds.[4]

4. By the end of 1999, mutual funds played a significant role in the Plan. Nearly 40 mutual funds, with generally higher fees, were being offered in a range of investment categories.

5. Over the years, a number of these mutual funds paid Edison revenue sharing, which essentially amounted to a kickback from the mutual fund fees collected from participant funds. These kickbacks were used by Edison to satisfy its obligation to pay Hewitt's administration and recordkeeping fees.

6. Many mutual funds added had an existing arrangement, or entered into one soon thereafter, to refund the 12b-1 fees back to Edison directly or to Hewitt on Edison's behalf.[5]

7. Plan participants were presented with a menu of investment options, which they had a right to believe, were selected solely for their investment value by their Edison fiduciaries.

8. Because Edison set up and maintained an arrangement in which they received kickbacks, reducing their expenses when participants chose mutual funds, it had a profound conflict of interest.

9. The primary motivation for this arrangement, particularly in view of the absence of any concern by Edison fiduciaries for the harm to participants, apparently was the pecuniary benefit Edison received from revenue sharing, as this was a part of their fund evaluation.[6]

---

[4] Ex. 1708 (SCE005591, Quarterly Investment Report showing the categories of mutual funds available, many of which include a corresponding Russell Fund).
[5] Ex. 1709 (HA2273 at 2280, Hewitt Report showing the amount of revenue sharing credited to Edison per month); Ex. 1710 (TINMAN 00400, 1999 Quarterly Fund Performance Report showing the funds in the Plan); Ex. 109, (Dennis Fox Ex. 21, Hewitt Recordkeeping Agreement/Purchase Order – 1999); Ex. 69 (David Ertel Ex. 12, Agreement with T. Rowe Price for Defendants to receive revenue sharing off of the of the T. Rowe Price funds included in the Plan); Ex. 1708 (SCE005591, 1999 Quarterly Fund Performance Report).
[6] Ex. 102 (Al Fohrer Exhibit 21, internal 1998 Edison presentation discussing

-6-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

10. David Ertel, head of the Investments Staff, acknowledged, in his deposition, that revenue sharing amounts were provided to Edison as part of their evaluation of funds and fund classes.[7]

11. Asset management fees should not be artificially inflated in order to funnel money away from a retirement fund to a recordkeeper or plan sponsor. A participant should not be paying more for something that provides a benefit to the fiduciary when an identical product – the same mutual fund, in the institutional share class – exists at a lower expense ratio.

12. Marvin Tong, also of the Investments Staff, similarly acknowledged that higher cost funds in the plan were used to offset administrative fees being paid to Hewitt,[8] which was of concern not only to the fiduciaries selecting the investments, but also to Edison's Human Resources department, as revenue sharing ultimately affected their budget.[9] Thus, the Human Resources staff often encouraged the Investments Staff to choose funds with revenue sharing.[10]

the benefits of revenue sharing to the company); Ex. 52, (Barbara Decker Exhibit 31, email from David Ertel inquiring as to whether it is okay to delete revenue sharing funds on an "incremental basis"); Ex. 404 (Marvin Tong Exhibit 22, email where David Ertel asks George Grana in Human Resources for clarification on how 12b-1 fees should be used in fund selection); Ex. 77 (David Ertel Exhibit 23, email where Marvin Tong requests information on revenue sharing from Hewitt); and Ex. 78 (David Ertel Exhibit 24, email from David Ertel, listing revenue sharing as one of the criteria in fund selection).
  [7] Deposition of David Ertel, Vol. II., p. 269-272. See also Ex. 77 (David Ertel Exhibit 23, Edison had requested information on revenue sharing from Hewitt).
  [8] Deposition of Marvin Tong, p. 180-181. (Revenue sharing offsets the fees paid by Edison)
  [9] Deposition of Greg Henry, p. 253-254.
  [10] See e.g. Exs. 201 (Diane Kobashigawa Exhibit 9, an email from Lori Meaders to HR stating that 12b-1 fees make a "dent" in the Plan's expenses); Ex. 311 (Thomas Noonan 24, email in which George Grana does the email explaining to David Ertel how much would be lost in 12b-1 revenue if a lower share class is chosen); Ex. 160 (Greg Henry Exhibit 37, an email discussing uses for 12b-1 fees outside of paying administrative and communication expenses); Ex. 204 (Diane Kobashigawa Exhibit 12, email discussing the splitting of the revenue amongst the HR departments); Ex. 310 (Thomas Noonan Exhibit 21, email discussing the setting up of revenue sharing arrangements with the various mutual fund managers); Ex. 207 (Diane Kobashigawa Exhibit 15, 2007 email discussing David Ertel's comments to HR that they may start looking into funds that have share classes with lower fees and no revenue sharing); Ex. 312 (Thomas Noonan Exhibit 25, email from Lorie Padilla about the amount of 12b-1 fees that could be lost if the funds are changed to non revenue sharing funds); and Ex. 162 (Greg Henry Exhibit

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

- 7 -

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

13. Revenue sharing was important enough to prompt Mr. Ertel to inquire whether replacing a revenue-sharing fund with one that did not pay revenue sharing was even acceptable.[11] This question is not one that should be asked by someone who is acting solely in the best interest of the participants in a situation that would only benefit the Plan sponsor. Edison should have rejected revenue sharing mutual funds in general, but especially when an equal or stronger investment option was available, especially from the same manager, without revenue sharing and, therefore, at a lower cost to participants.

14. While the Investments Staff was handling these day to day functions, the TIC and Sub-TIC had the ultimate authority to make fund changes within the Plan. Doc. 283 at 4. The Investments Staff made recommendations for the elimination, retention, and addition of funds to the Plan and attended the TIC and Sub-TIC meetings in order to make these recommendations. Doc. 283 at 3-4. As admitted by Defendants, the majority of the members of the TIC and Sub-TIC were officers of EIX or SCE. Doc. 283-2.

