UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GLENN TIBBLE, et al. | ) | CV 07-5359 SVW (AGRx) |
| Plaintiffs, | ) | |
| | ) | FINDINGS OF FACT AND |
| v. | ) | CONCLUSIONS OF LAW |
| | ) | |
| EDISON INTERNATIONAL, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I.   **INTRODUCTION AND PROCEDURAL BACKGROUND**

    Named Plaintiffs Glenn Tibble, William Bauer, William Izral, Henry Runowiecki, Frederick Sohadolc, and Hugh Tinman, Jr. (collectively "Plaintiffs") filed this class action on August 16, 2007 on behalf of the Edison 401(k) Savings Plan ("the Plan") and all similarly-situated participants and beneficiaries of the Plan, against Defendants Edison International ("Edison"), Southern California Edison Company ("SCE"), the Southern California Edison Company Benefits Committee ("Benefits Committee"), the Edison International Trust Investment Committee ("TIC"), the Secretary of the SCE Benefits Committee, SCE's Vice President of Human Resources, and the Manager of SCE's Human Resources Service Center (collectively, "Defendants").  Plaintiffs sought to

recover damages pursuant to the Employee Retirement Income Security Act
(ERISA), 29 U.S.C. § 1132(a), for alleged financial losses suffered by
the Plan, in addition to injunctive and other equitable relief based on
alleged breaches of Defendants' fiduciary duties.  29 U.S.C. §§ 1104,
1106.

On June 30, 2009, the Court granted Plaintiffs' motion for class
certification and appointed Plaintiffs Bauer, Tibble, and Suhadolc as
class representatives.  The class is defined as: "All persons,
excluding the Defendants and other individuals who are or may be liable
for the conduct described in this Complaint, who were or are
participants or beneficiaries of the Plan and who were, are, or may
have been affected by the conduct set forth in the Second Amended
Complaint."  (Order at 21 [Docket No. 286].)  In August 2009, the Court
granted Plaintiffs' request to amend the class certification order so
as to name Plaintiffs Izral, Runowiecki, and Tinman as class
representatives.  (Order [Docket No. 308].)

In May 2009, both parties filed motions for summary judgment or
partial summary judgment.  (Docket Nos. 146, 186.)  The Court issued
its rulings on the summary judgment motions on July 16, 2009 and July
31, 2009.  The Court granted partial summary judgment in Defendant's
favor as to the majority of Plaintiff's claims.  Specifically, the
Court granted summary judgment in Defendants' favor on the following
claims asserted by Plaintiffs: (1) whether Defendants breached their
fiduciary duty by selecting mutual funds for the Plan that did not
perform as well as the Frank Russell Trust Company low-cost index
funds; (2) whether SCE's receipt of revenue sharing from certain mutual
funds which offset SCE's payments to its record-keeper, Hewitt

Associates, constituted a prohibited transaction under 29 U.S.C. § 1106(b)(2) or 29 U.S.C. § 1106(b)(3); (3) whether Defendants violated the specific Plan Document under 29 U.S.C. § 1104(a)(1)(D) by allowing some of the fees paid to Hewitt Associates to come from revenue-sharing arrangements; (4) whether Defendants violated the Plan documents by allowing some of the compensation for the Plan Trustee, State Street, to be paid from float; (5) whether allowing State Street to retain float constituted a prohibited transaction under 29 U.S.C. § 1106(a)(1)(D); (6) whether Defendants violated their duties of prudence and loyalty under § 1104(a)(1)(B) by doing any of the following: (a) selecting sector funds, especially the poorly-performing T. Rowe Price Science & Technology Fund, for inclusion in the Plan in 1999; (b) including a money market fund in the Plan rather than a stable value fund; and (c) structuring the Edison stock fund as a unitized fund instead of a direct ownership fund.  The claims listed above were all dismissed against Defendants.  (Orders, Docket Nos. 295, 303.)  The Court also ruled that the applicable statute of limitations for Plaintiff's claims was six years, which runs back to August 16, 2001.[1] (July 16, 2009 Order at 12-14 [Docket No. 295].)

    After the ruling on the summary judgment motions, two issues remained for trial: (1) whether the Defendants violated their duty of loyalty by selecting for the Plan certain retail mutual funds that provided for favorable revenue-sharing arrangements but charged higher fees to Plan participants than other funds; and (2) whether the Defendants violated their duty of prudence by selecting for the Plan a money market fund that allegedly charged excessive management fees.  In

---

[1] As stated above, Plaintiffs' initial Complaint was filed on August 16, 2007.

preparing for (and during) trial, the Plaintiffs amended their first theory of liability to conform to proof.  Specifically, as to the mutual funds, Plaintiffs argued that Defendants violated both their duty of loyalty and their duty of prudence by investing in the retail share classes of six mutual funds instead of the institutional share classes of those same funds.  The retail share classes of the six mutual funds offered more favorable revenue-sharing arrangements to SCE but charged the Plan participants higher fees than the institutional share classes.  Three of the mutual funds at issue were chosen after the statute of limitations period; thus, Plaintiffs challenged Defendants' initial investment decisions with regard to those funds. The other three funds were added to the Plan before the statute of limitations period; thus, Plaintiffs challenged the failure to switch to an institutional share class upon the occurrence of certain significant events within the limitations period.  Plaintiffs continued to assert the second theory of liability regarding the Money Market Fund.

A bench trial in this action was held on October 20-22, 2009. Additionally, the parties were permitted to file supplemental briefs, affidavits, and other evidence in response to Plaintiffs' assertion at trial of a new legal theory regarding the selection of retail share classes rather than institutional share classes of certain mutual funds.  The parties each submitted extensive post-trial briefing and additional evidence from November 2009 to April 2010.  A post-trial hearing regarding the supplemental evidence was held on April 26, 2010.

Having throughly examined the evidence, considered the arguments of both sides, and made the following factual findings, the Court

concludes that Defendants violated their duty of prudence under 29 U.S.C. § 1104(a) by choosing to invest in the retail share class rather than the institutional share class of the William Blair Small Cap Growth Fund, the MFS Total Return Fund, and the PIMCO (Allianz) RCM Global Tech Fund.  The Court awards damages accordingly, as set forth below.

The Court concludes that Defendants did not breach their fiduciary duties of loyalty or prudence by failing to switch into the institutional share classes of the Berger (Janus) Small Cap Value Fund, the Allianz CCM Capital Appreciation Fund, and the Franklin Small-Mid Cap Value Fund upon the occurrence of certain events within the limitations period.

Finally, the Court finds that Defendants did not breach their fiduciary duty of prudence by investing in the Money Market Fund managed by State Street Global Advisors or by failing to negotiate a lower management fee.

## II.  FINDINGS OF FACT

### A.  Background

Plaintiffs Glenn Tibble, William Bauer, William Izral, Henry Runowiecki, Frederick Sohadolc, and Hugh Tinman, Jr. (collectively "Plaintiffs") are current or former employees of Midwest Generation, LLC.  Midwest Generation, LLC is an indirect subsidiary of Edison Mission Group, Inc., which in turn, is a subsidiary of Defendant Edison International ("Edison International").

Defendant Edison International is the parent company of Southern California Edison ("SCE") (both entities referred to collectively as, "Edison").  SCE is a utility that provides electricity to retail

customers in California.  SCE is the sponsor of the Edison 401(k) Savings Plan ("the Plan"), formerly named the Stock Savings Plus Plan ("SSPP").  The Plan is a defined contribution plan, as defined by the Employee Retirement Income Security Act of 1974 as amended ("ERISA") § 3(34), 29 U.S.C. § 1002(34), and is an "eligible individual account plan."  The Plan was created in 1982 and is maintained for all employees of Edison-affiliated companies.  Edison employees may contribute from 1% to 85% of their eligible earnings to the Plan on a pre-tax basis, up to annual limits of the Internal Revenue Code, and Edison may match some contributions to the Plan.  The Plaintiffs have been participants in the Plan during the relevant time period.

Defendant SCE Benefits Committee ("Benefits Committee") and its members are among the named fiduciaries of the Plan.  The Benefits Committee is the Plan Administrator and is responsible for the overall structure of the Plan.  Members of the Benefits Committee are chosen by the SCE Chief Executive Officer and are required to report to the SCE Board of Directors.  The Secretary of the SCE Benefits Committee, a Defendant in this action, was a named fiduciary of the Plan during the relevant time period.[2]

Additionally, pursuant to the 2001 and 2006 Plan documents, SCE's Vice President of Human Resources and the Manager of SCE's Human Resources Service Center (now called "Benefits Administration"), both Defendants in this action, were named fiduciaries of the Plan during

---

[2] This named fiduciary status started in 2001.  In 2005, Aaron L. Whitely was the Secretary of the SCE Benefits Committee.

the relevant time period.[3]  The Benefits Administration staff is responsible for implementing administrative changes to the Plan, overseeing the budget for Plan administration costs, and monitoring the ongoing performance of the Plan's recordkeeper, Hewitt Associates, LLC ("Hewitt Associates").

Hewitt Associates has served as the third-party recordkeeper for the Plan since at least 1996.  Hewitt Associates is responsible for preparing reports regarding the Plan to be sent to the Plan participants and regulators, and maintaining a system that participants can access to make changes to their contributions and investment elections.

The SCE and Edison International Board of Directors delegates the authority to select and monitor the Plan's investment options to the Edison International Trust Investment Committee (the "TIC"), a Defendant in this action.  The TIC has delegated certain investment responsibilities to the TIC Chairman's Subcommittee (the "Sub-TIC"), which focuses on the selection of specific investment options.  The TIC and the Sub-TIC (collectively referred to as "the Investment Committees") were Plan fiduciaries during the relevant time period.  No members of the Investment Committees were simultaneously members of either the SCE or Edison International Board of Directors while serving on an Investment Committee.

---

[3] The named fiduciary status for these positions started in 2001.  At different times, Diane Featherstone, Lillian R. Gorman, John H. Kelly, Frederick J. Grigsby, Jr., and J. Michael Mendez have served as SCE's Vice President of Human Resources or Senior Vice President of Human Resources.

To some extent and with certain exceptions, SCE indemnifies Defendants and SCE directors and employees for conduct when they may be acting as Plan fiduciaries.

**B.   Structure of the Plan**

Before 1999, the Plan contained six investment options: (1) a Bond Fund invested in the Frank Russell Short Term Bond Fund; (2) a Balanced Fund invested in five Frank Russell Trust Company funds; (3) a Global Stock Fund invested in three Frank Russell Trust Company funds; (4) a Money Market Fund invested in the Wells Fargo Short-Term Income Fund; (5) a Common Stock Fund invested in the Barclay's Global Investor's Equity Index T-Fund; and (6) the Edison International Stock Fund ("EIX Stock Fund").

In 1998, SCE and the unions representing SCE employees began collective bargaining negotiations. (SUF ¶ 10.) As a result of these negotiations, the investment options included in the Plan were altered significantly.  After the negotiations were completed, the Plan offered a broad array of up to fifty investment options including ten "core" options and a mutual fund window, which included approximately forty mutual funds.  In March 1999 and February 2000, the Plan was amended to provide for this structure of investment options for union and non-union employees of Edison and its affiliates.  Since these changes, Plan participants have been allowed to select from a variety of investment options with different risk levels, including pre-mixed portfolios, a money market fund, bond and equity funds, the EIX Stock Fund, and dozens of mutual funds.

As of December 31, 2003, the Plan included 41 retail mutual funds. As of December 31, 2004, the Plan included 39 retail mutual funds. As of December 31, 2005, the Plan included 38 retail mutual funds.

The Plan had $2,128,870,558 in assets as of December 31, 2003; $2,655,515,479 in assets as of December 31, 2004; and $3,172,539,477 in assets as of December 31, 2005.

C.   **Investment Selection Process**

As stated above, the TIC and the Sub-TIC (collectively, "the Investment Committees") have the authority to decide whether to select, maintain or replace the investment options in the Plan, so long as such choices are consistent with the overall structure of the Plan as described above.  SCE's Investments Staff provides information and recommendations to the Investment Committees regarding which investment options to maintain or replace.  The Investments Staff includes David Ertel, Marvin Tong, Greg Henry, Linda Macias, and Darleen Loose.  This group is responsible for monitoring and evaluating the investments for the Plan, as well as the investments for other trusts monitored by Edison.

The Investments Staff does not have any authority over the administration of the Plan, the selection of the Plan's third-party service providers, or the selection of the Plan's investment options. Rather, the Investments Staff's role is limited to monitoring the Plan's investment options and, when needed, recommending to the Investment Committees that changes be made to the Plan's investment option line-up.  On a quarterly basis, the Investments Staff attends the meetings of the Investment Committees and gives presentations regarding the Plan's overall performance.  When advisable, the

Investments Staff presents information regarding the performance of specific investment options and recommends changes to the Plan's line-up, such as adding or terminating investment options.  The Investment Committees have discretion to accept or reject the recommendations of the Investments Staff.  In most instances, however, the Investment Committees accept the recommendations of the Investments Staff.

The Investments Staff uses the following criteria to evaluate the investment options in the Plan: (1) the stability of the fund's overall organization; (2) the fund's investment process; (3) the fund's performance; (4) the fund's total expense ratio (including fees and revenue-sharing); and (5) with respect to mutual funds, the availability of public information regarding the fund (collectively, the "Investment Criteria").  In applying the Investment Criteria, the Investments Staff evaluates fund performance on a net-of-fee basis to ensure that relative performance comparisons among funds may be made on a consistent basis.

The Investment Staff relies on a variety of sources to monitor the funds' performance and fees.  Specifically, Hewitt Financial Services ("HFS"), an affiliate of the Plan's record-keeper Hewitt Associates, provides investment advice to the Investments Staff.  HFS provides the Investment Staff with written reports regarding the performance of the Plan's investment options on a monthly, quarterly, and annual basis. The reports include short- and long-term performance, annualized performance, risk, and performance of peer groups and benchmarks.  The Investments Staff confers with HFS representatives to review the contents of the report on a quarterly basis, has an annual meeting with

HFS to undergo a more in-depth analysis, and confers with HFS on an as-needed basis to discuss specific investment options.

Additionally, the Investments Staff confers with the Frank Russell Trust Company ("Russell") regarding fund performance.  Russell is the investment consultant for Edison's Pension Fund, and at times has information regarding specific investment managers associated with the funds in the Plan's line-up or funds that are being considered by the Investments Staff.

The Investments Staff also conducts its own independent analysis regarding the performance of the investment options.  This research includes using data from Morningstar, Financial Engines, and other online sources to track the options' performance.  The Investments Staff, in conjunction with HFS and Russell (for the funds managed by Russell) also selects benchmarks for each investment option to determine if the investment options are meeting the Investment Criteria.

If an investment option's performance or a change in management or deterioration in financial condition suggests that the option may cease to meet the Investment Criteria in the future, the Investments Staff places the fund on a "Watch List" for closer monitoring.  If an option on the Watch List fails to meet the Investment Criteria, the Investments Staff will recommend to the Investment Committees that the option be removed from the Plan line-up.  In these instances, the Investments Staff often recommends adding a new option to the Plan in the place of the terminated option.

///

///

When a new option needs to be added to the Plan, the Investments Staff requests that HFS identify a small number of investment funds that would meet the Plan's needs.  Additionally, the Investments Staff conducts independent research to choose a new option to recommend to the Investment Committees.  Generally, however, the Investments Staff does not recommend that the Investment Committees make changes (either additions and deletions) to the Plan line-up unless there are significant issues with a particular Plan investment option such that it no longer meets the Investment Criteria.