15. The Investments Staff members were tasked with day to day responsibilities related to the Plan's investments and provided investment recommendations to the Sub-TIC which, in turn, reported to the TIC. Doc. 295 at 4. The Investments Staff has no authority to implement their day to day decisions.

16. The ultimate authority for investment decisions, including the use of mutual fund share classes, rested with the TIC and/or Sub-TIC. The Sub-TIC undoubtedly was responsible for overseeing the work of the Investments Staff and being knowledgeable of the Staff's actions and reasons for the same,

41, email from David Ertel in which he expresses concern over the potential loss of revenue sharing if the funds are switched from a retail class to an institutional class).[11] Ex. 52 (Decker Ex. 31, "if we delete funds that have high revenue sharing with one that has none, is that still acceptable on an incremental basis?").

- 8 -

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

including the fact that more expensive revenue sharing mutual funds were being used instead of institutional classes.[12]

17. The TIC adopted the recommendations of the Investments Staff nearly 100% of the time. The TIC and the Sub-TIC were also ultimately responsible for monitoring the performance of the funds, the fees of the funds, and the prudence of retaining or replacing funds and fund managers.[13]

18. The Plan, with its substantial asset pool, is an "institutional investor" which has no need for some of the services provided by mutual funds to the individual retail investor. A retail mutual fund with 10,000 shareholders for example, must furnish 10,000 statements to investors. If that same mutual fund is in a 401(k) plan, by contrast, it need furnish only one statement to the plan's administrator to show the account's return.

19. The Plan fiduciaries failed to capture the cost savings available in institutional share classes for a number of the Plan's mutual funds. Institutional classes offer exactly the same investment management process and product as retail classes. An examination of quarterly statements reveals that Edison fiduciaries knew that there were institutional classes available.[14]

20. Defendants had a financial incentive to retain mutual fund share classes that were more costly to the participants where those funds paid the sponsor revenue sharing, and this obvious and sole distinction in share classes cannot be justified by any process, especially when this factor would be well known to any qualified fiduciary and was an undeniable factor in Edison's selection of fund share class.[15]

---

[12] See e.g. Ex. 881 (SCE006389 at 6399, a presentation given to the Sub-TIC outlining the difference in fees and revenue sharing for various fund share classes).
[13] See e.g. Ex. 0029 (SCE008247, Roles and Responsibilities of TIC and Sub-TIC).
[14] See Ex. 1739 (SCE005669 at 5672, Quarterly Fund Performance Statement).
[15] Ex. 78 (David Ertel Exhibit 24, email from David Ertel, listing revenue sharing as one of the criteria in fund selection).

-9-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

21. A loyal fiduciary, in discharging his/her obligations solely in the interests of the Plan participants and beneficiaries, should examine the availability of alternative share classes and the relative costs for same, whenever a new fund is added to the Plan and periodically thereafter. The availability of a mutual fund's share classes, eligibility to acquire those share classes, and the costs are readily available qualified 401k plan fiduciaries.

22. Had the Defendant fiduciaries acted solely in the interests of the Plan participants and beneficiaries, they would have identified, and then secured, for the Plan, the least expensive mutual fund share class that was available from that fund manager.

23. My review of the records of the Investments Staff, TIC and Sub-TIC and the depositions taken in this case shows that revenue sharing was an important, and improper, consideration that lead to the fiduciaries' inclusion and retention of more expensive mutual fund share classes when less expensive institutional share classes were available.

24. My review of the records of the Investments Staff, TIC and Sub-TIC and the depositions taken in this case also shows no evidence of any examination or consideration of the lowest available share class available to the Plan from mutual fund managers.  Certainly, these records clearly show that the fiduciaries failed to take advantage of readily available less expensive share classes in the following funds, all of which became part of the Plan after August of 2001:[16]

    Franklin Small Mid-Cap Growth Fund

    MFS Total Return A Fund

    William Blair Small Growth Fund

    PIMCO RCM Global Tech Fund

---

[16] This date represents the earliest date from which this claim may be considered, according to the Court's Summary Judgment Order.  The funds in which Defendants likewise failed to capture the less costly share classes, prior to this date, are not discussed in this Declaration.

-10-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

Janus Small Cap Investors Fund, and

Allianz CCM Capital Appreciation Fund.

25. Had the fiduciaries secured the least expensive share classes available in those funds, they would have saved the participants almost $1 million in excess fees. These losses are illustrated in the chart attached hereto as Exhibit C, as well as the graph attached as Exhibit D.  These savings were calculated from the following basic information, all of which was readily available to the fiduciaries and from which they should have been able to asses the excess cost:[17]

   a. Identifying the availability of less costly share classes by reviewing the same materials which were available to the fiduciaries (e.g. Morning Star reports or internal reports provided by Hewitt) and measuring the difference in investment fees between the retail share class included in the Plan and the least expensive institutional share class available to, by not selected for, the Plan;

   b. Determining the average assets in the fund per year, based on beginning and end of year asset levels. When the fund was added during the year, the asset level at that time was utilized; and

   c. Calculating the difference in fees charged by the share class actually offered in the Plan and the least expensive share class available to the Plan and multiplying fee times the average annual fund assets.

26. <u>Franklin Small Mid-Cap Growth fund</u>- In September of 2001, the fiduciaries added, and retained until September 2007, a retail share class "A" of this fund, although an institutional class was available at that time, and has continued to remain available to date.

---

[17] In fact, on at least one occasion, the fiduciaries actually calculated the amount of savings available in a fund in the event they were willing to forego the sponsor's revenue sharing benefit. <u>See</u> Ex. 162.

-11-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

a. The investment management fee for the "Advisor" share class, since this fund was added, has been 25 basis points less than the retail "A" share class.

b. The higher fee is attributable entirely to 12b-1 fees that have served as a source for revenue sharing with Edison and provided no benefit to the participants.

c. Had the fiduciaries properly chosen the institutional share class over the retail share class, the participants would have saved approximately $30,000 per year, or $234,312 through 2007, in fees for the exact same mutual fund.

d. The above calculations appear in Exhibit E, attached hereto.