After the recommendations are made to the Investment Committees during the quarterly meetings, the Investment Committees may ask questions about the recommendations.  Ultimately, the Investment Committees decide whether to accept or reject the Investments Staff's recommendations in their discretion.

Changes to the Plan's investment line-up are generally only made once or twice per year.  Between August 2001 and the end of 2005, changes to the Plan's investment lineup occurred on: July 2002, October 2003, December 2003, October 2004, January 2005, and October 2005.

**D.   Mutual Funds**

As stated above, the Plan began offering a mutual fund window to Plan participants in March 1999 in response to collective bargaining negotiations.  At any given time, the Plan's mutual fund window consisted of approximately 40 retail mutual funds for participants to choose from.

**1.   Revenue Sharing**

Before the addition of the mutual funds to the Plan in 1999, SCE paid the entire cost of Hewitt Associates' record-keeping services.

These services include things such as mailing prospectuses, maintaining individual account balances, providing participant statements, operating a website accessible by Plan participants that allows participants to conduct transactions and obtain information about the Plan's investment options, and answering inquiries from Plan participants regarding their investment options.  The fees for these services were paid by SCE, not the Plan participants.

With the addition of the mutual funds to the Plan, however, certain "revenue sharing" was made available to SCE that could be used to offset the cost of Hewitt Associates' record-keeping expenses. "Revenue sharing" is a general term that refers to the practice by which mutual funds collect fees from mutual fund assets and distribute them to service providers, such as recordkeepers and trustees - services the mutual funds would otherwise provide themselves.[4]  Revenue sharing comes from so-called "12b-1" fees, which are fees that mutual fund investment managers charge to investors in order to pay for distribution expenses and shareholder service expenses.  See Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861, 863 (2d Cir. 1990).[5]  Each type of fee is collected out of the mutual fund assets, and is included as a part of the mutual fund's overall expense ratio.  (See Pomerantz Rep. ¶

---

[4] In a recent report from the Department of Labor ("DOL"), the Working Group noted that "in the employee benefit community, the term 'revenue sharing' is used loosely to describe virtually any payment that a plan service provider receives from a party other than the plan."  Report of the Working Group on Fiduciary Responsibilities & Revenue Sharing Practices, Department of Labor (June 18, 2009), available at, http:www.dol.gov/ebsa/publications/AC-1107b.html.

[5] 12b-1 fees receive their name from SEC Rule 12b-1, which was promulgated pursuant to the Investment Company Act of 1940 ("ICA").  See 17 C.F.R. § 270.12b-1(b).  The ICA generally bans the use of fund assets to pay the costs of fund distribution. In 1980, however, the SEC adopted Rule 12b-1 which specifies certain conditions that must be met in order for mutual fund advisers to be able to make payments from fund assets for the costs of marketing and distributing fund shares.  See Meyer, 895 F.2d at 863.

2.)  The expense ratio is the overall fee that the mutual fund charges to investors for investing in that particular fund, which includes 12b-1 fees as well as other fees, such as management fees.[6]  These fees are deducted from the mutual fund assets before any returns are paid out to the investors.

In 1999, when retail mutual funds were added to the Plan, some of the mutual funds offered revenue sharing which was used to pay for part of Hewitt Associates' record-keeping costs.  Hewitt Associates then billed SCE for its services after having deducted the amount received from the mutual funds from revenue sharing.  In short, revenue sharing offsets some of the fees SCE would otherwise pay to Hewitt Associates.

The use of revenue sharing to offset Hewitt Associates' record-keeping costs was discussed with the employee unions during the 1998-99 negotiations.  Specifically, the unions were advised that revenue sharing fees would result in some of the administrative costs of the Plan being partially offset from mutual funds' revenue sharing payments to Hewitt Associates.  Additionally, this arrangement was disclosed to Plan participants on approximately seventeen occasions after the practice began in 1999.

The SCE Human Resources Department, also called "Benefits Administration," is responsible for the overall administration budget for the Plan, including the expenses associated with Hewitt Associate's record-keeping costs.  The amount of revenue sharing affects the overall budget for the Plan.  The Human Resources Department has no authority to determine which funds are selected for the Plan line-up,

---

[6]  See Fact Sheet: Report on Mutual Fund Fees & Expenses, Securities & Exchange Commission (January 10, 2001), available at http://www.sec.gov/news/extra/mfeefaq.htm.

but needs to know what revenue sharing arrangements exist so as to budget accordingly.

**2.  Investment Decisions Were Not Motivated by a Desire to Increase Revenue Sharing**

**a.  Overall trend toward reduced revenue sharing**

From July 2002 to October 2008, the investment selections for the Plan demonstrate a general trend toward selecting mutual funds with **reduced** revenue sharing.  During this period, Defendants made 39 additions or replacements to the mutual funds in the Plan's investment line-up.  In 18 out of 39 instances, Defendants chose to replace an existing mutual fund that offered revenue sharing with a mutual fund that provided **less** revenue sharing or **no** revenue sharing at all.  In 11 instances, Defendants made mutual fund replacements that resulted in no net change to the revenue sharing received by SCE.  In 4 instances, Defendants added additional funds that did not replace existing funds; thus, there is no comparison to be made with regard to revenue sharing.[7] In sum, in 33 out of 39 instances, the changes to the mutual funds in the Plan evidenced either a decrease or no net change in the revenue sharing received by the Plan.  These changes could not have been motivated by a desire to capture revenue sharing.  In contrast, in only 6 instances out of 39, Defendants made mutual fund replacements that increased the revenue sharing received by SCE.  This overall pattern is not consistent with a motive to increase revenue sharing.

**b. Plan changes in 2003 were not motivated by a desire to capture more revenue sharing**

---

[7] Of these four additions, however, two of the mutual funds did not offer any revenue sharing, while the other two did offer revenue sharing.

Between March and June 2003, members of the Investments Staff were considering changes to the Plan's mutual fund line-up. Members of the Investment Staff, such as Marvin Tong and David Ertel, had email conversations with advisors from HFS and members of the SCE Human Resources Department in which they discussed the revenue sharing that SCE could expect to receive from the fund changes the Investments Staff was considering. These email conversations indicate that the Investments Staff was certainly aware of the benefits of revenue sharing; however, the actual changes made to the Plan line-up during 2003 do not evidence a desire to increase revenue sharing.

On June 30, 2003 and again on July 16, 2003, the Investments Staff attended meetings with the Investment Committees regarding the recommended changes to the Plan's investment line-up. During those meetings, the Investments Staff did not make any recommendations to the Investment Committees regarding revenue sharing. In fact, the Investment Staff recommended adding six mutual funds to the Plan at the 2003 meetings. Each of the six funds had both a retail share class and an institutional share class with different expense ratios and different revenue sharing benefits. With regard to each of those six funds added to the Plan, the Investment Committees selected the share class with the lowest expense ratio and the lowest revenue sharing, with the exception of one fund which offered no revenue sharing in either share class. In sum, the 2003 changes were not motivated by a desire to capture revenue sharing.

Additionally, there is no evidence that Defendants were motivated by revenue sharing when deciding to add or retain the six specific

mutual fund share classes at issue in this case, as discussed further below.

### 3. Mutual Fund Share Classes

Certain mutual funds offer their investors retail and institutional share classes.  Institutional share classes are available to institutional investors, such as 401(k) plans, and may require a certain minimum investment.  Institutional share classes often charge lower fees (i.e., a lower expense ratio) because the amount of assets invested is far greater than the typical individual investor.  The investment management of all share classes within a single mutual fund is identical, and managed within the same pool of assets.  In other words, with the exception of the expense ratio (including revenue sharing), the retail share class and the institutional share class are managed in identical fashion.

### 4. The Six Mutual Funds At Issue

Plaintiffs contend that Defendants violated their fiduciary duties of loyalty and prudence by investing in the retail share classes rather than the institutional share classes of the following six mutual funds: (1) Janus Small Cap Value Fund ("Janus Fund"); (2) Allianz CCM Capital Appreciation Fund ("Allianz Fund"); (3) Franklin Small-Mid Cap Growth Fund ("Franklin Fund"); (4) William Blair Small Growth Fund ("William Blair Fund"); (5) PIMCO RCM Global Tech Fund ("PIMCO Fund"); and (6) MFS Total Return A Fund ("MFS Total Return Fund").  The retail share classes of each of these funds had higher expense ratios than the institutional share classes; the higher fees were directly related to the fact that the retail share classes offered more revenue sharing.

### a.   William Blair Small Cap Growth Fund

The William Blair Small Cap Growth Fund ("William Blair Fund") was initially added to the Plan in July 2002.  Defendants chose to invest in a retail share class of the fund, although an institutional share class was available at that time.  There is no evidence that Defendants considered the institutional share class in July 2002 or that the Investments Staff presented information about the institutional share class to the Investment Committees in 2002.  From 2002 to 2009, the fees for the retail share class of the William Blair Fund were 24-29 basis points higher than the fees for the institutional share class. The higher fee is attributable to 12b-1 fees that served as a source of revenue sharing to SCE.

The Plan's initial investment in the William Blair Fund was $0. The minimum required investment for the institutional share class was $500,000.  Nonetheless, the $500,000 investment minimum for the institutional share class would not have precluded Defendants from investing in the institutional share class.  The William Blair Fund will waive the investment minimum in certain circumstances - for example, where a plan can commit to meet the investment minimum within a specified time frame.  Here, the Plan's investment in the William Blair Fund met or exceed the $500,000 minimum investment criteria by August 2002, within a month of its initial investment.

For large 401(k) plans with over a billion dollars in total assets, such as Edison's, mutual funds will often waive an investment minimum for institutional share classes.  It is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure

the institutional shares.  Defendants' expert, Daniel J. Esch, has personally obtained such waivers for plans as small as $50 million in total assets - i.e., 5 percent the size of the Edison Plan.

The only way a fiduciary can obtain a waiver of the investment minimum is to call and ask for one.  Yet none of the Edison fiduciaries nor anyone acting on their behalf (including HFS) ever requested that the William Blair Fund waive the minimum investment so that the Plan could invest in the institutional share class.  Had someone called on behalf of the Plan and requested a waiver of the investment minimum, the William Blair Fund almost certainly would have granted the waiver.

The William Blair Fund remains in the Plan to the present day; assets continue to be invested in the retail share class.

### b.   PIMCO RCM Global Technology Fund

The PIMCO RCM Global Technology Fund ("PIMCO Fund") was added to the Plan in July 2002.  Defendants initially chose to invest in the retail share class, although an institutional share class existed at that time.  From 2002 to 2003, the fees for the retail share class were 34-40 basis points higher than the fees for the institutional share class.  The higher fee is attributable to 12b-1 fees that served as a source of revenue sharing to SCE.

In July 2002, the minimum investment for the institutional share class of the PIMCO Fund was $5 million.  The Plan did not meet this minimum investment until July 2003, when the assets in the fund totaled $5.3 million.

Nonetheless, the $5 million investment minimum for the institutional share class would not have precluded Defendants from investing in the institutional share class.  The PIMCO Series

Prospectus filed on December 28, 2001 indicates that the PIMCO Fund will waive investment minimums for the institutional share class in its sole discretion.  As stated above, it is common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.  Defendants' expert has personally obtained such waivers for plans as small as $50 million in total assets - i.e., 5 percent the size of the Edison Plan.  Additionally, Defendants' expert has personally obtained waivers for plans like Edison's from the PIMCO Fund in the past.

None of the Edison fiduciaries nor anyone acting on their behalf (including HFS) ever requested that the PIMCO Fund waive the minimum investment so that the Plan could invest in the institutional share class in July 2002.  Had someone called on behalf of the Plan in July 2002 and requested a waiver of the investment minimum, the PIMCO Fund almost certainly would have granted the waiver.

In October 2003, Defendants converted the shares in the retail class of the PIMCO Fund to the institutional share class.  The following background is relevant to the decision to switch share classes:  In 2002, when Defendants first considered adding the PIMCO RCM Fund to the Plan, it was called the Dresdner RCM Global Technology Fund (the "Dresdner Fund").  The retail share class of the Dresdner Fund had a performance history and a Morningstar rating.  However, in the time between when the Investments Staff first recommended the Dresdner Fund to the Investment Committees, and when the fund was added to the Plan in July 2002, there was merger of the Dresdner Fund into the PIMCO RCM Global Technology Fund.  At that point, the assets

automatically transferred from the retail share class of Dresdner Fund into the retail share class of the PIMCO RCM Global Technology Fund. The retail share class of PIMCO Fund did not have a Morningstar rating or a performance history.

In early 2003, Edison began considering the elimination of a separate fund, the T. Rowe Price Science Fund, from the Plan.  The T. Rowe Price Science Fund had over $40 million in assets invested in it; Defendants considered mapping these assets into the PIMCO Fund upon the termination of the T. Rowe Price Science Fund.  In connection with that decision, Defendants reviewed the different share classes of the PIMCO Fund in July 2003.  Defendants learned that the retail share class of the PIMCO Fund (in which the Plan was invested) did not have a performance history or a Morningstar rating, but the institutional share class did have a performance history and a Morningstar rating. One of the Investment Criteria used to select mutual funds is the availability of public information, such as a sufficient performance history and Morningstar rating.  Thus, the Edison fiduciaries determined that it would be more prudent to invest in the institutional share class of the PIMCO Fund.

In October 2003, when the Edison fiduciaries eliminated the T. Rowe Price Science Fund from the Plan, they mapped the $40 million in assets from that fund into the PIMCO Fund and simultaneously converted all of the PIMCO Fund retail shares to institutional shares, thereby securing the lower fee rate.  Since October 2003, the shares have been invested in the institutional share class.

### c.   MFS Total Return Fund

The MFS Total Return Fund was added to the Plan in July 2002.  The
fund was added as a replacement for the Invesco Total Return Fund.
Assets in the amount of $500,000 were mapped from the Invesco Total
Return Fund into the MFS Total Return Fund when the fund was first
added to the Plan.  Defendants chose to invest in the retail share
class of the fund, although a cheaper institutional share class was
available in July 2002.  From 2002 to 2008, the fees for the retail
share class were 24-25 basis points higher than the fees for the
institutional share class.  The higher fee is attributable to 12b-1
fees that served as a source of revenue sharing to SCE.

David Ertel admitted that the Investment Staff did not present any
information to the Sub-TIC about the institutional share class of the
MFS Total Return Fund at the time it was added to the Plan.

In July 2002, to invest in the institutional share class of the
MFS Total Return Fund, a retirement plan had to: (1) have aggregate
assets of at least $100 million, and (2) invest at least $10 million
either in institutional shares of the MFS Total Return Fund alone or in
combination with investments in institutional shares of other MFS
funds.  There is no evidence as to what the applicable minimum
investment for the institutional share class was in 2003, 2004, 2005,
2006, or 2007.[8]

The Plan met the first criteria for investment in the

---

[8] Plaintiffs introduced a document at trial dated December 31, 2008, which
demonstrated that, as of that date, the mandatory minimum investment for the
institutional share class of the MFS Total Return Fund was $0.  (Trial Exh. 1742.)
However, this exhibit has no probative value because it does not indicate what the
investment minimum was at the time Edison fiduciaries added the Fund to the Plan
line-up, or at any time when Edison was invested in the fund.

institutional share class - aggregate assets of at least $100 million - at the time of its initial investment in July 2002.  As to the second criteria, the Plan never had a total of $10 million in assets invested in the MFS Total Return Fund alone.  However, as of April 2005, the Plan met the minimum investment requirement through a combination of assets in various MFS funds which exceeded $10 million.

The $10 million investment minimum for the institutional share class would not have precluded Defendants from investing in the institutional share class of the MFS Total Return Fund.  The January 2002 MFS Series Prospectus states that MFS Total Return Fund will waive the investment minimum in its discretion when it determines that the entity's aggregate assets were likely to equal or exceed $100 million or that such entity would make additional investments in MFS funds so as to meet the $10 million aggregate minimum within a reasonable time.