27. MFS Total Return A fund- In July of 2002, the fiduciaries added, and retained until September of 2008, a retail share class "A" of this fund, although an institutional class (class "I") was available at that time, and has continued to remain available.[18]

a. The investment management fee for the "I" share class was 35 basis points less than the retail "A" share class.[19]

b. The higher fee is attributable entirely to 12b-1 fees that have served as a source for revenue sharing with Edison and provided no benefit to the participants.

c. Had the fiduciaries properly chosen the institutional share class over the retail share class, the participants would have saved approximately $13,000 per year, or $49,366 through 2007, in fees for the exact same mutual fund.

d. The above calculations appear in Exhibit F, attached hereto.

---

[18] Deposition of Marvin Tong, p. 76 (Tong admits that an institutional share class was available for the MFS Total Return Fund).
[19] In 2004, the fee for the institutional class was 34 bps lower than the retail class.

-12-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

28. <u>William Blair Small Growth fund</u>- In July of 2002, the fiduciaries added, and continue to retain, a retail share class "N" of this fund, although an institutional class (class "I") was available at that time, and has continued to remain available.

    a. The investment management fee for the "I" share class was typically 26 basis points less than the retail "N" share class.

    b. The higher fee is attributable entirely to 12b-1 fees that have served as a source for revenue sharing with Edison and provided no benefit to the participants.

    c. Had the fiduciaries properly chosen the institutional share class over the retail share class, the participants would have saved $50,000 per year, or $228,251 through 2007, in fees for the exact same mutual fund.

    d. The above calculations appear in Exhibit G, attached hereto.

29. <u>PIMCO RCM Global Tech fund</u>- In July of 2002, the fiduciaries added, and retained until October of 2003, a retail ("A") share class of this fund, although an institutional ("I") class was available at that time, and has continued to remain available.

    a. During the discussions for the addition of this fund, the fiduciaries should have been aware of the institutional share class that had long existed for this fund. However, they added the retail share class, thus benefiting themselves from the revenue sharing for a year until they belatedly moved into the institutional share class.

    b. The Plan assets in the PIMCO RCM Global Tech fund remained in the retail "A" share class until October 2003.

    c. The investment management fee for the "I" share class was 34 basis points less than the retail share class in 2002 and 40 basis points less in 2003.

-13-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

    d.  Had the fiduciaries properly chosen the institutional share class over the retail share class, the participants would have saved $123,307 in fees for the exact same mutual fund.

    e.  The above calculations appear in Exhibit H, attached hereto.

30. <u>Janus Small Cap Investor fund</u>- In April of 2003, the Janus Small Cap Investor fund replaced the Berger Small Cap Value Investors fund, when Janus purchased Berger's business.

    a.  With this change came a potential shift in investment strategy of the management of the fund. The fiduciaries should have taken that time to evaluate the fund just as if a new fund was being added.

    b.  Stability of the investment management process is of paramount concern for investors. It is for this reason why a prudent financial expert should scrutinize an investment when there is a change in portfolio management or fund ownership. In particular, a prudent financial expert should be concerned whether, under new ownership, a continuity of the underlying investment team and process will remain.

    c.  It is also not uncommon for acquiring businesses to solicit from existing investors a written intention of their remaining with the new firm as part of the terms of a particular transaction. This inquiry should also prompt a prudent financial expert whose loyalty is devoted to plan participants to closely scrutinize the fund, including its various fee structures.

    d.  The Plan fiduciaries, rather than take this opportunity to capture the savings of the institutional share class at the time of this change, simply allowed the assets to remain in the more expensive retail share class.

    e.  The excess fees, as measured by the simple difference between management fees for the retail and institutional share classes has varied

-14-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

from 18-33 basis points since 2003, which amounted to annual excess fees of as much as $32,000.

f.  Had the fiduciaries properly chosen the institutional share class over the retail share class, the participants would have saved $143,289 through 2007 in excess fees for the exact same mutual fund.

g.  The above calculations appear in Exhibit I, attached hereto.

31.  Allianz CCM Capital Appreciation fund – In April of 2005, the Allianz CCM Capital Appreciation fund replaced the PIMCO CCM Capital Appreciation fund when Allianz bought PIMCO's business.

a.  For the same reasons as stated above, the fiduciaries should have taken, but failed to take, that time to evaluate the fund just as if a new fund was being added.

b.  Rather than take this opportunity to move the assets into an existing institutional fund with Allianz, which had exactly the same asset management, the fiduciaries allowed the assets to remain in the more expensive retail fund.

c.  The investment management fee for the "I" share class was 25 basis points less than the retail "Administration" share class.

d.  Therefore, the participants were paying excess fees of as much as $40,000 per year.

e.  Had the fiduciaries properly chosen the institutional share class over the retail share class, the participants would have saved $85,107 through 2007 in excess fees for the same mutual fund.

f.  The above calculations appear in Exhibit J, attached hereto.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

-15-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

32. As a result of the fiduciaries' disloyal selection of more expensive retail mutual funds noted above, participants were charged $863,633 in total excess fees through 2007.[20]

33. While the availability of identical, but less expensive share classes of the same funds was known to the Plan fiduciaries, Defendants may suggest that they failed to secure those cost savings for the plan because some recently created institutional classes might not have historical performance data. This ignores the important fact that other share classes had well publicized and identical returns for quite some time.[21] The difference in performance between share classes, if any, is an insignificant fact, since the stock selection and portfolio management process is identical and, thus, this would not be an excuse for a prudent investment professional to select the more expensive class. In fact, at times, the Edison fiduciaries themselves used performance data from other share classes in order to represent the performance of a newly added share class that did not have its own historical share class performance.[22]

34. Yet, it does not appear that there was any process in place to determine if cheaper share classes were available for the aforementioned funds, as well as several others which were added before 2001.[23]

35. Edison was aware that at least 14 of the mutual funds in the plan were not in the cheapest class,[24] with the above noted ones accounting for those within the time period established by the Court. In fact, Hewitt, Edison's chosen consultant, provided this information to the fiduciaries themselves.[25] [26]

---

[20] This number represent the amount of excess fees compounded at the same rate of growth as was actually experienced in the funds to get the total present value of these excess fees.