For large 401(k) plans with over a billion dollars in total assets, such as Edison's, mutual funds will often waive an investment minimum for institutional share classes. It is therefore common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.  Defendants' expert has personally obtained such waivers for plans as small as $50 million in total assets - i.e., 5 percent the size of the Edison Plan.

The only way a Plan fiduciary can obtain a waiver of an investment minimum for the institutional share class is to call the fund and ask for one.  Yet none of the Edison fiduciaries nor anyone acting on their behalf (including HFS) ever requested that the MFS Total Return Fund waive the minimum investment so that the Plan could invest in the

institutional share class.  Had someone called on behalf of the Plan
and requested a waiver of the investment minimum in July 2002, the MFS
Total Return Fund almost certainly would have granted the waiver.

The MFS Total Return Fund was eliminated from the Plan's menu of
investment options in October 2008, and its assets were mapped into the
Russell Balanced Moderate Growth portfolio at that time.

### d.   Janus Small Cap Value Fund

The Berger Small Cap Value Fund was added to the Plan in March
1999, which is outside the statute of limitations period in this
action.  Defendants chose to invest in the retail share class although
an institutional share class was also available.  Defendants do not
offer any reason why they initially chose to invest in the retail share
class.  From 2003 to 2007, the fees for the retail share class were
between 18 and 33 basis points higher than the fees charged for the
institutional share class.  The higher fee is attributable to 12b-1
fees that served as a source of revenue sharing to SCE.

Effective in April 2003, Stilwell Financial, which owned both the
Janus and Berger families of mutual funds reorganized several of
Berger's funds into Janus.  As part of this reorganization, the name of
the Berger Small Cap Value Fund was changed to Janus Small Cap Value
Fund (the "Janus Fund").  David Ertel, the Manager of Investments for
SCE and the head of the Investments Staff, admitted that the April 2003
rebranding did not prompt Edison to review the share class in which the
Plan assets were invested in.

The management team of the Janus Fund remained the same both
before and after the 2003 reorganization.  Specifically, the Janus Fund
was managed by a sub-advisor company called Perkins, Wolfe, and

McDonald ("PWM") both before and after the acquisition.  The same two managers from PWM, Robert Perkins and Thomas Perkins, continued to manage the fund after the acquisition.  During the acquisition, however, Janus purchased a minority interest of 30 percent in PWM.

The investment style of the Janus Fund remained essentially the same both before and after the 2003 reorganization, and the benchmark that the fund used, the Russell 2000 Value Index, did not change.  Further, Morningstar, which is a trusted source for information on mutual funds, did not change its categorization of the Janus Fund nor did it change the benchmarks it used to evaluate the Janus Fund.  In sum, the changes to the Janus Fund in April 2003 were nothing more than a rebranding.  The fund's management, investment style, and performance benchmarks did not change.

On June 30, 2003, the Trust Investment Committee/Chairman's Subcommittee ("Sub-TIC") held a meeting in which they reviewed the funds for the Plan, including the Janus Fund.  The meeting minutes/overview for the June 30, 2003 meeting reflect that, as of that date, the Janus Fund was placed on a "low priority" Watch List due to "Organizational issues/Manager turnover."  Thus, Defendants conducted a closer review of the Janus Fund as a result of the April 2003 reorganization.  Defendants did not switch share classes in 2003.

In October 2007, the Janus Fund was eliminated from the Plan's line-up of investment options and its assets were mapped into the Artisan Small Cap Value Fund.

### e.   Allianz CCM Capital Appreciation Fund

The PIMCO CCM Capital Appreciation Fund was added to the Plan in March 1999, which is outside the statute of limitations period for this

action.  Defendants chose to invest in a retail ("Administration") share class of the fund, although an institutional ("I") share class was available and continues to remain available.  Defendants do not offer any reason why they initially chose to invest in the retail share class.  From 2005 to 2009, fees for the retail share class were 25 basis points higher than fees for the institutional share class.  The higher fee is attributable to 12b-1 fees that served as a source of revenue sharing to SCE.

In 2000, Allianz bought a controlling interest in PIMCO.  Five years later, in April 2005, Allianz rebranded several of the PIMCO funds.  The PIMCO RCM Capital Appreciation Fund was renamed the Allianz CCM Capital Appreciation Fund (the "Allianz Fund") at that time.  There was no change in the management of the Allianz Fund as a result of the rebranding.[9]  Additionally, the fund's investment strategy remained the same, and Morningstar did not reclassify the Allianz fund or change its benchmarks after the April 2005 rebranding.

In June 2005, the Sub-TIC held a meeting in which they reviewed the funds for the Plan, including the Allianz Fund.  The meeting minutes from the June 2005 meeting indicate that the Allianz Fund was placed on a "low priority" Watch List due to "manager turnover" and "performance issues."  Thus, Defendants performed a closer review of

---

[9] Plaintiffs point out that, as a result of the April 2005 rebranding, Allianz removed one of PIMCO's "star" fund managers, William Gross, from several of their funds.  (Pl. Response to Def.'s Supp. Br. at 17.)  However, William Gross did not manage the PIMCO CCM Capital Appreciation Fund at any relevant time.  Moreover, Gross was a fixed-income manager, while the Allianz Fund is an equity fund.  Thus, Gross's departure from the management of some of PIMCO's funds is not material to whether Defendants should have conducted a due diligence review of the Allianz Fund in 2005.

the Allianz Fund in connection with the April 2005 rebranding.[10]

Defendants did not switch share classes in April 2005.

The Allianz Fund remains in the Plan to the present day; assets continue to be invested in the retail share class.

### f.   The Franklin Small-Mid Cap Growth Fund

The Franklin Small Cap Growth Fund was added to the Plan in March 1999, which is outside the statute of limitations period for this action.  Defendants chose to invest in a retail ("A") share class although an institutional ("Advisor") share class was available at that time and continues to remain available.  Defendants chose to invest in the retail share class in 1999 because the institutional share class had an inception date of 1997 and did not have a Morningstar rating or three years of performance history.  Conversely, the retail share class had a Morningstar rating and significant performance history.  Given that the availability of public information for mutual funds, including a Morningstar rating and significant performance history, is one of the five Investment Criteria, Defendants chose to invest in the retail share class rather than the institutional share class so as to capture the Morningstar rating and the performance history.

From 2001 to 2007, the fees for the retail share class of the Franklin Fund were 25 basis points higher than the fees for the institutional share class.  The higher fee is attributable to 12b-1 fees that served as a source of revenue sharing to SCE.

---

[10] It should be noted that the PIMCO CCM Capital Appreciation Fund had been placed on a medium-low priority Watch List as of March 2003 due to "performance issues."  The record is not clear whether the fund simply remained on the Watch List throughout 2003-2005, or if the fund had been removed from the Watch List only to return in April 2005.

On September 1, 2001, there was a change in the investment criteria of the Franklin Fund.  Prior to that time, the Franklin Fund invested in growth companies with market capitalizations up to 1.5 billion except for companies in the fund's Russell 2000 benchmark. After September 2001, the Franklin Fund could invest in companies with market capitalizations up to $8.5 billion.  The fund also expanded its main investment strategy, so that it could invest up to 80% of its net assets in small capitalization and mid capitalization growth companies. In short, the fund changed from a small-cap fund to a small-mid-cap fund.  As a result of this change, in September 2001, the retail shares that Edison previously held in the Franklin Small Cap Growth Fund were automatically converted into retail shares of the Franklin Small-Mid Cap Growth Fund.

The initial managers of the Franklin Fund before the September 2001 change - Edward Jamieson, Michael McCarthy, and Aidan O'Connell - remained as the core management of the fund after the change.  Two additional managers were added to the fund's management team in 2002. Morningstar did not reclassify the Franklin Fund after the change in investment strategy.

The SCE Investments Staff, in consultation with HFS, reviewed the Franklin Fund after the September 2001 change and concluded that the fund still satisfied the Investment Criteria.  The Investments Staff recommended that the Franklin Fund be reclassified as a mid-cap growth fund for the Plan's purposes.  On January 28, 2002, at the meeting of the Sub-TIC, the Investments Staff recommended reclassifying the fund as a mid-cap fund and adding the William Blair Small Cap Fund so as to have a small-cap fund in the mix of options for the Plan participants.

The recommendations were adopted.  Edison also changed its participant communications to advise the Plan participants that the Franklin Small-Cap Growth Fund would now be categorized as a "Medium U.S. Stock Fund." The Franklin Fund was not put on the Watch List as a result of the September 2001 change.   No new shares were added to the Franklin Fund as a result of the change, nor did Defendants switch share classes.

The Franklin Fund was eliminated from the Plan in October 2007 and its assets were mapped into the T. Rowe Price Mid-Cap Growth Fund.

**E.   Money Market Fund**

One of the funds in the Plan is a short-term investment fund (the "Money Market Fund") which, since 1999, has been managed by State Street Global Advisors ("SSgA").[11]   SSgA is a division of State Street Bank and Trust Company ("State Street"), which is also the Plan's Trustee.   In 1999, State Street, though its SSgA division, was awarded the money market business as part of the Plan's decision to hire State Street as the Trustee for the Plan.  At that time, State Street charged 18 basis points (0.18%) in management fees for the Money Market Fund.

Management fees for the Money Market Fund are not paid by SCE; rather, management fees are charged against Plan participants' fund assets as part of the expense ratio.

**1.   Selection of the State Street Money Market Fund**

Prior to hiring State Street and selecting the Money Market Fund, David Ertel ("Ertel") of the Investments Committee reviewed four other money market funds sometime in 1998.  Each of the four funds charged

---

[11] In general, a money market fund is a conservative investment vehicle that often invests in short-term money market securities, such as short-term securities of the United States Government or its agencies, bank certificates of deposit, and commercial paper.  See Jones v. Harris Associates L.P., Slip opinion, Case No. 08-586, at 9 n.6 (S.C. Mar. 30, 2010)

management fees ranging from 15 to 20 basis points.  On or about the same time, SCE sent out a Request for Proposal ("RFP") to select a Trustee for the Plan.  Ertel recommended that SCE hold off on selecting a money market fund until such time as the results from the RFP were received, as many of the RFP candidates also offered short-term investment funds.

As a result of the RFP, SCE received seven responses from various candidates for the Trustee position.  SCE formed an Oversight Group consisting of members from SCE's Human Resources Department, the Treasurer Department, Controllers, and the outside record keeper, Hewitt Associates, to review the responses to the RFP and narrow the options to the top three candidates.  Ertel was part of the Oversight Group.  The top three candidates for the Trustee position were Wells Fargo Bank, the Northern Trust Co., and State Street Bank, all of which provided short-term investment funds which they managed.  Each of the three top candidates charged management fees for their money market funds ranging from 15 to 20 basis points.  Specifically, Wells Fargo Bank charged fees of 20 basis points, North Trust Co. charged 15 basis points, and State Street charged fees of 18 basis points.[12]  State Street was ultimately selected as the Trustee in 1999, and the Plan decided to invest in the money market fund managed by SsgA.

### 2.  Monitoring of the Money Market Fund

The Investments Staff consistently monitors the performance of all the funds in the Plan, including the Money Market Fund.  As part of

---

[12] Additionally, the Trustee candidates that were not chosen as the top three candidates also charged management fees ranging from 15 to 20 basis points for their short-term investment funds.  Specifically, the Bank of New York and the Mellon Trust both charged fees of 20 basis points for short-term investment funds they managed, while Wachovia Bank charged fees of 15 basis points.

this process, the Investments Staff receives monthly, quarterly, and annual reports from HFS discussing the Money Market Fund's performance. The Investment Staff evaluates the Money Market Fund on the same Investment Criteria with which it evaluates other funds, which include: (1) the stability of the fund's overall organization; (2) the fund's investment process; (3) the fund's performance compared to benchmarks and peer groups; and (4) the fund's total expense ratio (fees).  The most important criterion is the Money Market Fund's performance net of fees as compared to peers and benchmarks.

At the time the Money Market Fund was chosen, Ertel evaluated the performance of the fund, including SsgA's fees, and found that the 18 basis-point fee was reasonable.

In January 2003, Marvin Tong ("Tong") joined the Investments Staff at SCE.  He reports directly to Ertel and is one of the persons responsible for monitoring the investment options in the Plan.  Tong spends approximately 50% of his time working on the Plan.  Prior to working at SCE, Tong had worked in the investment consulting field, consulting 401(k) plans and pension plans.  When he started at SCE, he reviewed the fees of all the options in the Plan, including the Money Market Fund.  Based on his experience, Tong believed that the 18 basis-point fee for the Money Market Fund was reasonable at that time.

In late 2004, Pamela Hess ("Hess") joined the team at HFS that provides investment support services to SCE.  Prior to that time, Hess worked as a Senior Investment Consultant at HFS from 2000 to 2005, and an Investment Analyst at HFS from 1999-2000.  In 2004, when she began working with SCE, Hess believed that the 18 basis-point fee for the Money Market Fund was reasonable in light of the size of the Plan's

investment in the fund and the services rendered by State Street to the Plan.

Hess often reviewed the fees for the Money Market Fund and alerted the SCE Investment Staff of opportunities to seek lower fees when they arose. In 2005, Hess had a conversation with Tong regarding the management fees of the Money Market Fund. Hess told Tong that she had reviewed the fees for the Money Market Fund and believed that the Plan had an opportunity to negotiate a lower fee, in light of the fact that the Plan's assets in the fund had grown. Tong, in turn, discussed Hess's suggestion with Ertel. Ertel authorized Tong to discuss the issue with SCE's Benefits Accounting Staff to attempt to negotiate the Money Market Fund fees with State Street.

There is no evidence in the record that Tong actually discussed the matter with the Benefits Accounting staff or that persons from the Benefits Accounting Department contacted State Street in 2005 regarding lowering the fees for the Money Market Fund. Nonetheless, in September 2005, SSgA dropped its fees from 18 basis points to 12 basis points. It is unclear whether SSgA or SCE initiated the reduction in fees.

In April 2007, Tong again discussed the reasonableness of the fees for the Money Market Fund with Hess. Hess told Tong that she had reviewed the fees for the Money Market fund, and that because the assets in the fund had grown to $440 million, she believed SCE could negotiate a lower management fee with SSgA. Hess stated that "true pricing" would lie somewhere between 8 to 9 basis points, and that Barclays Global Investments offered a "collective version" money market

fund for 9 basis points.[13]  Hess also pointed out that she believed Vanguard had "low cost vehicles" at 9 basis points.  Hess also stated that she did not believe SCE was overpaying with SSgA; rather, she felt that because two years had gone by since the last reduction in fees, and SCE's assets continued to grow, SCE might be in a position to negotiate lower fees.  At that time, Hess was aware of a number of other comparable 401(k) plans that offered their participants money market funds with fees of 12 basis points or higher.  In other words, the 12 basis-point fee charged by SSgA was comparable to what other 401(k) plans were paying at the time, in Hess's experience.

In response to Hess's information, Tong contacted the SCE Benefits Accounting staff, and together they negotiated with State Street a for a reduction in the investment management fee.  Consequently, in July 2007, SSgA reduced the fees for the Money Market Fund from 12 basis points to 10 basis points.  In October 2007, the management fees for the Money Market Fund were further reduced to 8 basis points.  Currently, fees for the Money Market Fund remain at 8 basis points.

From 1999 to the present, the SCE Investment Staff has regularly monitored the performance, net of fees, of the Money Market Fund.  Throughout this period, the Money Market Fund has consistently exceeded its performance benchmarks, net of fees, in a statistically significant manner.