[21] Ex. 77 (David Ertel Exhibit 23, email wherein Marvin Tong requests information on revenue sharing from Hewitt).

[22] Ex. 1743 (SCE005604, Quarterly Fund Performance Report for 9/30/00).

[23] Deposition of Lori Meaders, p. 65.

[24] As noted above (fn. 16), the scope of this declaration is limited to the six offending funds which were added after August of 2001.

[25] Exhibit 4 of my expert report (Ex. 341) lists some of the funds added as

-16-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

36. Thus, the statements made by the Edison fiduciaries, to the effect that they were invested in the lowest fee share class,[27] are false and reflect their failure to devote loyalty to the participants.

37. Clearly, Edison obtained the sole benefit from the inclusion of retail, instead of less expensive institutional, share classes. Those retail share classes all paid revenue sharing. The only material difference between the institutional and revenue sharing retail share classes is that the latter was more expensive and kicked back money to the Plan sponsor. The record reflects that revenue sharing was, in fact, a consideration in the selection and retention of mutual funds. A fiduciary acting solely in the interest of the Plan participants and beneficiaries would have secured the lower fees.[28]

**Excess Money Market Fund Fees**

38. The Plan fiduciaries had the responsibility, but failed, to engage in an adequate evaluative process in (a) selecting and retaining the Money Market Fund manager, and (b) assessing and monitoring the Fund's investment management fee in order to assure that participants were not being charge excess amounts. As a result, the fiduciaries failed to exercise the skill of an investment professional under similar circumstances and their imprudence cost the participants over $2 million.

39. State Street assumed the responsibility for managing the Money Market Fund in 1999, when it was selected by the fiduciaries to be the Plan trustee.

retail classes, even though institutional classes had already existed.
[26] Ex. 339 (John Peavy Exhibit 30, SCE2-E00060435 at 60448, chart from Hewitt with information requested by Edison about whether or not the funds in the Plan were in the cheapest share class – indicates that many revenue sharing funds had a cheaper, non revenue sharing share class available).
[27] Deposition of David Ertel, p. 271:15-20 "in every instance, we recommended the fund share class with the lowest available expense ratio to the - - to our committee."
[28] Ex. 52 (Barbara Decker Exhibit 31, email wherein David Ertel inquires if it is okay to delete revenue sharing funds on an incremental basis).

-17-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

40. The fiduciaries obligated Plan participants to pay State Street 18 basis points to manage the Fund from 1999 until 2005, at which time State Street reduced the fee to 12 basis points; and then to 10 bps in 2007.[29]

41. Based on my experience managing fixed income investment funds, a prudent fiduciary exercising the skill of an investment professional under similar circumstances[30] would have engaged in an evaluative process to consider other available similar, appropriate investment funds and their fees **before** selecting the State Street fund.  A prudent investment professional would also periodically engage in such a process **after** the fund manager was selected. The evaluative process would include benchmarking, surveying, or other means of comparison of fund managers and fees.

42. Based upon my review of the fiduciary records, the reduction in fees apparently was made by State Street unilaterally, without any noted involvement by the fiduciaries to assure a timely and adequate reduction to a reasonable fee. In my professional opinion, the fee reduction occurred simply because State Street was aware that its fees exceeded the market rate and did not want to risk losing the business to competitors. This opinion is supported by the fact that Edison's CFO, who also held positions on the TIC and Sub-TIC, testified that he had no idea what the STIF fund fee was.[31]

---

[29] The 18 bps is set forth in an email dated 10/16/98. Ex. 271 (SCE095273) (See also Ex. 1603, the 1999 Money Market fee schedule stating that the expense ratio was 18 bps). On 9/18/05, the fee was changed to 12bps. Ex. 235 (SCE063406, fee schedule lowering the fee to 12 bps per annum). The fee was subsequently changed to 10 bps on 7/30/07. Ex. 243 (SCE099235, fee schedule lowering the fee to 10 bps per annum).
[30] An investment professional, under similar circumstances, would also be required to engage in an evaluative process to determine which type of investment vehicle would be most appropriate for the "fixed income" category, such as money market versus stable value fund. Because the Court found that the fiduciaries engaged in an adequate evaluative process in selecting the money market fund's finding (Doc. 295 at 83-85), I am not expressing any opinion here on that matter. My silence on this matter here is not intended to reflect any change of my earlier opinion.
[31] Thomas Noonan Deposition, p. 156:9-16. Lori Meaders, a Senior Attorney at Edison testified that, while she regularly attended SubTIC meetings and or read

-18-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

43. There is no documentary or testimonial evidence that the Edison fiduciaries ever informed themselves of the market rate for fees, by use of a number of readily available benchmarking or surveying or any other methods. Furthermore, there was no evidence that the funds fees were ever reduced as a result of any effort or action or request of the Edison fiduciaries. There is no evidence in the Plan records or depositions reflecting any decision making process had ever been conducted regarding the Money Market Fund.

44. I found no committee meeting minutes, emails or depositions to indicate that the Edison fiduciaries made an <u>affirmative</u> decision to include or retain the Money Market Fund. The Plan material revealed no documents or discussions indicating that fees were ever a subject of discussion at any point in time – either before or after the notification that fees were being reduced.[32] This was clearly a failure of process. Nor was there any indication as to why the fees were being reduced when they were.

45. In my professional opinion, the fiduciaries failed to evaluate the propriety of this fund or critically monitor/evaluate its fees or performance through benchmarking, survey or other means. The fiduciaries also failed to take advantage of their bargaining power to secure readily available lower investment management fees for this fund. The fees charged to the Money Market Fund were excessive as a result of the fiduciaries' failure to be informed, monitor and actively obtain lower fees.[33]

---

the minutes of those meetings, she could not recall the possibility of fund fee negotiations ever being discussed. Lori Meaders Deposition; pp. 32-35.