Despite the Money Market Fund's consistently good performance, in 2008, in response to the global financial crisis, the Investment Committees requested that the Investments Staff conduct an extensive

---

[13] Hess described a "collective version" as similar to a private mutual fund.  A collective money market fund is not publicly traded; rather, it is available only to ERISA-qualified investors and other 401(k) investors.

review of the Money Market Fund.  The goal of the review was to ensure
that the Investment Committees were comfortable with the Money Market
Fund's management and credit risk.  During this review, members of the
Investments Staff had discussions with SSgA and HFS regarding the
performance of the Money Market Fund.  Based on the results of the
investigation, in early 2009, the Investment Committees took no action
regarding the Money Market Fund, as it continued to meet the Investment
Criteria and outperform its benchmarks.  Further, HFS found that the
management fee of 8 basis points was reasonable and competitive when
compared with similar funds; in fact, it was one of the lowest fees
offered for that type of fund in the market.

**III. CONCLUSIONS OF LAW**

    **A.   Jurisdiction**

The Court has federal question subject matter jurisdiction over
this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).
The Plan, formerly named the SSPP, is a "defined contribution plan,"
and an "eligible individual account plan" as defined by ERISA § 3(34),
29 U.S.C. § 1002(34).  Each of the named Plaintiffs were participants
in the Plan at the time the action was commenced and remain
participants in the Plan within the meaning of ERISA §§ 3(7) and (8),
29 U.S.C. §§ 1002(7) and (8).  The Plan is covered by and subject to
the provisions of part 4 of Title I of ERISA, § 401 *et seq.*, 29 U.S.C.
§ 1101 *et seq.*

Venue is proper in this Court pursuant to 29 U.S.C. § 1132(e)(2)
because the Plan is administered in this District and the Defendants
may be found in this District.

**B.    Standing**

ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), provide standing for any participant to assert, on behalf of the Plan, a breach of fiduciary duty claim under ERISA § 409, 29 U.S.C. § 1109. Concha v. London, 62 F.3d 1493, 1499 (9th Cir. 1995).  Defendants do not challenge the named Plaintiffs' status as participants of the Plan within the meaning of 29 U.S.C. §§ 1132(a)(2) or (a)(3).  See also 29 U.S.C. § 1002(7) and (8) (definition of participant); Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117 (1989) ("participant" means either employees currently in covered employment or "former employees who 'have . . . a reasonable expectation of returning to covered employment' or who have a 'colorable claim' to vested benefits . . . .') (quoting Kuntz v. Reese, 785 F.2d 1410, 1411 (9th Cir. 1986)).

ERISA § 409(a) provides that, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . .".  29 U.S.C. § 1109(a).  Claims under ERISA § 409 are brought in a representative capacity on behalf of the plan as a whole.  See In re First American Corp. ERISA Litig., 258 F.R.D. 610, 615 (C.D. Cal. 2009) ("[T]he text of § 409(a) characterizes the relevant fiduciary relationship as one 'with respect to a plan,' and repeatedly identifies the 'plan' as the

35

victim of any fiduciary breach. . . . 'A fair contextual reading of the
statute makes it abundantly clear that its draftsman were primarily
concerned with the possible misuse of plan assets, and with remedies
that would protect the entire plan, rather than the rights of an
individual beneficiary.'")(quoting <u>Massachusetts Mutual Life Ins. Co.
v. Russell</u>, 473 U.S. 134, 140 (1985)); <u>Kanawi v. Bechtel Corp.</u>, 254
F.R.D. 102, 110 (C.D. Cal. 2008) ("The complaint [alleging breach of
fiduciary duties] is based on allegations and recovery that address the
Plan as a whole, not individual claimants.  If recovery is received and
paid to the Plan, it is the responsibility of the Plan fiduciaries to
determine the manner in which such recovery will be applied.") Here, as
in <u>In re First American</u> and <u>Kanawi</u>, the Plaintiffs' claims assert harm
to the Plan as a whole, not to their individual accounts.  As
participants in the Plan, Plaintiffs may challenge the alleged breaches
of duty on behalf of the Plan.  29 U.S.C. § 1132(a)(2) and (a)(3); <u>see
Concha</u>, 62 F.3d at 1500.[14]

### C.   Legal Standard: Breach of Fiduciary Duty

ERISA is intended to "promote the interests of employees and their
beneficiaries in employee benefit plans."  <u>Shaw v. Delta Air Lines,
Inc.</u>, 463 U.S. 85, 90 (1983).  In enacting ERISA, "the crucible of

---

[14] Plaintiffs also have Article III standing to challenge Defendants' alleged
breaches of duty.  Article III standing requires Plaintiffs to show: (1) an injury
in fact; (2) a causal connection between the injury and the actions complained of;
and (3) redressability.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61
(1992).  As explained below, Plaintiffs have shown that the Plan suffered a loss
and that Defendants' conduct was the cause thereof.  Specifically, the Plan's
assets were reduced through the payment of excessive fees for mutual fund
investments.  This loss was caused by Defendants imprudent decision to invest in
more expensive, but otherwise identical, retail share classes when cheaper
institutional share classes were available.  Had Defendants exercised their duty of
prudence, the Plan would not have paid excessive fees.  <u>See In re First American
Corp. ERISA Litig.</u>, 258 F.R.D. at 617.  These losses are redressable under ERISA §
409, 29 U.S.C. § 1109.

congressional concern was misuse and mismanagement of plan assets by plan administrators." Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140 n.8 (1985) (citations omitted). To effectuate this concern, Congress imposed a number of detailed duties on plan fiduciaries. DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 417 (4th Cir. 2007). ERISA § 404, 29 U.S.C. § 1104, codifies the duties of loyalty and care owed by a plan fiduciary:

> (a)(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and --
>
> (A) for the exclusive purpose of:
>
> (I) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> . . .

29 U.S.C. § 1104(a)(1)(A) and (B). Subsection (a)(1)(A) codifies the duty of loyalty, while subsection (a)(1)(B) articulates the duty of prudence. These duties are "the highest known to the law." SEC v. Capital Consultants, LLC, 397 F.3d 733, 751 (9th Cir. 2005).

### 1. Duty of Loyalty

The duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). A fiduciary must "act with complete and undivided loyalty to the beneficiaries of the trust," and must make any decisions in a fiduciary capacity "with an eye single to the interests of the participants and beneficiaries." Leigh v. Engle,

727 F.2d 113, 123 (7th Cir. 1984) (quotations omitted); see Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982); DiFelice, 497 F.3d at 418-19.  These responsibilities have their source in the common law of trusts.  Pegram v. Herdrich, 530 U.S. 211, 224 (2000).  As Judge Cardozo famously stated: "Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the marketplace.  Not honestly alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."  Meinhard v. Salmon, 249 N.Y. 458, 464 (Ct. App. 1928).

Although ERISA's duty of loyalty gains definition from the law of trusts, there is an important distinction provided for by the statute's provisions.  See Variety Corp. v. Howe, 516 U.S. 489, 497 (1996) ("We also recognize . . . that trust law does not tell the entire story."); DiFelice, 497 F.3d at 417 ("The common law of trusts, therefore, 'will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties.'") (quoting Variety Corp., 516 U.S. at 497).  Under ERISA, "a fiduciary may have financial interests adverse to beneficiaries, but under trust law a trustee is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries."  Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 295 (5th Cir. 2000).  Thus, unlike in trust law, ERISA contemplates that in many circumstances a plan fiduciary will "wear two hats," and may have conflicting loyalties.  Id.; see Cunha v. Ward Foods, Inc., 804 F.2d 1418, 1432 (9th Cir. 1986)(citing Amato v. Western Union Int'l, Inc., 596 F. Supp. 963, 968 (S.D.N.Y. 1984); Friend v. Sanwa Bank of California, 35 F.3d 466, 469

(9th Cir. 1994).  Under ERISA, a conflict of interest alone is not a per se breach: "nowhere in the statute does ERISA explicitly prohibit a trustee from holding positions of dual loyalties." Friend, 35 F.3d at 468-69.  Instead, to prove a violation of the duty of loyalty, the plaintiff must show "actual disloyal conduct." In re McKesson HBOC, Inc. ERISA Litig., 391 F. Supp. 2d 812, 834-35 (N.D. Cal. 2005) (ERISA fiduciaries do not breach their duty of loyalty simply by "placing themselves in a position" where they might act disloyally.).

Consistent with this rule, a fiduciary does not breach his duty of loyalty by pursuing a course of conduct which serves the interests of the plan's beneficiaries while at the same time "incidentally benefitting" the plan sponsor or even the fiduciary himself. See Morse v. Stanley, 732 F.2d 1139, 1146 (2d Cir. 1984); Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir. 1982); Siskind v. Sperry Ret. Program, Unisys, 47 F.3d 498, 506 (2d Cir. 1995).  The benefit, however, must be incidental to a decision that is in the best interests of the plan participants.  As the Second Circuit explained: "Although officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants . . . simply because it incidentally benefits the corporation . . . their decisions must be made with an eye single to the interests of the participants and beneficiaries." Bierwirth, 680 F.2d at 271; see Bussian, 223 F.3d at 295 ("Despite the ability of an ERISA fiduciary to wear two hats, 'ERISA does require . . . that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions.'") (quoting Pegram, 530 U.S. 211).

In sum, an investment decision that happens to benefit the plan sponsor
or the fiduciary himself does not constitute a breach of the duty of
loyalty, so long as that decision was made solely in the best interests
of the plan participants and the beneficiaries.  See, e.g., Morse v.
Stanley, 732 F.2d at 1146 (fiduciary's decision to deny accelerated
payments to departing employees maintained the fiscal integrity of the
Plan while also benefitting the company); Siskind, 47 F.3d at 506
("Where the employer is viewed as a participant in the single employer
plan, it shares with its employees an interest in having the pension
plan contribute to business profitability along with its principal task
of ensuring future benefits to employees . . .").

        **2.   Duty of Prudence**

    ERISA requires that a fiduciary act with the "care, skill,
prudence, and diligence under the circumstances then prevailing that a
prudent man acting in a like capacity and familiar with such matters
would use in the conduct of an enterprise of a like character and with
like aims."  29 U.S.C. § 1104(a)(1)(B) (2006).  Like the duty of
loyalty, the duty of prudence is "the highest known to the law."
Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996) (quoting Donovan v.
Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

    "Prudence is measured according to the objective 'prudent person'
standard developed in the common law of trusts."  Whitfield v. Cohen,
682 F.Supp. 188, 194 (S.D.N.Y. 1988) (citing Donovan v. Mazzola, 716
F.2d 1226, 1231 (9th Cir. 1983) and S. Rep. N. 93-127, 93d Cong., 2nd
Sess., reprinted in 1974 U.S. Code Cong. & Ad. News 4639, 4838, 4865).
Under the common law of trusts, a trustee is "duty-bound to make such
investments and only such investments as a prudent [person] would make

of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived. . . ." In re Unisys Savings Plan Litig., 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts § 227 (1959)).

The prudence standard is not that of a prudent lay person, but rather that of a prudent fiduciary with experience dealing with a similar enterprise. Whitfield, 682 F. Supp. at 194 (citing Mazzola, 716 F.2d at 1231-21). To determine whether the fiduciary has met the prudence standard, "the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." Howard, 100 F.3d at 1488. The question is whether, "at the time they engaged in the challenged transactions, [the fiduciaries] employed the appropriate methods to investigate the merits of the investment and to structure the investment." Mazzola, 716 F.2d at 1232; Fink v. National Savings and Trust Co., 772 F.2d 951, 957 (D.C. Cir. 1985) ("A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard."). The prudence test focuses on the conduct of the fiduciaries when making the investment decision and not on the resulting performance of the investment. Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983). ("The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed.") (quoting 19B Business Organizations, S. Young, Pension and Profit-Sharing Plans § 17.02[3] at 17-29).

A fiduciary may secure independent advice from counsel or a financial advisor when making investment decisions, and indeed must do so where he lacks the requisite education, experience, and skill.

41

Donovan v. Bierwith, 680 F.2d 263, 272-73 (2d. Cir. 1982) (Friendly, J.). However, while securing independent advice is evidence of a thorough investigation, it does not act as a complete defense to a charge of imprudence. Howard, 100 F.3d at 1489; Bierwirth, 680 F.2d at 272 (independent advice of counsel does not operate as a "complete whitewash which, without more, satisfies ERISA's prudence requirement.") The fiduciary must investigate the expert's qualifications, provide accurate information to the expert, and ensure that reliance on the expert's advice is reasonably justified under the circumstances. Howard, 100 F.3d at 1489; Mazzola, 716 F.2d at 1234. Ultimately, the fiduciary has a duty to exercise his own judgment in light of the information and advice he receives. Crowhurst v. Cal. Institute of Tech., No. CV 9605433 RAP (Shx), 1999 WL 1027033, at *19 (C.D. Cal., July 1, 1999) (citing Mazzola, 716 F.2d at 1231).

The failure to investigate and evaluate a particular investment decision is a breach of fiduciary duty that may warrant an injunction against or the removal of the trustee (and perhaps the recovery of trustees fees paid for investigative services that went unperformed). Fink, 772 F.2d at 962. However, the failure to investigate alone cannot sustain an action for damages where the investment decision nonetheless was objectively prudent. Id. ("I know of no case in which a trustee who has happened - through prayer, astrology or just blind luck - to make (or hold) objectively prudent investments . . . has been liable for losses from those investments because of his failure to investigate and evaluate beforehand.") (Scalia, J., concurring); Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994); Whitfield, 682 F. Supp. at 195. Thus, having found that the fiduciary

42

failed to investigate a particular investment adequately, the court must then examine whether, in light of the facts that an adequate and thorough investigation would have revealed, the investment was objectively imprudent.  <u>Whitfield</u>, 682 F. Supp. at 195; <u>see</u>, <u>e.g.</u>, <u>Mazzola</u>, 716 F.2d at 1232 (finding a breach of duty where a reasonable investigation would have revealed that the loan the Plan made to a convalescent home was far below prevailing interest rates and "presented an unreasonable risk of not being timely and fully paid."); <u>Katsaros v. Cody</u>, 744 F.2d 270, 279-80 (2d Cir. 1984) (had the trustees engaged in an adequate investigation they would have discovered that "the loan was a loser from its inception"); <u>In re Unisys. Savings Plan Litig.</u>, 74 F.3d at 436 (denying summary judgment to fiduciaries where plaintiffs presented evidence that a thorough investigation (which was not done) would have revealed serious problems with the investment). The prudence of the challenged decision is judged at the time it was made, rather than with the benefit of hindsight.  <u>Roth</u>, 16 F.3d at 917-18; <u>DiFelice</u>, 497 F.3d at 424.

     In sum, if the investment decision is one that a prudent person would make at the time it was made, there is no liability for loss to the Plan participants.  <u>In re Unisys. Savings Plan Litig.</u>, 74 F.3d at 434; <u>Roth</u>, 16 F.3d at 919 ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway."); <u>see</u> <u>In re McKesson HBOC, Inc. ERISA Litig.</u>, 391 F. Supp. 2d 812, 835 (N.D. Cal. 2005) ("Because it was not imprudent to refuse to sell company stock, [defendant's] alleged conflict could not have harmed plaintiff.")

43

### D.   Challenged Conduct by the Plan Fiduciaries

#### 1.   Mutual Fund Investments

Plaintiffs contend that Defendants violated both their duty of loyalty and their duty of prudence when they invested in the retail share classes rather than the institutional share classes of the following six mutual funds: (1) Janus Small Cap Value Fund ("Janus Fund"); (2) Allianz CCM Capital Appreciation Fund ("Allianz Fund"); (3) Franklin Small-Mid Cap Growth Fund ("Franklin Fund"); (4) William Blair Small Cap Growth Fund ("William Blair Fund"); (5) PIMCO RCM Global Tech Fund ("PIMCO Fund"); and (6) MFS Total Return Fund.