[32] That no inquiry was made as to the STIF fees, is confirmed by Donald Mulligan, Senior relationship manager at State Street. Donald Mulligan Deposition, p. 56:11-17. While the discussion focused on the STIF fund as used in the Stock Fund, it is the same STIF fund. If an inquiry had been made in one instance, it would have been applicable to the other.

[33] I note that the Money Market Fund in the Edison Plan was not actually a 2A-7 fund, but rather a commingled STIF. Ex. 1604 (SCE-E00155735, email discussing how the Money Market Fund is actually a STIF).

-19-

46. At 18 basis points, participants paid nearly twice the fee that should have been negotiated.[34] In April of 2007, Hewitt, the record keeper, specifically told the Plan fiduciaries that they could be paying only 9 basis points for the management of a money market option.[35]

47. Edison should have, but failed, to evaluate their options in an objective manner and negotiate an appropriate fee under the circumstances. Further evidence of excessive fees can be found in the fact that Vanguard operates an Institutional Money Market Fund for only 8 basis points – with comparable or better performance and less risk.[36] It is important to note that this is the fee for Vanguard's institutional class, which has a $5 million minimum investment threshold. The Edison Money Market Fund had significantly greater assets and lower fees, such as from an institutional class, could readily have been obtained in a similar fund or negotiated in the existing fund. According to the latest prospectus for the Vanguard Institutional Money Market fund, the fee has been 8 basis points since 2007, and it was 9 basis points prior to that.

48. The investment management fees of the Money Market Fund exceeded that which a prudent investment professional would have secured for the Plan. The Plan fiduciaries failed to take advantage of the Plan's large size, ranging between $204-$477 million from 1999-2007 to negotiate and secure lower fees.

---

[34] The fee of 18 basis points was lowered by State Street to 12 basis points in 2005, and then 10 in 2007. Neither reduction was due to any affirmative action by the Plan fiduciaries. It is imprudent to allow fees to go unchecked and to simply leave it to the interested service provider to monitor and adjust their own fees.

[35] Ex. 278 (Lori Meaders Ex. 53, SCE2-E00041011, an email from Pam Hess at Hewitt to Marvin Tong indicating that the investment management fees for the Money Market fund were too high).

[36] Vanguard Prime Money Market Fund. The Morningstar Principia 2007 data base shows Vanguard's performance and fees. The State Street Money Market Fund is not reported in Morningstar. Its performance can be seen in Ex. 1708 (SCE005591), Ex. 1675 (SCE005608), Ex. 1676 (SCE005624), Ex. 1677 (SCE005640), Ex. 1678 (SCE005657), SCE2-E0034711 (Ex. 1681), Ex. 1679 (SCE005685), Ex. 1630 (SCE005697), and Ex. 1680 (SCE005717) (all fourth quarter Fund Performance Reports).

-20-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

49. A prudent investment professional would have negotiated in the fee agreement a sliding scale that would have afforded commensurate fee reductions with increases in asset size. Yet, no such sliding fee schedule appears for the Money Market Fund. Based on my experience in managing money market funds, the unilateral reduction in fees by State Street from 18 to 12 basis points, is not consistent with a reduction based on an increase in asset levels. Changes in fees due to fee schedule breakpoints occur gradually. I note here that the 18 basis point level persisted over a large increase in assets, only to change abruptly down to 12 basis points. While this change may have been at a time when assets increased, it is unlikely (and undocumented) that such changes were premeditated or contractual.

50. During the period of 1999- 2007, the total fees actually paid by the Plan to manage the Money Market Fund was $4,812,397 based on Edison's filings of Forms 11k with the SEC. This data, as well as a comparison to what the participants could have paid, is shown in Exhibit K, attached hereto.

51. In my experience managing money market funds, both inside and outside of 401(k) plans, a fund with a fee of 9 basis points was readily available to the Plan because of its sizeable assets.

52. Given the readily available fee of 9 basis points,[37] as confirmed by Hewitt's recommendation, the Plan would have saved $2.09 million in excess fees, over the period of 1999-2007 had the Edison fiduciaries acted with prudence.[38] This data is shown in Exhibits L-M attached hereto.

---

[37] Ex. 278 (Lori Meaders Exhibit 53, SCE2-E00041011, email from Pam Hess at Hewitt to Marvin Tong at Edison dated 4/23/07 indicating that investment management fees on the Money Market Fund were too high).
[38] Total fees are calculated and compounded using a growth rate equal to the fund's actual annual return rate.

-21-

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

1       I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3       Executed on October 5, 2009.

4

5

6

7   _____

8   Steve Pomerantz, PhD

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF STEVEN POMERANTZ, PH.D.**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

**EXHIBIT A**

Exhibit A

# Steve Pomerantz, PhD

53 Humbert Street
Princeton, NJ 08542
Phone 609.921.7545
Fax 609.482.4424
steve@stevepomerantz.com
www.stevepomerantz.com

## CURRICULUM VITAE of STEVE POMERANTZ, Ph.D.

### PROFESSIONAL EXPERIENCE

Steve Pomerantz is the president of Steve Pomerantz LLC. The firm provides investment management consulting and litigation support on cases involving: investment management fees and practices, tax shelters, securities and investment related damages, investment performance and suitability, event studies, asset allocation analysis and options, derivatives and swap valuation.

Steve Pomerantz holds a Ph.D. in mathematics from the University of California at Berkeley and has over twenty years of experience in investment research, financial modeling, derivative structuring, portfolio and risk management.

Dr. Pomerantz has been qualified as an expert witness in securities related matters in various jurisdictions, providing litigation support to accountants and attorneys. His experience in litigation has been in cases involving, trust management, investment suitability, derivative valuation, investment strategy analysis, economic damages, tax shelters, mutual funds and investment industry practice.

The firm is often called upon to use sophisticated mathematical techniques to develop models for valuation and suitability analysis. Dr. Pomerantz is well versed in applications of operations research, statistics, probability and time-series analysis to provide solutions within a variety of assignments.