#### a.   Duty of Loyalty

As to the duty of loyalty, Plaintiffs contend that, when deciding to invest in the retail share classes rather than the cheaper institutional share classes of these funds, Defendants were improperly motivated by a desire to capture more revenue sharing for SCE even though doing so increased the fees charged to Plan participants. Plaintiffs contend that Defendants put the interests of SCE in offsetting the record-keeping costs to Hewitt Associates above the interests of the Plan participants in paying lower fees.

Plaintiffs rely primarily on a series of emails, generally between members of the Investments Staff and members of the SCE Human Resources Department, to support their claim that the Plan fiduciaries were improperly motivated by a desire to capture revenue sharing. Specifically, Plaintiffs point to the following evidence:

- On March 11, 2003, David Ertel, head of the Investments Staff, emailed George Grana, an employee of SCE's Human Resources Department and copied on the email other members of the Human Resources Department and Marvin Tong, a member of the Investments Staff.  In the email, Ertel told Grana that the Investments Staff and HFS were researching 5 new funds for the Plan.  Ertel asked

Grana, "We are having them [Hewitt Financial Services] look at
fund share classes with lower expense ratios (even if there is no
revenue sharing).  Question: if we delete funds that have high
revenue sharing with one that has none, is that still acceptable
on an incremental basis?"

- On March 17, 2003, Barbara Decker and George Grana, both of the
Human Resources Department, discussed via email the availability
of revenue sharing from mutual funds.  In the email communication
Grana told Decker that Ertel was asking for clarification "about
fund selection and 12b1 fee offsets."  Grana proposes to tell
Ertel that when a fund manager offers the same fund with different
share classes but one has more favorable revenue sharing, if all
else is equal, "we should continue to use a share class which
offers a reasonable revenue sharing arrangement."[15]

- On June 24, 2003, Josh Cohen of HFS wrote an email to Marvin Tong
which, among other things, provided the revenue sharing available
in the share classes of several mutual funds that the Investments
Staff was considering adding to the Plan.  Cohen noted that one of
the funds, the Templeton Developing Markets Fund, had "revenue
sharing issues."  Cohen wrote, "While I don't think this would
have a bearing on your decision to add a Franklin fund, you may
want to let Diane know your intentions to do so."  (Diane refers
to Diane Kobashigawa, who at the time was the Manager of Benefits
Administration in the SCE Human Resources Department.)

- On June 25, 2003, Lorie Padilla of the Human Resources Department
emailed other members of the Human Resources Department as well as
David Ertel and Marvin Tong and attached an estimate of "how the
12b-1 income [revenue-sharing] may change with the suggested fund
changes."

- Also on June 25, 2003, David Ertel responded to the email sent by
Lorrie Padilla.  Ertel modified the worksheet to reflect a
proposed change to the PIMCO RCM Global Technology Fund.  Ertel
noted that the Investments Staff was considering recommending that
the Investment Committees convert the retail share of the PIMCO
Fund to institutional shares, and that if they adopted that
recommendation, "we would pick up a Morningstar rating, and
historical information, and would lose $105,000 in 12b-1 fees
[revenue sharing]."  Ertel asked the email recipients, "What does
everyone think of the tradeoff?"


While these emails certainly indicate that members of the

Investments Staff were **aware** of the benefits of revenue-sharing, there

---

[15] There is no evidence that this message was delivered or communicated to Ertel or
anyone on the Investments Staff or Investment Committees.

is no evidence that members of the Investments Staff were motivated by revenue sharing when making fund recommendations to the Investment Committees.  David Ertel testified that the reason he discussed revenue sharing with members of the SCE Human Resources Department in 2003 is because the Human Resources Department is responsible for overseeing the administration of the Plan and the budget/expenses related thereto. Ertel wanted to notify the Human Resources Department of what offsets would potentially be available to SCE to satisfy their obligations to the record-keeper, Hewitt Associates.  Ertel testified that these communications were strictly for the purpose of having the Human Resources Department deal with budgetary matters and did not influence the selection of any mutual funds for the Plan.  Having observed the witness during trial, the Court finds this testimony credible.

Furthermore, Ertel's testimony is supported by the contents of the emails themselves.  For example, in the June 24, 2003 email, when Josh Cohen indicated to Ertel that a mutual fund had revenue sharing issues, Cohen stated, "I don't think this would have a bearing on your decision to add a Franklin fund," but suggested that Ertel let the Human Resources department know about the change.  Similarly, in the June 25, 2003 emails, Lorrie Padilla of the Human Resources Department attempts to estimate the effect of certain fund changes on the administrative budget through 12b-1 fees, and communicates with Ertel and the Investments Staff for that purpose.  However, there is no evidence that Lorrie Padilla or any other employee from Human Resources employee ever told Ertel or anyone on the Investments Staff to consider funds that would increase revenue sharing.

It is also undisputed that the SCE Human Resources Department has no authority over which funds are recommended or selected for the Plan's line-up.  Plaintiffs did not present any evidence that the Human Resources staff ever discussed revenue sharing with the Investment Committee members who had the authority to select the funds for the Plan.

David Ertel and Marvin Tong both testified that the Investments Staff never considered revenue sharing when making recommendations to the Investment Committees to add or replace mutual funds.[16]  Ertel also testified that revenue sharing was never discussed at any of the meetings with the Investment Committees.  Further, Ertel testified that no one ever instructed him to consider revenue sharing in his analysis of whether or not to recommend a certain fund.  Having observed Ertel and Tong, the Court finds this testimony credible.  Thus, the Court concludes that these emails do not demonstrate that the Plan fiduciaries were motivated by revenue sharing when selecting mutual funds for the Plan.

---

[16] Plaintiffs attempted to rebut this testimony by introducing Trial Exhibit 78, an email purportedly from David Ertel to Josh Cohen at HFS.  The email is dated 06/24/2003 and states: "Criteria for selecting mutual funds per discussion with DFW and Dave Ertel . . . Between Classes: 2. Morningstar rating is available, 3. Works in 3 main tracking sites . . . 4. Revenue sharing is favorable."  Plaintiffs argue that this email demonstrates that Ertel believed favorable-revenue sharing was a relevant criteria when recommending mutual fund share classes.

In response, however, Ertel testified that he did not write this email.  Barbara Decker ("Decker") testified under oath that she wrote the email reflected at the top of Trial Exhibit 78 as a note to herself, and it was not sent to anyone.  Decker is the director of benefits in SCE's Human Resources Department.  She has no authority to recommend or select mutual fund investments for the Plan line-up.  Decker also testified under oath that she had never advised nor suggested to any members of the Investments Staff or the Investments Committee that a mutual fund should be selected or retained because of the availability of revenue sharing.  The Court finds the testimony credible and therefore concludes that Trial Exhibit 78 does not reflect that Ertel believed revenue sharing should be considered when recommending a mutual fund share class to the Investment Committees.

More importantly, the actual fund selections made by the Investment Committees in mid-2003 belie any argument that the Plan fiduciaries were motivated by a desire to capture revenue sharing. Each of the purportedly damaging emails discussed above relate to the fund recommendations that the Investments Staff was considering for the June and July 2003 meetings of the Investment Committees.  At those 2003 meetings, the Investments Staff recommended adding six new mutual funds to the Plan, and the Investments Committees adopted those recommendations.  With regard to each of the six funds added to the Plan in 2003, the Investment Committees chose to invest in the fund share class with the **lowest expense ratio and the lowest revenue sharing**, with the exception of one fund, the Vanguard Mid-Cap Index Fund, which had no revenue sharing in either share class.  Thus, the decisions made by the fiduciaries at the 2003 meetings clearly were not motivated by a desire to increase revenue sharing.

The mutual fund selections from 2002 to 2008 evidence a pattern that is flatly inconsistent with a desire to capture more favorable revenue sharing arrangements.  From 2002 to 2008, the Plan fiduciaries made 39 additions or replacements to the mutual fund in the Plan's investment line-up.  In 18 out of 39 instances, Defendants chose to replace an existing mutual fund with one offering less revenue sharing or no revenue sharing at all; and in 11 instances, the changes resulted in no net change in the amount of revenue sharing received by SCE.  In only 6 instances out of 39 did the Plan fiduciaries select a replacement fund that offered a higher amount of revenue sharing.[17]

---

[17] The six mutual fund replacements that resulted in a net increase in revenue sharing occurred sporadically throughout the years - one replacement was made in 2002, one in 2003, two in 2004, one in 2007, and one in 2008.  The sporadic nature

This pattern is strong evidence that the Plan fiduciaries were not motivated by a revenue-sharing when making mutual fund selections.  See Bussian v. RJR Nabisco, Inc., 223 F.2d 286, 289 (5th Cir. 2000) (When analyzing a duty of loyalty claim, "the proper inquiry has as its central concern the extent to which the fiduciary's conduct reflects a subordination of beneficiaries' and participants' interests to those of a third party."); compare Leigh v. Engle, 727 F.2d 113, 126 (7th Cir. 1984) (breach of duty of loyalty found where "the trust's use of its assets at **all relevant times** tracked the best interests of [third parties]; "the extent and duration of . . . actions congruent with the interests of another party" were relevant in deciding whether defendants breached their duty of loyalty.) (emphasis added).

Finally, there is no evidence that any of the Plan fiduciaries considered revenue-sharing when selecting or deciding to retain the six mutual funds at issue in this case.  As stated above, the emails and documents that Plaintiffs rely on to support their breach of loyalty claim relate to the fund selections that the Plan fiduciaries made in 2003.  However, all six of the funds at issue in this case were added to the Plan prior to 2003, long before these emails were written.  Of the six funds relevant to this case, only one was even involved in the 2003 changes - the PIMCO RCM Global Technology Fund.  With regard to the PIMCO Fund, however, the change that Defendants actually made in 2003 was to transfer all the assets from the retail share class into an institutional share class which had a lower expense ratio and offered

---

of these decisions is not consistent with a conscious effort to increase revenue sharing at any given time.

1  less revenue sharing.[18]  This change, like the other fund selections

2  made in 2003, could not have been motivated by a desire to capture

3  revenue sharing.   Plaintiffs did not introduce any evidence that the

4  Plan fiduciaries discussed revenue sharing in connection with the

5  selection of the Janus Fund or the Franklin Fund in March 1999, or in

6  connection with the selection of the MFS Total Return Fund, the William

7  Blair Fund or the PIMCO Fund in July 2002.

8      In sum, the Court concludes that there is no evidence that the

9  Plan fiduciaries engaged in actual disloyal conduct.   The Plan

10 fiduciaries did not make fund selections with an eye toward increasing

11 revenue sharing and did not put the interests of SCE above those of the

12 Plan participants.   For these reasons, Plaintiffs' duty of loyalty

13 claim fails.[19]

14 ────────────────────

15 [18] With regard to the PIMCO Fund, Plaintiffs do not claim any damages after October
   2003, when the assets in the fund were transferred from the retail share class to
16 the institutional share class.

17 [19] During the trial and at post-trial hearings, the Court and the parties engaged in
   extensive discussion regarding whether a breach of the duty of loyalty requires
18 that the fiduciary act with intent to advantage himself or third-parties over the
   plan beneficiaries, or whether the simple fact that the fiduciary made certain
19 investment decisions that were not in the beneficiaries' best interests suffices to
   show a breach of the duty of loyalty.  Ultimately, the Court does not need to reach
20 this issue, as Plaintiffs have alleged both duty of loyalty and duty of prudence
   claims based on the same investment decisions, and the latter does not require
   intent.
21     Nonetheless, in reviewing the relevant authorities, the Court concludes that
   the duty of loyalty is primarily concerned with conflicts of interest; thus, a
22 breach of that duty requires some showing that the fiduciaries' decisions were
   motivated by a desire to serve the interests of over those of the beneficiaries.
23 See Pilkington PLC v. Perelman, 72 F.3d 1396, 1401-02 (9th Cir. 1995) (triable
   issue existed as to defendant's breach of the duty of loyalty where there was
   strong evidence that the trustees were attempting to maximize the amount of funds
24 reverted to the company at the beneficiaries' expense); Cooke v. Lynn Sand & Stone
   Co., 673 F. Supp. 14, 24 (D. Mass 1986) (same); Leigh v. Engle, 858 F.2d 361, 364
25 (7th Cir. 1988) ("[T]he administrators breached their duties [of loyalty] when they
   made investment decisions out of personal motivations, without making adequate
26 provisions that the trust's best interests would be served."); Wright v. Nimmons,
   641 F. Supp. 1391, 1402 (S.D. Tex 1986) (the duty of loyalty requires that "the
27 fiduciary must not abuse his position of trust in order to advance his own selfish
   interests") George Gleason Bogert et al., Bogert's Trusts and Trustees § 255 (2d
   ed. 2009)(the duty of loyalty requires that the fiduciary act "solely in the
28 interest of the plan's participants without balancing those interests with the

50

### b.   Duty of Prudence

Plaintiffs' duty of prudence argument is simple: Plaintiffs
contend that, even if the Plan fiduciaries were not improperly
motivated by revenue-sharing benefits, it was objectively imprudent for
the Plan fiduciaries to decide to invest (or to continue to invest) in
retail share classes of the six mutual funds where identical
investments were available in the institutional share classes for lower
fees.  In other words, a prudent person managing his own funds would
invest in the cheaper share class, all else being equal, because doing
so saves money.

With regard to the six specific mutual funds at issue here,
Plaintiffs make different arguments about the prudence of Defendants'
investment decisions depending upon when the mutual funds were added to
the Plan.  Three of the mutual funds - the William Blair Fund, the
PIMCO Fund, and the MFS Total Return Fund - were added to the Plan
after August 2001, within the statute of limitations period.
Plaintiffs therefore argue that the **initial decision to invest** in the
retail share classes rather than the institutional share classes of
these funds constituted a breach of the duty of prudence.  Plaintiffs
seek damages representing the difference in fees in the retail versus
institutional share classes and lost investment opportunity from the
time in which the William Blair, PIMCO, and MFS Total Return funds were
first added to the Plan to the present.

The remaining three funds - Janus, Allianz, and Franklin - were
added to the Plan before August 16, 2001, which is outside the statute
of limitations period for this action.  Plaintiffs therefore do not

interests of the company.")

51

challenge Defendants' initial decisions to invest in the retail share classes when the funds were first added to the Plan.  Rather, Plaintiffs argue that the Janus Fund, the Allianz Fund, and the Franklin Fund all underwent significant changes during the statute of limitations period that should have triggered Defendants to conduct a full due diligence review of the funds, equivalent to the diligence review Defendants conduct when adding new funds to the Plan. Plaintiffs contend that had this due diligence been done, Defendants would have realized that the Plan was paying excessive fees by investing in the retail rather than the institutional share classes, and would have changed share classes.  Plaintiffs contend that Defendants' failure to conduct a due diligence review of the fees charged for the funds at the time of these significant events and the decision to retain the retail share class after these events constituted a breach of the duty of prudence.  Plaintiffs seek damages representing the difference in fees in the retail versus institutional share classes for the Janus, Allianz, and Franklin funds and lost investment opportunity from the time in which the funds underwent these significant changes to the present.

The Court addresses each of these arguments in turn.