Strong verbal and communication skills enable Dr. Pomerantz to reduce complex securities, investments and financial topics to simple and accurate frameworks. He has taught as an adjunct professor at the undergraduate and graduate level in such courses as statistics, probability, operations research and finance.

He has twenty years of experience in the investment management area serving a variety of firms and clients in areas as diverse as derivative structuring, quantitative research, portfolio and risk management. This experience coupled with his academic training provides a

perspective that is grounded in scientific rigor yet possesses the practical realities of how the business of finance operates.

Areas of Dr. Pomerantz's practice include:

- Mutual Fund and Investment Management Fee Analysis
- Investment Management Performance
- Tax-Shelter Analysis
- Hedge Funds
- Investment Suitability
- Derivatives Valuation
- Stock Option Valuation
- Concentrated Hedging Strategies
- Risk Management

## LICENSES

Dr. Pomerantz has held numerous NASD licenses including the Series 3, 7, 24 and 63. In addition, he is an NASD-trained arbitrator.

## EDUCATION

Dr. Pomerantz received a Ph.D. in Mathematics from the University of California at Berkeley in 1986. His thesis was in the area of Non-Linear Partial Differential Equations. In 1981 he received a Bachelor of Arts in Mathematics from Queens College of the City University of New York.

## TEACHING EXPERIENCE

Dr. Pomerantz has held adjunct professor positions at Stevens Institute of Technology, the College of St Elizabeth and St Peters College teaching courses in Finance, Operations Research, Statistics and Probability.

## PRIOR WORK EXPERIENCE

Steve Pomerantz LLC                                                      2000-
Investment Management Consultant

Various assignments in research, portfolio management and risk management for:
         Insurance Companies, Traditional and Alternative Investment Advisors.

Director of Quantitative Research                                        1992-2000
Weiss Peck & Greer LLC

A-24

Provide quantitative decision support to all investment management areas of the firm
including equity, fixed income, alternatives, asset allocation, client servicing and firm-wide
risk management.

Vice President                                                                          1990-1992
Nomura Securities International
Cross-market trader in all fixed-income and mortgage derivative markets.

Vice President                                                                          1988-1990
Citibank - Consumer Banking Group
Asset-Liability management for consumer banking division and internal mortgage portfolio.

Vice President                                                                          1987-1988
Morgan Stanley
Development and trading of dynamic hedging strategies in equity, interest rate, commodity
and currency markets.

Vice President                                                                          1986-1987
Bank of America
Model Development for bond analysis and exotic currency options.

## ARTICLES PUBLISHED

MUTUAL FUND ADVISORY FEES: NEW EVIDENCE AND A FAIR FIDUCIARY
DUTY TEST (with John P. Freeman & Stewart Brown) 61 Okla. L. Rev.

MONTE CARLO SIMULATION ANALYSIS – A TOOL FOR PROJECTING THE
UNKNOWN (with Bruce Dubinsky) CPA Expert – Winter 2007

MONTE CARLO SIMULATION ANALYSIS – Part II: BEYOND THE THEORY
CPA Expert – Spring 2007

MONTE CARLO SIMULATION ANALYSIS – Part III: A CASE HISTORY
CPA Expert – Summer 2007

THE PURSUIT OF ALPHA IN A FUND OF HEDGE FUNDS
Hedge Fund Association – May 2006

MONTE-CARLO ANALYSIS: A TOOL FOR EVALUATING INVESTMENT
RETURNS
New York State Bar Association Fall/Winter 2005 Newsletter

DESIGNING A 401K PLAN
New York State Bar Association Fall/Winter 2005 Newsletter

AN INFORMATION-BASED MODEL OF MARKET VOLATILITY
1989 Financial Analyst Journal, Nov/Dec. (received the 1989 Graham and Dodd Scroll
Award by the Financial Analysts Federation)


## APPEARANCES


Deposition in *Tibble et al Edison Intl. et al*, US District Court –Central District of
Califomia, 401(k) Analysis, May 2009

Deposition in *Alfano v BDO Seidman et al*, Superior Court of New Jersey –Bergen
County, Tax Shelter Analysis, January 2009

Deposition in *Re: Inter Vivos Trust.*, Superior Court of New Jersey –Bergen County,
Investment Suitability, January 2009

Deposition in *Giordano v Merrill Lynch & Co. Inc.*, Superior Court of New Jersey –
Mercer County, Stock Option Analysis, January 2009

Deposition in *Kennedy et al v ABB Inc., et al*, US District Court –Western District of
Missouri, 401(k) Analysis, November 2008,March 2008

Deposition in *Pat Beesley et al v International Paper*, US District Court –Southern
District of Illinois, 401(k) Analysis, November 2008

Deposition in *Abbot et al v Lockheed Martin Corporation*, US District Court –Southern
District of Illinois, 401(k) Analysis, October 2008

Deposition in *Kanawi et al v Bechtel Corporation*, US District Court –Northern District
of California, 401(k) Analysis, September 2008

Deposition in *Bennett et al v Fidelity*, US District Court –District of Massachusetts,
Mutual Fund Fee Analysis, September 2008

Deposition in *Bemont et al v The United States of America*, US District Court –Eastern
District of Texas, Tax Shelter Analysis, June 2008, July 2009

Deposition in *Atwater et al v NFLPA*, US District Court - Northern District of Georgia,
Investment Suitability, May 2008

Deposition in *Taylor et al v United Technologies Corporation*, US District Court –
District of Connecticut, 401(k) Analysis, April 2008

Deposition in *Spano et al v The Boeing Company*, US District Court –Southern District
of Illinois, 401(k) Analysis, April 2008

Direct and Cross Examination in Fegers et al v Atlantic Data Services,Inc.,
Commonwealth of Massachusetts – Superior Court, February 2008

Direct and Cross Examination in New Phoenix v Commissioner of Internal Revenue, Tax
Shelter Analysis, January 2008

Direct and Cross Examination in *Rosenbach et al v DGI*, AAA, Tax Shelter Analysis,
October 2007