### i.   Funds Added to the Plan After August 17, 2001

The William Blair Small Cap Growth Fund ("William Blair Fund"), the PIMCO RCM Global Technology Fund ("PIMCO Fund") and the MFS Total Return A Fund ("MFS Total Return Fund") were all added to the Plan in July 2002.  At that time, both retail share classes and institutional share classes were available for all three funds.  The only difference between the retail share classes and the institutional share classes

was that the retail share classes charged higher fees to the Plan participants.  Otherwise, the investments were identical.  Defendants chose to invest in the retail share classes of all three of these funds.

To determine whether the decision to invest in retail share classes constitutes a breach of the duty of prudence, the Court must examine whether the fiduciaries engaged in a thorough investigation of the merits of the investment at the time the funds were added to the Plan.  See Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996); Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983).  Defendants assert that one of the five Investment Criteria they use to evaluate a mutual fund is the expense ratio of the fund - i.e., the fees charged to Plan participants.  Further, both Plaintiffs' expert, Dr. Steven Pomerantz, and Defendants' expert, Daniel Esch, testified that a prudent fiduciary commonly would review all available share classes and the relative costs for each when selecting a mutual fund for a 401(k) Plan.  Here, however, there is **no evidence** that Defendants even considered or evaluated the different share classes for the William Blair Fund, the PIMCO Fund, or the MFS Total Return Fund when the funds were added to the Plan.  Not a single witness testified regarding any discussion or evaluation of the institutional versus retail share classes for these funds prior to July 2002.  Indeed, Ertel admitted that when the Investments Staff made their presentation to the Sub-TIC (the committee with the ultimate authority for selecting funds for the Plan) regarding the merits of adding the MFS Total Return Fund to the Plan in 2002, they did not present the Sub-TIC with any information about the institutional share class.  The same appears to be true regarding the

William Blair Fund and the PIMCO Fund.  The presentation materials that the Investment Staff prepared for the January 28, 2002 meeting of the Sub-TIC - the meeting during which the Investments Staff recommended adding these three funds to the Plan - contains **no information** about the institutional share classes of the William Blair, PIMCO or MFS Total Return funds.  The Investments Staff simply recommended adding the retail share classes of these three funds without any consideration of whether the institutional share classes offered greater benefits to the Plan participants.  Thus, the Plan fiduciaries responsible for selecting the mutual funds (the Investment Committees) were not informed about the institutional share classes and did not conduct a thorough investigation.

Moreover, had the Investments Staff and the Investment Committees considered the institutional share classes when adding these funds in 2002 and weighed the relative merits of the institutional share classes against the retail share classes, they would have realized that the institutional share classes offered the exact same investment at a lower cost to the Plan participants.  Thus, Defendants would have known that investment in the retail share classes would cost the Plan participants wholly unnecessary fees.  See, e.g., Mazzola, 716 F.2d at 1232 (finding a breach of duty where a reasonable investigation would have revealed that the loan the Plan made to a convalescent home was far below prevailing interest rates and "presented an unreasonable risk of not being timely and fully paid."); Katsaros v. Cody, 744 F.2d 270, 279-80 (2d Cir. 1984) (had the trustees engaged in an adequate investigation they would have discovered that "the loan was a loser from its inception"); In re Unisys. Savings Plan Litig., 74 F.3d at 436

(denying summary judgment to fiduciaries where plaintiffs presented evidence that a thorough investigation (which was not done) would have revealed serious problems with the investment).

In fact, in 2003, a year after these funds were added to the Plan, the Investments Staff did review the merits of the institutional share class of the PIMCO Fund versus the retail share class.  At that time, the Investments Staff reviewed the available share classes for the PIMCO Fund because they were considering mapping a large amount of assets from another fund into the PIMCO Fund.  In the course of that review, Ertel realized that the institutional share class of the PIMCO Fund had a significant performance history and a Morningstar rating, whereas the retail share class did not.  Ertel also realized that the institutional share class charged less 12b-1 fees to the Plan participants.  Thus, the Investments Staff recommended, and the Investment Committees adopted the recommendation, that the retail shares of the PIMCO Fund should be transferred into the institutional share class.  These facts are very telling: In the one instance in which the Plan fiduciaries actually reviewed the different share classes of one of these three funds, the fiduciaries realized that it would be prudent to invest in the institutional share class rather than the retail share class.  Had they done this diligence earlier, the same conclusion would have been apparent with regard to all three funds, and the Plan participants would have saved thousands of dollars in fees.

On the basis of the evidence outlined above, Plaintiffs have met their burden of demonstrating that the Plan fiduciaries did not act with the care, skill, and diligence of a prudent man acting in a like

1  capacity when deciding to invest in the retail share classes of the

2  William Blair, PIMCO, and MFS Total Return funds.

3      Defendants nonetheless contend that their investment selection

4  process in 2002 was reasonable and thorough because they relied on

5  Hewitt Financial Services ("HFS") for advice regarding which mutual

6  fund share classes should be selected for the Plan.  Defendants'

7  expert, Esch, opines that in 2002 plan fiduciaries did not have access

8  to information about different share classes, and therefore, reliance

9  on HFS's advice was reasonable.[20]

10     While securing independent advice from HFS is some evidence of a

11 thorough investigation, it is not a complete defense to a charge of

12 imprudence.  See Howard, 100 F.3d at 1489.  At the very least, the Plan

13 fiduciaries must "make certain that reliance on the expert's advice is

14 reasonably justified."  Id.; Donovan v. Bierwith, 680 F.2d 263, 272-73

15 (2d. Cir. 1982) (Friendly, J.) (independent advice from counsel does

16 not act as a "complete whitewash which, without more, satisfies ERISA's

17 prudence requirement.").  Here, the Court cannot conclude that reliance

18 on HFS's advice (whatever that advice may have been, which is unclear)

19 was reasonable.  Defendants have not presented any evidence regarding

20 the review and evaluation HFS did in connection with the William Blair,

21 PIMCO, and MFS Total Return funds.  Defendants did not present evidence

22 of: the specific recommendations HFS made to the Investments Staff

23

24     [20] Ertel and Tong testified that when selecting mutual funds to recommend for the

25 Plan from 2003 forward, the Investments Staff always selected the most inexpensive
   share class that met the Plan's Investment Criteria.  The process for selecting

26 mutual funds after 2003, however, is not relevant to the investment selections made
   in July 2002.  Further, it is clear that the Investments Staff did not follow that

27 framework with regard to the William Blair, PIMCO, and MFS Total Return funds.
   With regard to those funds, both the retail share class and the institutional share

28 class were equal in all respects other than the fees charged to participants; thus, both
   share classes would have met the Investment Criteria.

regarding those funds, what the scope of HFS's review was, whether HFS considered both the retail and the institutional share classes, whether HFS provided information to the Investments Staff about the different share classes, what questions were asked regarding the recommendations, and what steps the Investments Staff took to evaluate HFS's recommendations.  Thus, while reliance on HFS's recommendations may be justified in some circumstances, in the absence of any evidence about the thoroughness and scope of HFS's review as to these three particular funds, the Court cannot conclude that such reliance was prudent.  <u>See Howard</u>, 100 F.3d at 1489 (finding a breach of the duty of prudence where fiduciaries relied solely on a valuation provided by Arthur Young when selling stock and did not ask any questions about the valuation despite the fact that Arthur Young provided no empirical support for several of the assumptions.).

At trial, Defendants could not offer any credible reason why the Plan fiduciaries chose the retail share classes of the William Blair, PIMCO and MFS Total Return funds.  Defendants' witnesses offered three *possible* reasons why the Investments Staff might recommend investment in a retail share class rather than a cheaper institutional share class:  <u>First</u>, Ertel testified that one of the Investment Criteria for selecting a fund is the availability of public information about the fund, including a Morningstar rating and performance history.  Thus, *if* the retail share class of a certain mutual fund had significant performance history and a Morningstar rating, but the institutional share class did not, the Investments Staff would recommend investment in the retail share class.  <u>Second</u>, Tong testified that frequent

1  changes to the Plan cause confusion among the Plan participants.[21]

2  Thus, to avoid frequent changes to the Plan, if the Plan had previously

3  chosen to invest in the retail share class, the Investments Staff would

4  not recommend changing to the institutional share class so long as the

5  investment was meeting the Investment Criteria.  <u>Third</u>, Ertel testified

6  that certain minimum investment requirements might preclude the Plan

7  from investing in the institutional share classes.

8       None of these explanations is supported by the facts in this case.

9  As to the first explanation, Defendants presented no evidence that the

10  retail share classes of the William Blair, PIMCO, and MFS Total Return

11  funds had more significant track records or provided any greater

12  information to the Plan participants than the institutional share

13  classes.  In fact, Ertel testified that <u>none</u> of the mutual funds at

14  issue in this case presented a situation where the retail share class

15  had a performance history and a Morningstar rating but the

16  institutional share class did not.  The exact opposite is true

17  regarding two of the funds.  When Defendants chose to invest in the

18  retail share class of the William Blair Fund, the retail class did <u>not</u>

19  have a Morningstar rating.  Similarly, when Defendants added the PIMCO

20  Fund to the Plan in July 2002, the retail share class did <u>not</u> have a

21  Morningstar rating or significant performance history, while the

22  institutional share class did have those features.  If Defendants had

23  investigated the different share classes for the William Blair Fund and

24  the PIMCO Fund in July 2002, by Defendants' own Investment Criteria

25  they would have realized that the institutional share classes were

26

27  [21] Barbara Decker, the Director of Benefits in SCE's Human Resources Department
    testified that she had received complaints from the employees' unions regarding
28  changes to the Plan's investment options.

superior to the retail share classes - that is, the institutional classes were both less expensive (lower expense ratio) and provided more publicly available information.

Similarly, the argument that the Investments Staff refrained from making changes to certain investments because of possible participant confusion is not supported by the facts.  Defendants did not produce any documents or other evidence indicating that the reason the Plan fiduciaries chose the retail share classes of the William Blair Fund, the PIMCO Fund, and the MFS Total Return Fund was to mitigate participant confusion.  Indeed, such an argument is illogical with respect to these funds because all three of the funds were added to the Plan as new investment options.  In other words, the Plan fiduciaries had already decided to add an additional investment option to the Plan; adding an institutional retail share class would not cause any greater confusion than adding a retail share class.  Furthermore, although Defendants did produce evidence that Unions representing Edison employees had complained about past fund changes, these complaints resulted from changes to the funds as a whole - i.e., eliminating and/or adding a fund to the Plan - not as a result of changes from one share class to another.  No evidence was produced that Plan participants had complained in the past about changes from one share class to another.

Finally, Defendants' argument that mandatory investment minimums precluded Defendants from investing in the institutional share classes of the William Blair Fund, the PIMCO Fund, and the MFS Total Return Fund is not credible.  While it is true that in July 2002 the institutional share classes of each of these three funds required a

minimum investment that the Plan did not meet, the unrebutted evidence establishes that a prudent fiduciary managing a 401(k) plan the size of the Edison Plan could have (and would have) obtained a waiver of the investment minimums.

As the findings of fact indicate, the minimum investment requirements for the William Blair, PIMCO and MFS Total Return funds were not set in stone.  The Prospectuses filed with the SEC in late 2001 and early 2002 for each of these three funds all indicate that the funds will consider a waiver of the investment minimums for certain investors.

Plaintiffs' expert, Dr. Steven Pomerantz ("Pomerantz") opined that the William Blair Fund, the PIMCO Fund, and the MFS Total Return Fund would have waived the investment minimums for the Plan had anyone from Edison asked them to do so.  Pomerantz offered several examples from his personal experience to support this conclusion: From 1994 to 2000, Pomerantz worked for a registered investment advisor offering several mutual funds.  The advisor made a business decision to eliminate all investment minimums on the funds.  Additionally, Pomerantz consults to an investment advisor that has a stated minimum investment of $1 million for its funds.  Pomerantz testified that the advisor has been approached dozens of times over the past 12 years and asked to waive the minimum.  In every instance, the advisor did so.  Pomerantz also consults with an insurance company and helps the company manage its one-billion-dollar general reserve fund.  The company purchases all of its mutual funds through a broker called Northwestern Mutual and currently is invested in approximately 30 mutual funds.  With regard to each of those funds, the insurance company is permitted to invest in

the cheapest institutional share class *regardless of the stated minimums*.  In other words, even where the company's investment would not meet the minimum, Northwestern Mutual obtains a waiver from the mutual fund.

Based on this (and other) experience, Pomerantz opines that a 401(k) Plan like Edison's, with assets over $1 billion dollars, presents a large opportunity for investment advisors.  That is, a relationship with the Edison Plan could lead to millions in assets under management for the advisor.  In light of that opportunity, investment advisors generally are willing to waive investment minimums for investors like the Edison Plan and would have done so in this case.

The testimony of Defendants' expert, Daniel Esch, is largely consistent with Pomerantz's opinions.  Since 1994, Esch has served as the Chief Executive Officer and Managing Director of Defined Contribution Advisors, Inc., a firm that is a registered investment advisor and provides investment advisory services to corporations and plan fiduciaries regarding (among other things) investment selection and monitoring.  Importantly, Esch never testified that the Edison fiduciaries could not have obtained waivers of the investment minimums for the institutional share classes of the William Blair Fund, the PIMCO Fund, or the MFS Total Return Fund.  Instead, Esch stated that the waiver decision is made on a case-by-case basis and waivers are more likely granted when the advisor can expect a large influx of assets.

Esch testified that the only way that a fiduciary can obtain a waiver of the minimum investment criteria is if the fiduciary, or a consulting firm acting on his or her behalf, calls the fund to request

61

a waiver.  Specifically with regard to the William Blair, PIMCO, and MFS Total Return funds, Esch testified that these funds do not have any "absolute cut-offs" at which they would not consider waiving the stated investment minimums.  Esch testified that his firm "automatically" calls these funds on behalf of its clients and asks if the funds will waive the investment minimums so that the clients can invest in the institutional share classes.  These waiver requests are such a "standard" part of Esch's work that Esch typically will request a waiver even without asking his client first.  Further, Esch testifies that he frequently requests waivers on behalf of his clients even if they are not close to meeting the stated investment minimum.  Esch has personally received waivers of investment minimums for plans as small as $50 million in total assets – i.e., 5 percent the size of the Edison Plan – and has personally obtained waivers of the minimums for clients investing in the PIMCO Fund.

While there is evidence that the PIMCO Fund and other similar mutual funds have granted waivers to large investors like the Edison Plan, there is no evidence that the funds have ever denied a request for a waiver on behalf of the Edison Plan or any other similarly-sized 401(k) Plan.  Even more troubling, there is no evidence that the Plan fiduciaries, Hewitt Financial Services, or anyone else acting on behalf of the Plan **ever even inquired** as to whether the funds would waive the investment minimums for the institutional share classes.  Finally, there is **no** evidence that, at the time the investments in these funds were made, the Plan fiduciaries discussed the investment minimums for

the institutional share classes or that such minimums influenced their decision to invest in the retail share classes in any way.[22]

Based on the testimony of Pomerantz and Esch, which the Court finds credible, the Court concludes that had the Plan fiduciaries requested a waiver of the minimum investments for the institutional share classes of the William Blair, PIMCO and MFS Total Return funds, the mutual funds would have waived the minimum investment requirement. At the very least, the evidence establishes that a prudent fiduciary managing a 401(k) Plan with like characteristics and aims would have inquired as to whether the mutual funds would waive the investment minimums. Defendants' failure to do so constitutes a breach of the duty of prudence.[23]

---

[22] Ertel admitted at trial that there is no record of any discussion about these three mutual funds which indicates that the Plan fiduciaries decided not to invest in the institutional share classes because the Plan did not meet the required minimums.