Deposition in *Trotman v Delaware Management Business Trust*, US District Court –
Eastern District of Pennsylvania, Investment Management, October 2007

Deposition in *Spillsbury v KPMG*, District Court of Clark County, Nevada. Tax Shelter
Analysis, August 2007

Deposition in *Strigliabatti et al v Franklin Resources Inc.*, US District Court –Northern
District of California, Mutual Fund Fee Analysis, May 2007

Deposition in *Gallus et al v American Express Financial Corp*, US District Court –
District of Minnesota, Mutual Fund Fee Analysis, January 2007

Deposition in *Sullivan v KPMG and QA Investments*, Superior Court of New Jersey. Tax
Shelter Analysis, November 2006

Direct and Cross Examination in *Techtmann v Merrill Lynch*, NASD Arbitration,
Investment Suitability, November 2006

Deposition in re: Sklodowski *v First Union* ,Superior Court of New Jersey, Analysis of
Investment Performance, October 2006

Deposition in *WCF LLC v Charles Calomiris*, Superior Court –District of Columbia,
Investment Management, October 2006

Direct and Cross Examination in *Guido v McDonald Securities*, NASD Arbitration,
Investment Suitability, October 2006

Deposition in *Sins et al v Janus Capital Management*, US District Court –District of
Colorado, Mutual Fund Fee Analysis, September 2006

Direct and Cross Examination in *Kusma v Smith Barney*, NASD Arbitration, Investment
Suitability, April 2006

Direct and Cross Examination in *Chu v Smith Barney*, NASD Arbitration, Investment
Suitability, March 2006

Deposition in *Williams et al v Waddell & Reed*, US District Court –District of Kansas, Mutual Fund Fee Analysis, March 2006, July 2006

Deposition in *McNair v KPMG*, District Court of Harris County -  Texas. Tax Shelter Analysis, February 2006

Deposition in *Jones et al v Harris Associates LP*, US District Court – Northeastern District of Illinois, Mutual Fund Fee Analysis, February 2006

Deposition in *Baker et al v American Century*, US District Court – Western District of Missouri, Mutual Fund Fee Analysis, December 2005, April 2006

Deposition in *Nelson et al v UBS Asset Management*, US District Court – Northern District of Illinois, Investment Suitability, August 2005

Deposition, Direct and Cross Examination in *Coleman v KPMG*, AAA, Tax Shelter Analysis August 2005

Deposition in re: *Gibson v First Union* ,Superior Court of New Jersey, Analysis of Investment Performance, July 2005

Deposition in *Lola Brown Trust et al  v Neuberger Berman Real Estate Income Fund*, US District Court – District of Maryland,
Investment Management performance, asset allocation and event models, May 2005

Deposition in *Hobby v Georgia Power*, US District Court – Atlanta Division, Valuation of Employee Stock Options, March 2005

Direct and Cross Examination in *Kahn v Oppenheimer & Co., Inc.*, NASD Arbitration, Investment suitability, February 2005

Deposition in *Howard v Covansys Inc.*, US District Court – Eastern Division, Valuation of Employee Stock Options, July 2004

Direct and Cross Examination in *Stacy Foundation v Merrill Lynch*, Pierce, Fenner & Smith. Inc., JAMS Arbitration, Investment Suitability, June 2004

**July 2009**

**EXHIBIT B**

Pomerantz Declaration
Exhibit B

Materials Considered

**Plaintiff Produced**
BAUER 0000001 – BAUER 0000387
IZRAL 00001 – IZRAL 00068
RUNOWIECKI 00001 – RUNOWIECKI 00045
SUHADOLC 00001 – SUHADOLC 00177
TIBBLE-0000001 – TIBBLE -0000309
TINMAN 00001 – TINMAN 01002

**Third Party Produced**
EDISON-RUSSELL-0000001 – EDISON-RUSSELL- 0016840
HA 0001 – HA 2937
HA 2980 – HA 2981
HA 2992 – HA 2996
HA 3001 – HA 3005
HA 3014 – HA 3038
HA 3041 – HA 3054
HA 3069 – HA 3070
HA 3072 – HA 3073
HA 3078 – HA 3086
HA 3094 – HA 3103
HA 3106 – HA 3107
HA 3117 – HA 3118
HA 3121 – HA 3132
HA 3136 – HA 3149
HA 3152 – HA 3155
HA 3160 – HA 3160
HA 3166 – HA 3167
HA 3170 – HA 3178
HA 3191 – HA 3197
HA 3201 – HA 3216
HA 3219 – HA 3221
HA 3251 – HA 3282
HA 3290 – HA 3382
HA 3408 – HA 3458
HA 3466 – HA 3506
HA 3521 – HA 3555
HA 3560 – HA 3638
HA 3644 – HA 3696
HA 3704 – HA 3713
HA 3721 – HA 3775
HA 3781 – HA 3838
HA 3852 – HA 3876
SSBT-EDISON 000001 – SSBT-EDISON 000910

**Defendant Produced**
SCE000001 – SEC009413
SCE009414.0001 – SCE009491.1515
SCE009492 – SCE104016

B-29

SCE10418
SCE10436 – SCE112984
SCE112987 – SCE113767
SCE113770 – SCE119425
SCE2-E00000001 – SCE2-E00113928
SCE2-E00113935 – SCE2-E00115401
SCE2-E00115403 – SCE2-E00132981
SCE2-E00132986 – SCE2-E00144881
SCE2-E00144884 – SCE2-E00146925
SCE2-E00146928 – SCE2-E00147710
SCE2-E00147712 – SCE2-E00156997
SCE2-E00147711 – SCE2-E00147711
SCE2-E00157000 – SCE2-E00158664
SCE2-E00158667 – SCE2-E00171711
SCE-E00000001 - SCE00166309
SCE-E00166313 – SCE-E00191689
SCE-E00191703 – SCE-E00208298
SCE-E00208362 – SCE-E00211181
SCE-E00211185 – SCE-E00211190
SCE-E00211283 – SCE-E00211286
SCE-E00211290 – SCE-E00211301
SCE-E00211303 – SCE-E00211309
SCE-E00211313 – SCE-E00211738
SCE-E00211742 – SCE-E00211800
SCE-E00211807 – SCE-E00211961
SCE-E00211963 - SCE-E00212060
SCE-E00212069 - SCE-E00212070
SCE-E00212079 - SCE-E00212088
SCE-E00212093 - SCE-E00212100
SCE-E00212114 - SCE-E00212126
SCE-E00212142 - SCE-E00212240
SCE-E00212243 - SCE-E00212292
SCE-E00212299 - SCE-E00222461
SCE-EU00142021 – SCE-EU00159277
SCE-U005967 – SCE-U103362
SCE-U109469 – SCE-U109483
SCE2-EU00053103 – SCE2-EU00053104
SCE119403-SCE119434
SCE137509