[23] Defendants made one additional argument in support of their decision to invest in the retail share classes of the William Blair, PIMCO, and MFS Total Return Fund. Defendants' expert presented evidence that other 401(k) plans were invested in retail share classes of mutual funds. Specifically, Esch presented various surveys indicating that in 2001, 44% of mutual fund assets in 401(k) plans were invested in retail share classes, while 20% were invested in institutional shares; in 2008, 41% of mutual fund assets in 401(k) plans were in retail shares, while 29% were in institutional shares. Finally, Defendants' expert presented survey evidence indicating that in 2007, 60% of large 401(k) plans containing between $1 and $5 billion of assets (like the Edison Plan) invested in retail classes of funds, and 79% of such plans invested in institutional share classes. Defendants contend that this evidence establishes that Defendants' decision to include retail share classes in the Plan was well within the mainstream of share class decisions made by other 401(k) Plan fiduciaries.

Defendants' argument misses the point. Plaintiffs are not contending, and the Court has not found, that the mere inclusion of some retail share classes in the Plan constituted a violation of the duty of prudence. The only issue here is whether it was a breach of the duty of prudence to select retail shares rather than institutional shares of *the same mutual fund* where the only difference between the two share classes was that the retail share class charged a higher fee. Defendants' survey evidence is not relevant to this issue because it does not show that similarly-situated 401(k) Plan fiduciaries invest in retail share classes *where otherwise identical cheaper institutional share classes of the same funds are available*.

In sum, the Plan fiduciaries simply failed to consider the cheaper institutional share classes when they chose to invest in the retail share classes of the William Blair, PIMCO, and MFS Total Return funds. Defendants have not offered any credible explanation for why the retail share classes were selected instead of the institutional share classes. In light of the fact that the institutional share classes offered the exact same investment at a lower fee, a prudent fiduciary acting in a like capacity would have invested in the institutional share classes. Defendants violated their duty of prudence when selecting the retail share classes of the William Blair Fund, the PIMCO Fund, and the MFS Total Return Fund.  Damages resulting from the breach are discussed *infra* at Section IV.

### c.   Funds Added to the Plan Before August 17, 2001

The Berger (Janus) Small Cap Fund ("Janus Fund"), the PIMCO (Allianz) CCM Capital Appreciation Fund ("Allianz Fund") and the Franklin Small (-Mid) Cap Growth Fund ("Franklin Fund")[24] were all added to the Plan in March 1999.  Plaintiffs do not challenge Defendants' initial decision to invest in the retail share classes of these funds, but rather challenge Defendants' failure to convert the retail shares to institutional shares upon the occurrence of certain "triggering events" after August 2001.

### i.   Janus Fund

Plaintiffs contend that the Plan fiduciaries should have converted to the institutional shares of the Janus Fund in April 2003.  As the findings of fact indicate, in April 2003, Stilwell Financial, which

---

[24] As explained below, each of these funds underwent a name change after August 2001. The Court refers here to the original name of the fund, with the later name change indicated in parenthesis.

owned both the Janus and Berger families of mutual funds, reorganized several of the Berger funds into Janus and renamed the Berger Small Cap Fund to the Janus Small Cap Fund ("Janus Fund"). Plaintiffs' expert, Pomerantz, opined that with this type of name change, there could be *a potential* change in management or investment style of the fund. Pomerantz opined that, upon this name change in April 2003, a prudent fiduciary would have reviewed the fund just as if it were a new fund being added to the Plan, including a review of the fee structure and the available share classes for the fund. Pomerantz concludes that had the Plan fiduciaries done this type of review, they would have discovered that the cheaper institutional share class was available and would have transitioned the existing retail shares into the institutional class.

Defendants' experts disagree. Defendants' experts, John Peavy and Daniel Esch, produced undisputed evidence that although the name of the fund changed in April 2003, there were no associated changes in the fund's ownership, the management team, the investment strategy, or the market benchmarks used to evaluate the fund. The only significant change that occurred in April 2003 was that Janus acquired a 30 percent ownership in the sub-advisor of the fund, PWM. Esch testified that this type of name change would have triggered some review of whether the portfolio managers remained the same, and he certainly would have asked why the name of the fund had changed. However, because no material factor regarding investment management or strategy had in fact changed, Esch opined that there was no reason for the Plan fiduciaries to analyze the Janus Fund as if it were being added to the Plan for the first time or conduct a review of the available share classes.

The Court finds Defendants' arguments more reasonable under these facts.  While it seems logical that the April 2003 name change would have triggered a duty to review whether the fund's ownership or management had changed, Plaintiffs have not explained why the April 2003 would have triggered a review of the fund's share classes or fee structure.[25]  Notably, no new assets were being mapped into the fund at that time, no new share classes were added to the fund, and there appears to be no reason for Defendants to believe that the fee structure would have changed.  Further, the Plan fiduciaries did undertake a closer review of the organization and management structure of Janus Fund in April 2003, which is evidenced by the fact that the Janus Fund was placed on the Watch List at the June 2003 meeting of the Investment Committees due to "organizational issues."  Plaintiffs have not presented evidence that the duty of care required anything more under the circumstances.[26]

### ii.  Allianz Fund

Plaintiffs make a similar argument with regard to the Allianz Fund.  The fund was initially named the PIMCO CCM Capital Appreciation Fund, but was renamed the Allianz CCM Capital Appreciation Fund in

---

[25] Indeed, Pomerantz testified in his Supplemental Trial Declaration that: "[A] prudent financial expert should scrutinize an investment when there is any type of significant change to the fund, such as a potential change in portfolio management or a change in fund ownership. *In particular, a prudent financial expert should be concerned whether, under new ownership, a continuity of the underlying investment team and process will remain.*"  Pomerantz does not indicate whether, and why, a prudent expert would also be concerned about the fees charged for the fund or the available share classes.

[26] Esch testified that, for his clients, he does not consider fees as part of the criteria for placing a fund on a watch list.  The watch list criteria consists of "return and levels of risk a manager takes."  The Plan's fiduciaries do consider the expense ratio as one of five Investment Criteria when evaluating and reviewing all funds, including those on the Watch List.  However, where a fund is placed on the Watch List in connection with this type of change - where a common owner is rebranding some of its fund - Plaintiffs have not explained why a closer review of the fund's fee structure would be required.

April 2005.  Plaintiffs' expert initially testified that the April 2005 change was the result of a change in ownership in the fund, but later admitted that, in fact, the ownership change had occurred five years earlier in 2000.  Pomerantz also testified that he was not sure if there was a change in investment strategy or management of the Allianz Fund in April 2005.  Nonetheless, Pomerantz opined that the name change raised *the possibility* that the fund's management or strategy would have changed, and therefore, a full diligence review of the fund was required.[27]

As is the case with the Janus Fund, Defendants presented unrebutted evidence that the ownership of the Allianz Fund did not change in April 2005, and the management team, investment style, and market benchmarks of the fund all remained the same after April 2005. Defendants' experts opined that the change to the fund was cosmetic only and did not require a full due diligence review equivalent to that performed for a newly-added fund.

The Court accepts the conclusions of Defendants' experts.  Here too, Plaintiffs' expert does not explain <u>why</u> it would be prudent to review the available share classes and fee structure of the Allianz Fund as a result of the April 2005 rebranding.  Plaintiffs have presented no evidence that the April 2005 name change had any connection to a possible change in available share classes, minimum

---

[27] Plaintiffs also presented evidence that in April 2005, Allianz removed one of PIMCO's "star" fund managers, William Gross, from several of their funds.  This fact is irrelevant, however, because William Gross never managed the Allianz CCM Capital Appreciation Fund.  Gross was a fixed-income manager, whereas the Allianz Fund is an equity fund.  Defendants' expert, Esch, opined that "it would not be a logical conclusion . . . that if Bill Gross is leaving management of a fixed income fund, why that would impact the equity side of the house."  As Plaintiffs have offered no contrary explanation as to why Gross's departure would affect the Allianz Fund, the Court accepts Esch's conclusion.

investment requirements, or the fees associated with different share classes.  As with the Janus Fund, Defendants were not considering mapping any assets to the Allianz Fund in April 2005 or taking any other action that would require a review of the available share classes.  Further, the Plan fiduciaries did perform a closer review of the management structure and performance of Allianz Fund after the name change, which is evidenced by the fact that the fund was placed on a Watch List in June 2005.  This level of diligence appears appropriate under the circumstances.

### iii. Franklin Fund

In September 2001, the Franklin Small Cap Growth Fund changed its investment strategy.  In essence, the fund changed from a small-cap growth fund, which was limited to investments in growth companies with market capitalizations not greater than $1.5 billion, to a small-mid-cap growth fund that could invest in growth companies with market capitalizations up to $8.5 billion.  As a result of this change, the shares that the Edison Plan previously held in the Franklin Small Cap Growth Fund were automatically converted by Franklin into retail shares of the Franklin Small-Mid Cap Growth Fund.

Plaintiffs' expert opines that a change in the mandate of the fund is "quite significant" and should have triggered the Edison fiduciaries to investigate the change and do a full due diligence review of the Franklin Fund just as if the fund were being added to the Plan in the first instance.  In so doing, Pomerantz contends that the Plan fiduciaries would have noted the significantly lower fees of the institutional share class and converted the retail shares at that time.

It is undisputed that the Plan fiduciaries did conduct a diligence review of the Franklin Fund as a result of the 2001 change in investment strategy.  David Ertel testified that the Investments Staff reviewed the Franklin Fund in September 2001 and concluded that it still satisfied the Investment Criteria.  The Investments Staff determined that the Franklin Fund should be reclassified as a mid-cap growth fund for the Plan's purposes, and also recommended adding the William Blair Small Cap Fund to the Plan's investment line-up so as to provide participants with a small-cap investment option.  The Investment Committees accepted these recommendations.  Defendants also changed the communications to Plan participants to indicate that the Franklin Fund would be categorized as a "Medium U.S. Stock Fund."  No new shares were added to the Franklin Fund as a result of the September 2001, and the ownership and core management of the fund remained the same.  Defendants' experts opine that, given the nature of the 2001 change, no further review of the Franklin Fund was necessary under the circumstances.

The Court concludes that Plaintiffs have failed to show that this type of diligence review fell short of the standard of prudence.  The fiduciaries' review of the Franklin Fund was directed toward the type of issues raised by the fund's change in investment strategy - such as whether the Plan participants should be provided with an alternative small-cap investment option.  As with the Janus and Allianz funds, Plaintiffs have not explained why the Franklin Fund's September 2001 strategy change would have put Defendants on notice that they should review their original share class selection and the fees associated therewith.  While Defendants' original share class selection may have

been imprudent, Plaintiffs have not challenged that decision.

In sum, Plaintiffs have not met their burden of showing that a prudent fiduciary would have reviewed the available share classes and associated fees for the Janus, Allianz, and Franklin funds as a result of the events described above.  Thus, Plaintiffs' prudence claim fails with respect to these three funds.

### 2.   Fees of the Money Market Fund

Plaintiffs' final argument is that Defendants breached their duty of prudence by requiring Plan participants to pay excessive investment management fees for the Money Market Fund.  Plaintiffs contend that Defendants either: (1) should have negotiated lower fees with the investment manager of the Money Market Mutual Fund, State Street Global Advisers ("SSgA"), and that had they done so, Defendants could have secured lower fees, or (2) Defendants should have invested in a similar money market fund with another investment manager that charged lower fees.  Plaintiffs contend that Defendants' failure to take either of these actions resulted in the Plan participants paying fees that were, at times, twice the amount of a reasonable fee.

As stated above, the fees charged by SSgA for the Money Market Fund were as follows: From the Plan's initial investment in the Money Market Fund in 1999 until September 2005, SSgA charged 18 basis points. In September 2005, the fees were reduced to 12 basis points and remained at 12 basis points through July 2007.  From July 2007 to October 2007, SSgA charged a management fee of 10 basis points. Finally, in October 2007, the management fee was reduced to 8 basis points, where it remained as of the trial in this action.

Plaintiffs rely principally on the opinion of Dr. Pomerantz in arguing that these fees were excessive.  Pomerantz opined that Defendants could have invested in a comparable money market fund that charged only 9 basis points for the entire period from 1999 to 2007. He also opined that Defendants could have secured a fee of 9 basis points from SSgA in 1999 had they inquired earlier about a reduced fee rate.

Pomerantz's opinions are not supported by the record.  First, Pomerantz did not perform any type of a survey of comparable money market funds or a benchmark exercise to support his conclusion that lower fees were available from other funds.  There is no evidence that the fees charged by State Street from 1999 to 2007 exceeded the **reasonable range of fees** charged by other comparable funds.  In fact, the evidence is to the contrary.  In late 1998 when SCE was first considering selecting a Money Market Fund for the Plan, Ertel researched four different funds, each of which charged fees between 15 to 20 basis points.  Similarly, when the Plan sent out a Request for Proposal for the Trustee business, all of the candidates that responded and that offered a short-term investment fund charged fees between 15 and 20 basis points.  This evidence demonstrates that the fees charged by State Street at the time of the Plan's initial investment in the Money Market Fund were well within the reasonable range of fees charged by other short-term investment funds.

Pomerantz testified that he believed that Vanguard offered a comparable money market fund that Defendants could have invested in, which charged a fee of 9 basis points from 1999 to 2007, and 8 basis points from 2007 to the present.  But this conclusion is also

71

unsupported by the evidence.  Pomerantz based his argument on his review of a Vanguard prospectus which was not produced to the Court[28] or introduced at trial.  In fact, the Vanguard Registration Statement from December 24, 2004, demonstrates that Vanguard's prime money market fund charged a management fee of 15 basis points in 1999 and 2000, 13 basis points in 2001, 11 basis points in 2002, 10 basis points in 2003, and 9 basis points in 2004.[29]  Thus, contrary to Pomerantz's assertions, the Vanguard money market fund actually charged fees in excess of 9 basis points from 1999-2003.

Additionally, Plaintiffs have not presented evidence that the Vanguard money market fund ("Vanguard Fund") performed as well as the Money Market Fund net of fees throughout the relevant time period.  Several witnesses - Ertel, Tong, and Hess - testified that when monitoring the Money Market Fund, the most important criteria is the fund's performance net of fees.  Thus, while fees are certainly important, they are only one part of the analysis; a fiduciary must look to the fund's performance as well.[30]  See Taylor v. United Technologies Corp., No. 3:06cv1494 (WWE), 2009 WL 535779, at *10 (D. Conn., Mar. 3, 2009) (process by which fiduciaries monitored and selected mutual funds was prudent where fiduciaries reviewed the returns of the mutual fund net of its management fee).  In the case of the Money Market Fund, the evidence is undisputed that the fund performed consistently well (net of fees) throughout 1999 to 2008.  In

---

[28] It may be that the document was produced among the thousands of trial exhibits submitted, but it has not been identified, nor was it discussed at trial.

[29] Plaintiffs do not dispute the accuracy of the 2004 Vanguard Registration Statement.

[30] The Court accepts this testimony; it is both logical and unrebutted by Plaintiffs.

72

1  fact, the Money Market Fund was the only fund in the Edison Plan that

2  outperformed its benchmark on a statistically significant basis from

3  the second quarter of 1999 through the second quarter of 2008.

4      Pomerantz opined that the Vanguard Fund had comparable or better

5  performance as the Money Market Fund. (Trial Exh. 341 ¶ 53 [Pomerantz

6  Expert Report dated April 30, 2009].)  However, Pomerantz based this

7  conclusion on information obtained from the Morningstar Principia 2007

8  data base, which was not produced to the Court.  It is not clear

9  whether Pomerantz's opinion or the Morningstar Principia 2007

10 information is based on historical information - i.e. from 1999 to 2007

11 - or is limited to 2007 performance figures.[31]  Assuming the information

12 relates only to 2007 performance figures, there appears to be little

13 difference between the Vanguard Fund and the Money Market Fund.