## Depositions

William Bauer taken on November 19, 2008.
Bruce Clarke taken on February 20, 2009.
Barbara Decker taken on March 16 and 17, 2009.
David Ertel taken on March 19 and 20, 2009.
Alan Fohrer taken on April 3, 2009.
Dennis Fox taken on April 3, 2009.
Lillian Frank taken on March 24, 2009.
Gregory Henry taken on January 19, 2009.
Pam Hess taken on January 9, 2009.
William Izral taken on November 16, 2008.
Diane Kobashigawa taken on March 27, 2009.

Melanie Langsett taken on May 15, 2009
Sydney Stallard Marzeotti taken on January 15, 2009.
Lori Meaders taken on April 1, 2009.
Donald Mulligan taken on January 16, 2009.
Thomas Noonan taken on March 26, 2009.
John W. Peavy taken on May 19, 2009
Henry Runowiecki taken on November 22, 2008.
Frederick Suhadolc taken on November 19, 2008.
Glenn Tibble taken on November 14, 2008.
Marvin Tong taken on January 16, 2009.
Hugh Tinman taken on November 22, 2008.
Aaron Lou Whitley taken on March 30, 2009.

**Defendants' Expert Reports**
Expert Report of Melanie Langsett
Expert Report of Cathy M. Niden
Expert Report of John W. Peavy

**Pleadings**
Order Denying Defendants Motion for Summary Judgment (July 16, 2009)
Order Denying Defendants Motion for Summary Judgment (July 31, 2009)
Final Pre Trial Conference Order (September 25, 2009)

**EXHIBIT  C**

**Pomerantz Declaration**
**Exhibit C**

Tibble, et al. v. Edison, et al., No. CV07-05359 (SVW)

## Annual & Cumulative Compounded Excess Mutual Fund Fees

| FUND | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Franklin Small-Mid-Cap Growth A | $17,779 | $30,731 | $24,844 | $27,493 | $26,314 | $26,519 | $10,136 | $163,816 |
| MFS Total Return A | --- | $538 | $3,365 | $6,103 | $8,927 | $11,730 | $13,774 | $44,437 |
| William Blair Small Cap Growth N | --- | $541 | $15,186 | $48,884 | $51,483 | $43,975 | $48,257 | $208,326 |
| PIMCO RCM Global Tech A | --- | $1,403 | $45,578 | --- | --- | --- | --- | $46,981 |
| Janus Small Cap Value Inv | --- | --- | $9,835 | $32,361 | $30,049 | $30,655 | 14,253 | $117,153 |
| Allianz CCM Capital Apprec | --- | --- | --- | --- | $12,624 | $25,201 | $39,731 | $77,556 |
| ANNUAL DAMAGE | $17,779 | $33,213 | $98,808 | $114,840 | $129,396 | $138,080 | $126,152 | $658,269 |
| CUMULATIVE COMPOUNDED DAMAGE | $17,779 | $45,730 | $190,491 | $335,925 | $491,446 | $677,451 | $863,633 | $863,633 |

**EXHIBIT  D**

Pomerantz Declaration
Exhibit D

Tibble, et al. v. Edison, et al., No. CV07-05359 (SVW)



TOTAL COMPOUNDED EXCESS MUTUAL FUND FEES

$863,633

$677,451

$491,446

$335,925

$190,491

$98,808

$45,730

$33,213

$17,779

$17,779

$129,396

$114,840

$158,080

$126,152

2001    2002    2003    2004    2005    2006    2007

Annual Damage   Cumulative Compounded Damage

$1,000,000
$900,000
$800,000
$700,000
$600,000
$500,000
$400,000
$300,000
$200,000
$100,000
$-

D-33

**EXHIBIT E**

Pomerantz Declaration
Exhibit E

Tibble, et al. v. Edison, et al., No. CV07-05359 (SVW)

## Franklin Small-Mid Cap Growth Fund

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| Year End Fund Assets (thousands)[1] | $26,614 | $16,056 | $8,529 | $11,346 | $10,648 | $10,403 | $10,812 | ------- |
| Annual Avg. Assets (thousands)[2] | ------- | $21,335 | $12,293 | $9,938 | $10,997 | $10,526 | $10,608 | $5,406 |
| A Class Fee (bps)[3] | ------- | 86 | 89 | 102 | 98 | 97 | 96 | 98 |
| Adv Class Fee (bps)[3] | ------- | 61 | 64 | 77 | 73 | 72 | 71 | 73 |
| Excess Fee (bps)[4] | ------- | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Annual Excess Fees[5] | ------- | $17,779 | $30,731 | $24,844 | $27,493 | $26,314 | $26,519 | $13,515 |
| Annual Returns | ------- | ------- | 29.6% | 37.7% | 13.0% | 10.5% | 7.5% | 11.7% |
| Compounded Cumulative Excess Fees | ------- | $17,779 | $43,248 | $84,396 | $122,860 | $162,074 | $200,748 | $237,691 |

1 – Source: 11ks
2 – average of year-end & preceding year end assets
3 – Source: Morningstar
4 – A class fee less Adv class fee
5 – Excess fee times annual avg assets

E-34