14 Notably, by mid-2007, the Money Market Fund charged fees of 10 basis

15 points, which dropped to 8 basis points at the end of 2007.  Thus, the

16 Money Market Fund fees were comparable to the fees charged by the

17 Vanguard Fund in 2007.  If fees and performance of the two funds were

18 comparable in 2007, it cannot be said that Defendants acted imprudently

19 when selecting the Money Market Fund and not the Vanguard Fund.

20     Plaintiffs also point to trial exhibit 1207 in support of their

21 argument that the Plan should have invested in a money market fund that

22 charged lower fees.  Exhibit 1207 is an internal SCE report, likely

23 created by the Investments Staff, dated April 16, 1998, which outlines

24 potential changes to Plan's fund line-up.  The report provides

25 information regarding four separate "SSPP Money Market Funds" managed

26

27     [31] Further, given that Pomerantz was incorrect about the amount of fees charged by
    the Vanguard fund over time, the Court is skeptical of Pomerantz's conclusion
    regarding the performance of the Vanguard Fund in the absence of any documentary

28  evidence.

by Frank Russell, Barclays, Vanguard, and Wells Fargo.  Plaintiffs note that, according to the report, Barclays offered a money market fund at 10 basis points in 1998.  What Plaintiffs fail to consider is that the other three candidates all offered money market funds charging fees from 15 to 20 basis points.  Moreover, the same report indicates that the Donoghue Money Market Index listed fees at 30 basis points.  Thus, even considering exhibit 1207, the 18 basis-point fee charged by State Street in 1998-99 appears to be well within the range of competitive, reasonable money market fund fees.  Finally, although Barclays did charge lower fees in 1998, Plaintiffs have presented no evidence regarding the performance of the Barclays fund.

Moreover, even if Plaintiffs had established that the Vanguard Fund or the Barclays fund performed comparably to the Money Market Fund (which they did not), the fact that another money market fund charged lower fees (albeit not as low as Plaintiff contends) does not mean that investment in the Money Market Fund was imprudent.  As the Court in Hecker v. Deere & Co., 556 F.3d 575 (7th Cir. 2009), explained: "The fact that it is possible that some other funds might have had even lower [expense] ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." Id. at 586; Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 596 n.7 (8th Cir. 2009) ("[W]e do not suggest that a claim is stated by  a bare allegation that cheaper alternative investments exist in the marketplace.").  ERISA does not require the a plan fiduciary select the cheapest fund available; "[r]ather, a plan fiduciary need only . . . select funds with the care, skill, prudence and diligence of a prudent

74

person acting in a similar role."  Renfro v. Unisys Corp., No. 07-2098,
2010 WL 1688540, at *5 (E.D. Pa., Apr. 26, 2010).  Where the undisputed
evidence establishes that the Money Market Fund significantly
outperformed its market benchmarks net of fees for 9 years, and
Plaintiffs can only present evidence that, at most, two money market
funds charged lower fees than the Money Market Fund at some point from
1999 to 2007 while several others charged comparable or even higher
fees during the same period, Plaintiffs cannot meet their burden of
showing that investment in the Money Market Fund was imprudent.

     Next, Plaintiffs argue that Defendants could have gotten lower
fees from SSgA itself had Defendants attempted to negotiate a lower fee
prior to 2005.  This argument, however, is based on pure speculation.
Plaintiffs did not present any witnesses from SSgA to testify as to how
SSgA would have responded to a request by SCE for lower fees prior to
2005.  Nor did Plaintiffs present any evidence from SSgA or any other
money market fund manager regarding fee negotiations with large 401(k)
plan investors during the relevant time period.  Similarly, there is no
evidence that SSgA charged other 401(k) plans fees lower than 18 basis
points between 1999 to 2005.[32]

     Moreover, the fact that SSgA was amenable to a fee reduction in
2005 and again in 2007 does not mean that it would have responded

_____

[32] Plaintiffs' shortcomings in this respect are easily contrasted with the type of
evidence Plaintiffs presented regarding the mutual funds' willingness to waive
minimum investment requirements for the institutional share classes.  With regard
to that issue, the Court was presented with the Prospectuses of the specific mutual
funds at issue, which stated that the funds would consider waiving investment
minimums for institutional investors.  Further, both Plaintiffs' expert and
Defendants' expert testified about specific instances in which the mutual funds at
issue and others like them had waived minimums for investors like the Edison Plan,
and about the common practice of requesting waivers of minimum investment
requiremetns.  Here, in contrast, Plaintiffs have not presented any specific
evidence of fee negotiations between SSgA (or other money market fund managers) and
investors like the Edison Plan.

1  likewise in the years prior.   The Plan's assets in the Money Market

2  Fund increased over time, from approximately $250 million in 2001 to

3  approximately $650 million in 2008.   As Pamela Hess testified, the rise

4  in assets put Defendants in a better position to try and negotiate

5  lower fees in the later years.   Additionally, the market changed

6  significantly over this time period.   Defendants' expert testified

7  that, as a general matter, management fees for money market funds have

8  steadily decreased across the board from 1999 to 2007.   Plaintiff does

9  not dispute this trend.   In light of these facts, it is equally likely

10 (if not more so) that SSgA reduced their management fees in 2005

11 because the Plan continued to invest a larger number of assets in the

12 fund and/or because the market conditions in 2005 dictated a lower fee.

13 There is simply nothing in the record to support the assumption that

14 SCE could have received a fee of 9 basis points prior to 2007.[33]

15      Finally, Plaintiffs contend that the Plan fiduciaries failed to

16 monitor the fees of the Money Market Fund during the relevant time

17 period.   Plaintiffs argue that there are no documents indicating that

18 the Plan fiduciaries conducted any review of the Money Market Fund's

19 fees prior to 2007.   Plaintiffs' expert opines that a prudent fiduciary

20 in Defendants' position would have negotiated a sliding fee scale

21 agreement with SSgA, such that the management fee for the fund would

22

23 _____

24 [33] Plaintiffs in large part rely upon the email from Pam Hess to Marvin Tong dated
   April 27, 2007 (Trial Exh. 278) for the proposition that SSgA would have lowered
25 its management fees prior to 2007 had SCE asked them to do so.   However, Hess's
   email does not support Plaintiff's position.   In the email, Hess speaks only in the
26 present tense, and does not discuss historical fee rates for the Money Market Fund.
   Thus, while Hess suggests that, as of April 2007, SCE possibly could negotiate a
   fee of 8-9 basis points, she does not suggest that such a fee would have been
27 available at an earlier time.   To the contrary, Hess testified that when she first
   started advising SCE in late 2004, she thought the fees for the Money Market Fund -
28 then at 18 basis points - were reasonable and competitive.

76

automatically reduce at scheduled breakpoints as the Plan's assets in the fund grew.

These arguments lack merit.  First, as the findings of fact indicate, Defendants did periodically review the reasonableness of the fees for the Money Market Fund.  When the Money Market Fund was first chosen in 1999, Ertel had reviewed and compared the fees of four comparable money market funds.  The Plan fiduciaries also reviewed the comparable money market funds (including fees) of seven candidates that responded to a Request For Proposal for the trustee business.  The Money Market Fund fees charged by SSgA were comparable to those of the RFP candidates.  Thereafter, the Investments Staff consistently monitored the Money Market Fund's performance net of fees on a monthly, quarterly, and annual basis.  In January 2003, when Marvin Tong joined the Investments Staff, he reviewed the fees of the Money Market Fund, and based on his prior experience in the investment consulting field, he concluded that the fees were reasonable.  Thereafter, in 2005 and 2007, Tong had discussions with Pamela Hess from HFS in which Hess indicated that she had reviewed the Money Market Fund fees and thought a lower fee could be negotiated.  In each of those instances, the Money Market Fund fee was reduced, first to 12 basis points in 2005, and then to 10 and 8 basis points in 2007.  Finally, in 2008, the Investments Staff conducted an extensive review of the Money Market Fund.

As to Plaintiffs' contention that Defendants should have negotiated a sliding fee arrangement, Hess testified that not all managers allow for such an arrangement.  Plaintiffs have presented no evidence that SSgA would have agreed to such an arrangement or that SSgA had negotiated sliding fee agreements with other 401(k) plan.

Furthermore, it is undisputed that the management fee was periodically reduced as the Plan's assets in the Money Market Fund increased. Thus, while Defendants may not have had an agreement for lock-step reductions in the fee as the assets grew, the actual fee reductions are roughly consistent with such a pattern.

However, even if Defendants' process for monitoring and negotiating the fees for the Money Market Fund was somehow deficient, Plaintiffs' claim for damages fails if a hypothetical prudent fiduciary would have made the same investment decision. Howard v. Shay, 100 F.3d 1484, 1489 (9th Cir. 1996); Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994); Fink v. National Savings and Trust Co., 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring). For the reasons stated above, Plaintiffs cannot show that the fees for the Money Market Fund exceeded the reasonable range of fees for comparably performing money market funds or that the decision to select and maintain the Money Market Fund was otherwise objectively imprudence. Thus, Plaintiffs' prudence claim fails with regard to the Money Market Fund.

**IV.  DAMAGES AND OTHER RELIEF**

Defendants' decisions to invest in the retail share classes rather than the institutional share classes of the William Blair Fund, the PIMCO Fund, and the MFS Total Return Fund caused the Plan participants substantial damages. However, due to certain errors in the Plaintiffs' damages calculations and the fact that Defendants did not present damage calculations for these funds from July 2002 forward, the Court cannot calculate with accuracy the exact amount of damages at this

time.  Thus, the Court will allow Plaintiffs to submit revised damage
calculations in accordance with the following guidelines.

The Court concludes that, despite the stated mandatory minimum
investments for the institutional share classes, Defendants could have
invested in the institutional share classes of the William Blair,
PIMCO, and MFS Total Return funds at the time the funds were first
added to the Plan.  Thus, for each of the three funds, damages should
run from the date the Plan initially invested in the funds, July 2002,
to the present.[34]

Plaintiffs and Defendants in most respects do not differ in the
methodology that should be used to calculate damages.  To the extent
such differences exist, the Court will address them below.  The
following methodology should be used for each of the three funds:
First, Plaintiffs should identify and measure the difference in
investment fees between the retail share classes included in the Plan
and the less expensive institutional share classes that were available
but not selected for the Plan.  Second, Plaintiffs should calculate the
average asset levels for each year that the Plan was invested in the
funds.  Rather than using the average year-end asset balance to
calculate the average annual asset level, Plaintiffs should use the
monthly asset balances for the months of the year in which the Plan was
invested in the retail share classes to calculate an average annual
asset level for that year.[35]  Third, Plaintiffs should multiply (a) the

---

[34] To the extent that Plaintiffs need additional information from Defendants to
calculate damages from January 2010 forward, Defendants shall cooperate with
Plaintiffs and provide such information forthwith.

[35] The Court adopts this method, which was put forth by Defendants, so as to resolve
an overstatement in Plaintiffs' calculations for the PIMCO RCM Global Tech Fund
("the PIMCO Fund").  Plaintiffs calculated the average annual assets for each fund
by taking the average of the year-end assets and the previous-year-end assets.

difference between the fees charged for the retail share classes actually offered in the Plan and the fees charged for the less expensive institutional share classes by (b) the average annual fund assets, to determine the actual damages attributable to the higher fees.

Finally, damages should account for the fact that had the Plan fiduciaries not invested in the more expensive retail share classes, the Plan participants would have had more money invested and therefore would have earned more money over the course of time, so called "lost investment opportunity." In calculating lost investment opportunity, Plaintiffs should use the returns of the funds in which the assets actually are (and have been) invested.[36] For example, the MFS Total Return Fund was removed from the Plan in October 2008 and replaced by the Russell Balanced Moderate Growth Portfolio. The assets for the MFS Total Return Fund were mapped into the Russell Balanced Moderate Growth Portfolio in October 2008; thus, Plaintiffs should use the Russell Balanced Moderate Growth Portfolio returns to calculate lost investment

_____

With regard to the PIMCO Fund, however, the year-end asset level for 2003 was $43.9 million, the bulk of which was due to the mapping of approximately $40 million in assets from the T. Rowe Price Science & Technology Fund into the PIMCO Fund. That $40 million influx of assets from the T. Rowe Price Fund, however, was never invested in the retail share class of the PIMCO Fund. At the time of the mapping in October 2003, the Plan fiduciaries converted all the shares in the PIMCO Fund to institutional shares. Thus, because the $40 million dollars in assets from the T. Rowe Price Fund were never invested in retail shares, they should not be used as a basis for calculating damages due to Defendants' imprudence in selecting the retail share class. Plaintiffs must exclude the amount of assets in the PIMCO Fund in 2003 that were only invested in institutional shares (the approximately $40 million in funds mapped from the T. Rowe Price Fund) when calculating the average asset level.

The Court believes that by using the average monthly asset levels for the months of the year during which the Plan was invested in the retail share classes of the funds, this will provide a more accurate level of damages attributable to the imprudent investment in retail shares.

[36] This approach was adopted by Defendants in their proposed calculations, but not by Plaintiffs. The Court finds that this is a more accurate way of calculating actual lost investment opportunity.

opportunity from October 2008 forward.  Similarly, because the Plan
switched the assets in the PIMCO Fund from retail shares to
institutional shares in October 2003, Plaintiffs should use the
institutional share class returns when calculating lost investment
opportunity from October 2003 forward.

Plaintiffs shall provide updated damage calculations in accordance
with these principles within 20 days of the date of this Order.

Finally, to the extent any of the three funds at issue continue to
be invested in retail share classes and cheaper but otherwise identical
investments are available in the institutional share classes of those
same funds, Defendants shall take steps to remedy the situation
consistent with this Order so as to eliminate future damage to the Plan
participants.

**V.    CONCLUSION**

For the reasons stated above, the Court rules as follows:

Defendants did not breach their duty of loyalty under ERISA by
investing in retail share classes rather than institutional share
classes of the William Blair Small Growth Fund, the PIMCO RCM Global
Tech Fund, the MFS Total Return A Fund, the Franklin Small Mid-Cap
Growth Fund, the Janus Small Cap Investors Fund, and the Allianz CCM
Capital Appreciation Fund.

Defendants breached their duty of prudence under ERISA by
investing in retail share classes rather than institutional share
classes of the William Blair Fund, the PIMCO Fund, and the MFS Total
Return Fund.  Plaintiffs shall have 20 days from the date of this Order
to submit updated damage calculations reflecting the amount of damages
resulting from the excess fees incurred in connection with investment

1   in the institutional share classes of these funds, including lost

2   investment opportunity, from July 2002 to the present.

3       Defendants did not breach their duty of prudence in failing to

4   review the available share classes and failing to switch to the

5   institutional share classes of the Janus Small Cap Investors Fund in

6   April 2003, the Allianz CCM Capital Appreciation Fund in April 2005, or

7   the Franklin Small-Mid Cap Growth Fund in September 2001.

8       Finally, Defendants did not breach their duty of prudence by

9   investing in the Money Market Fund managed by SSgA or by failing to

10  negotiate a different management fee for the Money Market Fund at any

11  point from 1999 to the present.

12      Plaintiffs shall submit a proposed judgment consistent with this

13  Order (and the updated damage calculations), and consistent with the

14  Court's prior rulings on Defendants' motion for summary judgment issued

15  on July 16, 2009 and July 31, 2009, within 20 days of the date of this

16  Order.

17

18

19      IT IS SO ORDERED.

20

21

22  DATED:    07/08/10              _____

23                                        STEPHEN V. WILSON

24                                  UNITED STATES DISTRICT JUDGE

25

26

27

28