1
2
3
4
5
6
7
8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

11 GLEN TIBBLE, et al.,                    **CV 07-5359 SVW (AGRx)**

12                     Plaintiffs,

13       vs.                              **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

14 EDISON INTERNATIONAL, et al.,

15                     Defendants.

16

17 **I.    Background Information**

18          Named plaintiffs Glenn Tibble, William Bauer, William Izral, Henry Runowiecki,

19 Frederik Sohadolc, and Hugh Tinman, Jr. (collectively, "Plaintiffs") filed this class action on

20 August 16, 2007 on behalf of Edison 401(k) Savings Plan ("the Plan") and all similarly-situated

21 participants and beneficiaries of the Plan, against Defendants Edison International ("Edison"),

22 Southern California Edison Company ("SCE"), the Southern California Edison Company

23 Benefits Committee ("Benefits Committee"), the Edison International Trust Investment

24 Committee ("TIC"), the Secretary of the SCE Benefits Committee, SCE's Vice President of

25 Human Resources, and the Manager of SCE's Human Resources Service Center (collectively,

26 "Defendants").  Plaintiffs sought recovery under the Employee Retirement Income Security Act

27 (ERISA), 29 U.S.C. § 1332(a), for alleged financial losses suffered by the Plan, injunctive and

28 other equitable relief based on alleged breaches of the Defendants' fiduciary duties.

Plaintiffs are former employees of Midwest Generation, LLC, an indirect subsidiary of Edison Mission Group, Inc., which in turn is a subsidiary of Edison. Edison is the parent company of SCE (both entities referred to collectively as "Edison"). SCE is a utility that provides electricity to retail customers in California. SCE is the sponsor of the Plan, which was created in 1982 and is maintained for all employees of Edison-affiliated companies. The Plan is a defined contribution 401(k) Savings Plan, wherein, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses*." Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1825 (2015) ("*Tibble I*"). During the relevant time period, Edison employees were able to contribute from 1% to 85% of their eligible earnings to the Plan on a pre-tax basis, up to annual limits of the Internal Revenue Code, and Edison was able to match some contributions to the Plan. Plaintiffs were participants in the Plan during the relevant time period.

At issue in the instant case are 17 mutual funds that Defendants selected as Plan investment options in March 1999. For each of the 17 funds, Defendants initially selected the retail shares instead of the institutional shares, or failed to switch to institutional share classes once one became available. In general, institutional share classes are available to institutional investors, such as 401(k) plans, and may require a certain minimum investment. Institutional share classes often charge lower fees (i.e., a lower expense ratio) because the amount of assets invested is far greater than the typical individual investor. The investment management of all share classes within a single mutual fund is identical, and managed within the same pool of assets. In other words, with the exception of the expense ratio (including revenue sharing), the retail share class and the institutional share class are managed identically. Plaintiffs contend that Defendants breached their duty of prudence by not switching the retail shares of the 17 funds at issue to institutional shares.

**A. Plan Fiduciaries and Recordkeepers**

Defendant SCE Benefits Committee ("Benefits Committee") and its members were among the named fiduciaries of the Plan. The Benefits Committee was the Plan Administrator responsible for the overall structure of the Plan. Members of the Benefits Committee were chosen by the SCE Chief Executive Officer and were required to report to the SCE Board of Directors. The Secretary of the SCE Benefits Committee, a Defendant in this action, was a named fiduciary of the Plan during the relevant time period.

2

Additionally, SCE's Vice President of Human Resources and the Manager of SCE's Human Resource Service Center (now called "Benefits Administration"), both Defendants in this action, were named fiduciaries of the Plan during the relevant time period. The Benefits Administration staff was responsible for implementing administrative changes to the Plan, overseeing the budget for the Plan administration costs, and monitoring the ongoing performance of the Plan's recordkeeper, Hewitt Associates, LLC ("Hewitt Associates").

Hewitt Associates served as the third-party recordkeeper for the Plan. As recordkeeper, Hewitt Associates prepared reports regarding the Plan to be sent to the Plan participants and regulators, and maintained a system that participants can access to make changes to their contributions and investment elections.

The SCE and Edison International Board of Directors delegated the authority to select and monitor the Plan's investment options to the Edison International Trust Investment Committee, (the "TIC"), a Defendant in this action. In turn, the TIC delegated certain investment responsibilities to the TIC Chairman's Subcommittee (the "sub-TIC"), which focuses on the selection of specific investment options. The TIC and the Sub-TIC (collectively referred to as "the Investment Committees") were Plan fiduciaries during the relevant time period.

**B. Structure of the Plan**

Before 1999, the Plan contained six investment options. However, in 1998, SCE and the unions representing SCE employees began collective bargaining negotiations. As a result of these negotiations, the investment options in the Plan changed and the Plan offered a broad array of up to 50 options, including ten "core" options and a mutual fund window that included approximately 40 mutual funds. In March 1999 and February 2000, the Plan was amended to provide for this structure of investment options for union and non-union employees of Edison and its affiliates. After these changes were made, Plan participants could select from a variety of investment options with different risk levels, including pre-mixed portfolios, a money market fund, bond and equity funds, the EIX Stock Fund, and dozens of mutual funds.

**C. Mutual Funds**

As stated above, the Plan began offering a mutual fund window to Plan participants in March 1999 in response to collective bargaining negotiations. Before the addition of the mutual funds to the Plan in 1999, SCE paid the entire cost of Hewitt Associates' record-keeping services. These services include things such as mailing prospectuses, maintaining individual account balances, providing participant statements, operating a website accessible by Plan

3

participants that allows participants to conduct transactions and obtain information about the Plan's investment options, and answering inquiries from Plan participants regarding their investment options.  The fees for these services were paid by SCE, not the Plan participants.

With the addition of the mutual funds to the Plan, however, certain revenue sharing was made available to SCE that could be used to offset the cost of Hewitt Associates' record-keeping expenses.  "Revenue sharing" is a general term that refers to the practice by which mutual funds collect fees from mutual fund assets and distribute them to service providers, such as recordkeepers and trustees – services the mutual funds would otherwise provide themselves.  Revenue sharing comes from so-called "12b-1" fees, which are fees that mutual fund investment managers charge to investors in order to pay for distribution expenses and shareholder service expenses.  *See Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 863 (2d. Cir. 1990).  Each type of fee is collected out of the mutual fund assets, and is included as a part of the mutual fund's overall expense ratio.  The expense ratio is the overall fee that the mutual fund charges to investors for investing in that particular fund, which includes 12b-1 fees as well as other fees, such as management fees.  These fees are deducted from the mutual fund assets before any returns are paid out to the investors.

In 1999, when retail mutual funds were added to the Plan, some of the mutual funds offered revenue sharing which were used to pay for part of Hewitt Associates' record-keeping costs.  Hewitt Associates then billed SCE for its services after having deducted the amount received from the mutual funds from revenue sharing.  In short, revenue sharing offsets some of the fees SCE would otherwise pay to Hewitt Associates.

The use of revenue sharing to offset Hewitt Associates' record-keeping costs was discussed with the employee unions during the 1998-99 negotiations.  Specifically, the unions were advised that revenue sharing fees would result in some of the administrative costs of the Plan being partially offset from revenue sharing payments to Hewitt Associates.  Additionally, this arrangement was disclosed to Plan participants on approximately seventeen occasions after the practice began in 1999.

## II.  Previous Orders

### A. First Proceedings in District Court

Plaintiffs filed their class action on August 16, 2007, and this Court granted Plaintiffs' motion for class certification on June 30, 2009.  *See* Dkt. 286.  At this time, the Court also appointed Plaintiffs Bauer, Tibble and Suhadolc as class representatives.  *Id.*  In August 2009,

the Court granted Plaintiffs' request to amend the class certification to name Plaintiffs Izral, Runowiecki, and Tinman as class representatives. *See* Dkt. 308.

### i. Summary Judgment Orders

In May 2009, both parties filed motions for summary judgment or partial summary judgment. *See* Dkts. 146, 186. The Court issued rulings on July 16, 2009 and on July 31, 2009 granting partial summary judgment in Defendants' favor as to the majority of Plaintiffs' claims. Specifically, the Court granted partial summary judgment in Defendants' favor on the following claims asserted by Plaintiffs: (1) whether Defendants breached their fiduciary duty by selecting mutual funds for the Plan that did not perform as well as the Frank Russell Trust Company low-cost index funds; (2) whether SCE's receipt of revenue sharing from certain mutual funds which offset SCE's payments to its record-keeper, Hewitt Associates, constituted a prohibited transaction under 29 U.S.C. § 1106 (b)(2) or 29 U.S.C. § 1106 (b)(3); (3) whether Defendants violated the specific Plan Document under 29 U.S.C. § 1104(a)(1)(D) by allowing some of the fees paid to Hewitt Associates to come from revenue-sharing arrangements; (4) whether Defendants violated the Plan documents by allowing some of the compensation for the Plan Trustee, State Street, to be paid from float; (5) whether allowing State Street to retain float constituted a prohibited transaction under 29 U.S.C. § 1106 (a)(1)(D); (6) whether Defendants violated their duties of prudence and loyalty under 29 U.S.C. § 1104(a)(1)(B) by doing any of the following: (a) selecting sector funds, especially the poorly-performing T. Rowe Price Science & Technology Fund, for inclusion in the Plan in 1999; (b) including a money market fund in the Plan rather than a stable value fund; and (c) structuring the Edison stock fund as a unitized fund instead of a direct ownership fund.

Further, the Court ruled that some of Plaintiffs' claims were barred due to the statute of limitations mandated by ERISA Section 1113. This provision states that "[n]o action may be commenced with respect to a fiduciary's breach of any responsibility, duty or obligation" after the earlier of "six years after (A) the date of the last action which constituted part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation." Therefore, the Court ruled that the applicable statute of limitations ran back to August 16, 2001. Dkt. 295 at 12-14.

The Court relied on *Phillips v. Alaska Hotel & Rest. Employees Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991) to support the contention that there is no 'continuing violation' theory applicable to claims subject to ERISA's statute of limitations. Dkt. 302 at 13. In *Phillips*, the

Ninth Circuit reasoned that the limitation period of §113(a)(2) would start running at the earliest date on which a plaintiff became aware of the breach, and therefore, although the trustee's conduct could be seen as a series of breaches, the statute of limitations did not begin tolling again with each violation because each breach was "of the same character." *Phillips*, 944 F.2d at 520. Based on its analysis of the statute of limitations, this Court held that Plaintiffs' claims regarding retail mutual funds added to the Plan in 1999 and 2000 were barred. Dkt. 302 at 88.

### ii. Bench Trial

After the summary judgment rulings, two issues remained for trial: (1) whether the Defendants violated their duty of loyalty or duty of prudence by selecting for the Plan certain retail share mutual funds that provided for favorable revenue-sharing arrangements but charged higher fees to Plan participants than identical institutional share mutual funds; and (2) whether the Defendants violated their duty of prudence by selecting for the Plan a money market fund that allegedly charged excessive management fees.

As to the mutual funds, Plaintiffs argued that Defendants violated both their duty of loyalty and their duty of prudence by investing in the retail share classes of six mutual funds instead of the institutional share classes of those same funds. As explained, the retail share classes of the six mutual funds offered more favorable revenue-sharing arrangements to SCE but charged the Plan participants higher fees than the institutional share classes. Three of the mutual funds at issue were chosen after the statute of limitations period; thus, Plaintiffs challenged Defendants' initial investment decisions with regard to those funds. The other three funds were added to the Plan before the statute of limitations period; thus, Plaintiffs challenged the failure to switch to an institutional share class upon the occurrences of purported significant changes in circumstances that occurred within the limitations period.

### a. Duty of Loyalty

#### 1. Overall trend toward reduced revenue sharing

The Court found that from July 2002 to October 2008, the investment selections for the Plan demonstrated a general trend toward selecting mutual funds with reduced revenue sharing. Dkt. 405 at 15. The Court found that in 33 out of 39 instances, the changes to the mutual funds in the Plan evidenced either a decrease or no net change in the revenue sharing received by the Plan. *Id*. In contrast, in only six out of 39 instances did Defendants make mutual fund replacements that increased the revenue sharing received by SCE. *Id*. The Court found that "this overall pattern is not consistent with a motive to increase revenue sharing." *Id*.

### 2. Plan changes in 2003 were not motivated by a desire to capture more revenue sharing

The Court also found that changes the Investments Staff made to the Plan's mutual fund line-up between March and June 2003 were not motivated by revenue sharing. *Id*. at 16. The Court discussed email conversations conducted between members of the Investments Staff concerning these proposed changes. *Id*. The Court found that while the email conversations indicated that the Investments Staff was aware of the benefits of revenue sharing, the actual changes made to the Plan line-up during 2003 did not evidence a desire to increase revenue sharing. *Id*.

The Court also discussed meetings of the Investments Staff and Investments Committees that occurred in 2003. *Id*. The Court found that at meetings on June 30 and July 16, 2003, the Investments Staff did not make any recommendations to the Investment Committees regarding revenue sharing. *Id*. In fact, the Investment Staff recommended adding six mutual funds to the Plan and, with regard to each of those six funds, the Investment Committee selected the share class with the lowest expense ratio and the lowest revenue sharing, with the exception of one fund which offered no revenue sharing in either share class. Based on these facts, the Court concluded that the 2003 changes were not motivated by a desire to capture revenue sharing. The Court also found no evidence that Defendants were motivated by revenue sharing when deciding to add or retain the six specific mutual fund share classes at issue. Thus, the Court found that Defendants did not breach their duty of loyalty.

#### b. Duty of Prudence

Plaintiffs contended that Defendants violated their duty of prudence by investing in the retail share classes rather than the institutional share classes of six mutual funds. The retail share classes of each of these funds had higher expense ratios than the institutional share classes; the higher fees were directly related to the fact that the retail share classes offered more revenue sharing that SCE would then use to offset payments to Hewitt Associates.

### 1. The William Blair Fund, PIMCO Global Technology Fund, and the MFS Total Return Fund

The William Blair Fund, PIMCO Global Technology Fund, and MFS Total Return Fund were each added to the Plan after August 16, 2001. With respect to these three funds, although the institutional share classes were available at the time they were added to the Plan, Defendants chose to invest in the retail share classes. The institutional share classes of these funds had

investment minimums.  However, the Court found that mutual funds will often waive fees for large 401(k) plans, and that it is common for advisors representing such plans to call mutual funds and request waivers of these investment minimums to secure institutional shares.  The Court also cited Defendants' expert, Daniel J. Esch, who described personally obtaining "such waivers for plans as small as $50 million in total assets – i.e., 5 percent the size of the Edison Plan."  Dkt. 405 at 23. The Court found that no Defendant had called to request a waiver of the minimum for any of these funds. Further, the Court found that "the unrebutted evidence establishes that a prudent fiduciary managing a 401(k) plan the size of the Edison Plan could have (and would have) obtained a waiver of the investment minimums." *Id*. at 60.

The Court stated that Defendants had not presented any evidence that they had "considered or evaluated the different share classes" of these funds when they were added to the Plan. Dkt. 405 at 53.  Further, the Court found that had Defendants considered the institutional share classes, they would have realized they were identical to the retail share classes, save their lower cost to Plan participants.  "Thus Defendants would have known that investment in the retail share classes would cost the Plan participants wholly unnecessary fees." Dkt. 405 at 54.

The Court reasoned that when the Investments Staff conducted a review of the PIMCO Fund in 2003, as they prepared to map assets from another fund into the PIMCO Fund, the fiduciaries realized that the institutional share class "had a significant performance history and a Morningstar rating, whereas the retail share class did not." *Id*. at 55.  They also realized that the institutional share class charged lower 12b-1 fees, and subsequently recommended that the retail shares of the PIMCO Fund be transferred into the institutional share class.  The Court reasoned that, "[h]ad they done this diligence earlier, the same conclusion would have been apparent with regard to all three funds, and the Plan participants would have saved thousands of dollars in fees." *Id*.

Defendants argued that their investment selection process was reasonable and thorough because they relied on HFS for advice regarding the selection of mutual funds.  However, the Court found that "[w]hile securing independent advice from HFS is some evidence of a thorough investigation, it is not a complete defense to a charge of imprudence." *Id*. at 42. The Court also found that Defendants did not offer any credible reasons for why they would choose the retail share class of the funds instead of the institutional share classes. *Id.* at 60.  The Court rejected

"three *possible* reasons why the Investments Staff might recommend investment in a retail share class rather than a cheaper institutional share class." *Id.* (emphasis in original).[1]

The Court concluded that "a prudent fiduciary acting in a like capacity would have invested in the institutional share classes," and therefore that Defendants violate their duty of prudence with respect to the William Blair Fund, the PIMCO Fund, and the MFS Total Return Fund. *Id.* at 64.

## 2. The Janus Small Cap Value Fund, Allianz CCM Capital Appreciation Fund, and Franklin Small-Mid Cap Growth Fund

With respect to the Janus Small Cap Value Fund, the Allianz CCM Capital Appreciation Fund, and the Franklin Small-Mid Cap Growth Fund, Plaintiffs argued that, although the funds had been added to the Plan prior to August 16, 2001, outside of the statute of limitations, they "underwent significant changes during the statute of limitations period that should have triggered Defendants to conduct a full due diligence review of the funds . . ." *Id.* at 52.

The Court found that Plaintiffs had "not met their burden of showing that a prudent fiduciary would have reviewed the available share classes and associated fees for the Janus, Allianz, and Franklin funds," due to changes in circumstances. *Id.* at 70. Therefore, the Court concluded that Plaintiffs' prudence claims against Defendants, with respect to those funds, failed. *Id.*

### B. Appeal to Ninth Circuit

On appeal, Plaintiffs argued that the district court should have let them argue that Defendants had breached their duty of prudence with respect to all of the funds added prior to the statute of limitations period. While Defendants agreed that they had a duty to monitor and review funds for which circumstances had changed, potentially making investment in those funds imprudent, they argued that Plaintiffs had not met their burden of showing that circumstances had sufficiently changed. The Ninth Circuit agreed and affirmed this Court's opinion in its entirety. *Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013).

### C. Appeal to Supreme Court

The United States Supreme Court vacated the Ninth Circuit's affirmance of this Court's summary judgment order.

---

[1] These reasons were: (1) retail share classes had performance histories and Morningstar ratings but institutional share classes did not; (2) changes to the Plan cause confusion among Plan participants; and (3) institutional share classes had minimum investments that might have precluded the Plan from investing. Dkt. 405 at 57-58.

Specifically, the Supreme Court reversed the Ninth Circuit's findings concerning the statute of limitations, holding that the Circuit Court had erred in "applying a statutory bar to a claim of a 'breach or violation' of a fiduciary duty without considering the nature of the fiduciary duty." *Tibble I* at 1828. The Supreme Court reasoned that "under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id*. Therefore, "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 1829. In sum, the Supreme Court held that, regardless of whether a significant change in circumstances occurs or when the investment was selected, "a fiduciary's allegedly imprudent retention of an investment" is enough to trigger the tolling of a new statute of limitations period. *Id*. at 1825, 1828-1829. The Court remanded the case to the Ninth Circuit to reconsider in light of its decision on the statute of limitations issue. *Id*. at 1829.

### D. Remand to the Ninth Circuit

On remand, the Ninth Circuit agreed with the Supreme Court that "the record does not establish exactly what would have resulted from the application of the correct legal standard," and remanded for this Court to consider whether there was a breach of the fiduciary duty. *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("*Tibble II*").

The Circuit Court distinguished *Phillips*, which this Court relied on in determining the statute of limitations in its summary judgment order, from the instant case. This Court previously interpreted *Phillips* to stand for the proposition that "[t]here is no 'continuing violation' theory to claims subject to ERISA's statute of limitations." Dkt. 295 at 13. However, the Ninth Circuit stated that in fact, "Phillips did not reject a continuing violation theory for the ERISA statute of limitations generally; it merely held that, for claims subject to § 1113(2), the earliest date of actual knowledge of a breach begins the limitations period, even if the breach continues." *Tibble II* at 1196. Specifically, the Court reasoned that § 1113(2) keeps Plaintiffs with knowledge of a breach from sitting on their rights, "and allowing the series of related breaches to continue." *Id*. Then, the Circuit Court directed this Court to decide if "regardless of whether there was a significant change in circumstances, Edison should have switched from retail-class fund shares to institutional-class fund shares to fulfill its continuing duty to monitor the appropriateness of the trust investments." *Id*. at 1199.

Further, the Ninth Circuit urged this Court to reconsider its previous order on attorneys' fees. In the first trial, Plaintiffs sought nearly $2.5 million in attorneys' fees and costs, which the

Court denied.  The Ninth Circuit stated that this Court should "reconsider the fee issue in light of the significant amount of work that was required to vindicate an important principle," reasoning that this case is of "greater importance than this Court believed" it was at the time of its earlier fee determination.  *Id.*

## III.  Current Case

On remand, the parties agree that there are 17 mutual funds at issue.  It is undisputed that for each of these funds Defendants selected the retail-class instead of the institutional-class as Plan investment options in March 1999.  The funds at issue remained in the Plan beyond August 16, 2001, the relevant date for the statute of limitations, and many remained in the Plan until February 1, 2011, when Defendants removed all mutual funds from the Plan. For 14 of the funds, institutional shares were available for years before August 16, 2001, and for the other three institutional shares became available during the statutory period.

It is undisputed that institutional-class shares of these mutual funds are identical to the retail-class shares, except that retail-class shares charge higher fees.  It is also undisputed that Defendants did not switch the Plan mutual funds from retail-class to institutional-class because they did not consider the institutional shares until 2003.

Plaintiff contends that, considering the continuing duty to monitor Plan investments, Defendants should have switched to institutional-class shares on August 16, 2001 for 14 of the funds, and for the other three funds the switch should have been made on the day when the institutional-class shares of these funds became available.  Plaintiff contends that, in failing to monitor these investments and switch over to the institutional-class shares, Defendants breached their duty of prudence under ERISA, and are obligated to make good to the Plan all losses, including lost investment opportunity, resulting from that breach.

In the previous trial, this Court rejected the contention that Defendant was justified in selecting the retail-class shares because these shares had more public information available, because participants would be confused by proposed changes in the switch from retail to institutional shares, or because the Plan did not qualify for the investment minimum required of institutional share classes.  In the current case, Defendants do not revive these same arguments. Instead, they concede that they were in the wrong in not considering institutional shares. They argue, however, that a *hypothetical* prudent fiduciary who did consider the institutional shares would have still invested in at least some of the retail share classes.  Defendants assert that during collective bargaining negotiations between Edison and Plan participants in 1999, the

parties agreed—or, at least, understood—that Edison would invest in funds with revenue sharing in order to defray some of the recordkeeping costs Edison was paying Hewitt Associates. Defendants contend that "[t]he unions understood and accepted this bargain." Dkt. 545 at 17. Because the unions accepted this bargain, and because for most of the 17 funds at issue, "fees charged to Plan participants by the 'retail' class were the same as the fees charged by the 'institutional' class, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs," Defendants argues that investment in the retail share classes was prudent.

Notably, although Defendants contend that this exchange (investment in shares with revenue sharing, which would be used to pay the recordkeeper, for a new Plan with more varied investment options) was discussed with Plan participants during collective bargaining, and then on approximately 17 occasions after it was implemented, this bargain was never memorialized in the Collective Bargaining Agreement between union members and Edison. *See* exs. 1988–96, 1379). The Plan Documents, which included Edison's obligation to pay for the Plan's administrative costs, also do not contemplate choosing a high fee class to recoup revenue sharing. *See* exs. 279, 280.

Defendants also assert that a hypothetical prudent fiduciary would "have compelling, affirmative reasons not to switch share classes in the circumstances the fiduciaries found themselves in here." *Id*. at 17. First, Defendants assert that Edison would have had to shoulder the entire cost of the recordkeeper without revenue sharing, and this might have prompted Edison to "exercise its power as the Plan's sponsor to change the Plan terms, either restricting the Plan's line-up once again or requiring the Plan to bear most or all of its recordkeeping costs through per-participant contributions." *Id*. Second, Defendants argue that replacing the revenue-sharing classes with non-revenue sharing classes would have cost Plan members around $20,000 for each of the share class changes ordered. Third, Defendants point out that because Regulators frequently rejected Edison's proposed rate increases during the relevant time period, "even as Edison faced growing employee compensation costs . . . there was reason for the fiduciaries to believe that stripping out revenue sharing from the Plan's mutual fund options could lead to changes in the Plan's structure for allocating the burden of administrative expenses." *Id*. at 17-18. Finally, Defendants assert that share class changes result in costs such that "a hypothetical prudent fiduciary would not have changed share classes . . . because the net cost to the Plan for investment management (after taking into account revenue sharing payments by the fund or its

adviser to the Plan's recordkeeper) was essentially the same as with the fund already in the Plan." *Id*. at 18.

Plaintiffs argue that, in its previous summary judgment order, this Court stated that although Edison incurred incidental benefit when it chose funds with revenue sharing, it did not violate its duty of loyalty because it was "motivated by a desire to capture revenue sharing." Dkt. 295 at 35-48. However, Plaintiffs argue that "[i]ntentionally using retail instead of institutional shares for the purposes of reducing Edison's bills from Hewitt . . . would be a clear conflict of interest and breach of the duties of loyalty and prudence." Dkt. 533 at 21. Plaintiffs also contend that "the existence of such a quid pro quo agreement is belied" by Defendants' claims in the previous trial that they never considered revenue sharing, and by this Court's findings that Defendants were not liable for a breach of loyalty, in part because they never considered revenue sharing in making Plan decisions. Plaintiffs also argue that none of Defendants' exhibits contain the quid pro quo agreement Defendants claim justified their use of retail-class shares.

In the previous trial, this Court found that that Defendants did not even consider institutional share classes of the three funds at issue in that case, a fact that is undisputed in the instant case as well. Because Defendants successfully argued that they did not consider the institutional share classes in denying Plaintiffs' claim for breach of the duty of loyalty, Plaintiff asserts that "Defendants are judicially estopped from attempting to take a contrary position and contend that it would have been prudent and loyal to consider revenue sharing as a reason for keeping the retail shares of these mutual funds in the Plan." Dkt. 533 at 23.

Plaintiffs also assert that Defendants' claim that "using retail shares was justified because, without that revenue sharing, Edison might have found the additional administrative expenses too high," causing them to pass along all administrative expenses to participants is unfounded because Plan losses represented a small portion of Edison's total profits between 2001 and 2011. Dkt. 565 at 3. Plaintiffs assert that Edison had $1.97 billion in cash at the beginning of 2001, according to its annual report, Ex. 2210 at 112, and that Edison's cash remained between $1.4 billion and $3.9 billion from 2001 through 2011. Dkt. 565 at 4. Therefore, Plaintiffs assert, Edison had ample funds to pay the administrative costs of switching the retail-share funds over to institutional-share funds, and Defendants' argument that Edison "would have changed the Plan if it could not use revenue sharing from retail shares to offset its administrative expenses," is "pure speculation." *Id*.

13

Defendants assert that a prudent fiduciary would have "been concerned that stripping revenue sharing from the original funds could jeopardize the new benefit design." Dkt. 566 at 4. Defendant concedes that for seven of the funds at issue, a prudent fiduciary might have switched to the institutional shares because, for those funds, the revenue sharing benefit did not make up for the difference in fees between the retail share and the institutional share. *Id.* However, Defendants also assert that the annual reviews fiduciaries conducted of share classes was consistent with its duty to monitor, and therefore prudent according to the standard the Supreme Court set forth. Dkt. 566 at 5; *see Tibble I.* Further, Defendant argues that Plaintiffs are unable to prove that the Plan could have implemented share class changes "on the same day the fiduciaries approved the change, without undue risk." Dkt. 566 at 5. Defendants point to evidence that the recordkeeper needed months to make those changes.[2] *Id.*

Finally, Plaintiffs argue that the Court should use the S&P 500 to measure the Plan's lost investment opportunity in determining damages. Plaintiffs assert that the S&P will provide a simpler, less flawed measure for calculating lost investment opportunity than will the State Street Plan performance summaries, which Defendants introduced as exhibits at trial. Plaintiffs assert that the State Street summaries differ by about $30 to $50 million per year from official Plan asset values, shown on the Plan's Department of Labor Form 5500. The Court noted at trial that these differences seem relatively minor. However, Plaintiffs also argue that the State Street Plan excludes certain investment options from its calculation that reveal "the inadequacy of that return for calculating lost investment opportunity from February 2011 to present . . . ." *Id.* at 6. Specifically, Plaintiffs assert that the State Street Plan's exclusion of participant investments in the brokerage window added when the mutual funds were removed in 2011 is significant because participants who invested in the mutual fund window likely would have invested in the brokerage window, which also offered mutual funds as investment options. Plaintiffs further argue that, although the brokerage window should not be excluded in calculating lost investment opportunity, the money market fund and the TIPS fund should be left out because it is unlikely Participants would have moved their investments to these funds. *Id.* Additionally, these funds constituted small percentages of the Plan's assets during the relevant time period. *Id.*

---

[2] For example, fiduciaries approved a share class change for the PIMCO fund in July 2003 and this was not implemented until October 2003. Dkt. 405 at 21. Defendants also point out that "Plaintiff's own expert has previously written that, even today, roughly a third of recordkeepers need a month, and several recordkeepers need two months or more, to provide notice of and implement a share class change." Dkt. 566 at 4; Ex. 2214 at 2; July 5, 2017 Trial Tr. Vol. 2, at 105:18-206:3.

Defendants argue for the use of the statutory rate set in 28 U.S.C § 1961 to determine opportunity losses after 2011. Dkt. 566 at 6.  *See Blankenship v. Liberty Life Assurance Co.*, 486 F.3d 620, 628 (9th Cir. 2007) (stating that "generally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a difference rate'") (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164).  Defendant argues that even if the Court concludes that the equities of the case mandate a departure from the statutory rate, "the returns of the Plan's target date funds provide the closest available reference for how participants investing in the 17 funds at issue may have invested after 2011."  Dkt. 566 at 6.  Defendants argue that the S&P 500 is a "far more risky [sic] investment vehicle," and one in which "only a small minority of Plan participants invested," and therefore should not be used.  *Id*. at n.5.

## IV.    LEGAL STANDARDS

### A.  General Law on the Fiduciary Duty

In enacting the Employee Retirement Income Security Act of 1974 (ERISA), Congress sought "to protect . . . the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans and to "provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. §1001(b)).  Indeed, one of ERISA's principal targets "was misuse and mismanagement of plan assets by plan administrators."  *Mass Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n. 8 (1985) (citations omitted).  Under ERISA, a plan fiduciary is obligated to "discharge his duties . . . solely in the interest of the participants and beneficiaries . . . ."  29 U.S.C. § 1104(a)(1)(A). Further, a plan fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id*. at § 1104(a)(1)(B); *see also Fifth Third Bancorp. v. Dudenhoeffer*, 134 S.Ct. 2459, 2467–68 (2014). A fiduciary's duties of prudence and loyalty are "the highest known to the law."  *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 751 (9th Cir. 2005); *see also Meinhard v. Salmon*, 249 N.Y. 458, 464 (Ct. App. 1928) ("Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the

morals of the marketplace.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.").

The Supreme Court has stated that, because fiduciary duties under ERISA are "derived from the common law of trusts," *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985), "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble I* at 1828.

**B. Duty of Prudence**

Whether a fiduciary acted prudently "is measured according to the objective 'prudent person' standard developed in the common law of trusts." *Whitfield v. Cohen*, 682 F.Supp. 188, 194 (S.D.N.Y. 1988) (citing *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir. 1983).  The "prudence standard is 'not that of a prudent lay person, but rather that of a prudent fiduciary with experience dealing with a similar enterprise'. *Whitfield*, 682 F. Supp. at 194 (quoting *Marshall v. Snyder*, 1 Empl.Ben. Cases (BNA) 1878, 1886 (E.D.N.Y. 1979)).

Under the common law of trusts, a trustee is "duty-bound to make such investments and only such investments as a prudent [person] would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived . . ." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts § 227 (1959)).  Additionally, trust law indicated that, "a trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Tibble II* at 1197 (quoting Restatement (Third) of Trusts § 90(c)(3)).  Indeed, "'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and renewing investments.'" *Id*. at 1198 (quoting Restatement (Third) of Trusts § 90, cmt. b).  A fiduciary's decision to invest in a fund that charges higher fees to a beneficiary will shrink the beneficiary's original investment.  See *id*.  "Beneficiaries subject to higher fees to materially identical funds lose not only the money spent on higher fees, but also . . . the money that the portion of their investment spent on unnecessary fees would have earned over time." *Id*.

In order to determine whether an investment decision is prudent, a fiduciary has a duty to investigate, and may secure independent advice from financial advisors or other experts in the course of the investigation.  *Donovan v. Bierwith*, 680 F.2d 263, 272-73 (2d. Cir. 1982).  However, the fact that a fiduciary secured independent advice does not necessarily indicate that he acted prudently.  *Howard*, 100 F.2d at 1489; *Bierwith*, 680 F.2d at 272; *George v. Kraft*

*Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (reversing grant of summary judgment for defendants on breach of prudence claim because "relying on the advice of consultants" is not a complete defense).

## C.  Duty to Monitor

The Supreme Court has held that under ERISA, a fiduciary has a "continuing duty of some kind to monitor trust investments and remove imprudent ones." *Tibble I* at 1828–29.  This duty also derives from the law of trusts, under which a trustee is obligated not only to make prudent investment decisions, but also to monitor and review those investments "in a manner that is reasonable and appropriate to the particular investment action, and strategies involved." *Id*. at 1828 (quoting Restatement (Third) of Trusts, § 90, Comment *b*, p. 295 (2007).  This means that "the trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." *Id*. (quoting A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 147–148 (3d. ed. 2009).  Therefore, even if an initial investment decision was made outside of the six-year statutory period specified by ERISA, 29 U.S.C. § 1113 (1), if plan fiduciaries did not "conduct the sort of review that a prudent fiduciary would have conducted," regarding the investment within that time period, they breached their fiduciary duty of prudence. *Id*. at 1829.

## V.  ANALYSIS

### A.  SCE Violated its Duty of Prudence

The Court found in the first trial that SCE's decision to invest in retail-class shares instead of institutional-class shares of the same fund violated its duty of prudence. The Ninth Circuit upheld this finding. The Court finds that SCE provides no reason to reconsider this finding for the 17 mutual funds at issue on remand. SCE argues, for the first time, that they had a right to invest in the retail-class shares to take advantage of revenue sharing. There are several problems with this argument. First, as SCE itself noted at trial, there is no reason this same argument could not have been made at the first trial eight years ago.[3]

---

[3] In their post-trial briefing, Defendants argue that the first trial only dealt with mutual funds added after 2001 or that underwent a change of circumstances after 2001, and thus did not deal with the initial 40 funds identified in negotiations. Nevertheless, if there was an "understanding" the Defendants would choose higher-cost funds that also had higher revenue sharing, Defendants provide no reason why this understanding would cease for funds added, or that had changed circumstances, after 2001.

Second, the argument fails on its merits. Defendants' argument is that by informing Plan participants that revenue sharing is available,[4] the fiduciaries could then choose higher cost retail shares that had revenue sharing instead of the institutional shares that did not. This quid-pro-quo is not identified in any of the communications that Defendants present to the Court. Instead, the "understanding" seems to be simply that Defendants could use revenue sharing it received to defray recordkeeping costs—this is most logically interpreted to mean that *if a prudent investment* has revenue sharing, *then* Defendants are allowed to use these proceeds to defray recordkeeping costs instead of applying the proceeds to other possible uses (such as reinvesting that money into the Plan). There is no indication that this "understanding" would allow the fiduciaries to choose otherwise imprudent investments specifically to take advantage of revenue sharing. In fact, such a suggestion would call into question this Court's previous ruling that Defendants did not violate their duty of loyalty and contradict Defendants' previous arguments that the fiduciaries did not consider revenue sharing in making investment decisions.

To avoid this apparent contradiction, Defendants argue that in fact allowing Edison to take advantage of revenue sharing instead of investing in lower costs institutional-class shares was actually better for the Plan participants, since in a hypothetical scenario in which Edison had no revenue sharing to defray recordkeeping costs it would have reallocated Plan administrative costs to Plan participants. Beyond the fact this argument is both pure speculation and belied by the Court's previous findings that Defendants were not motivated by recouping revenue sharing in making investment decisions, the argument also requires the Court to accept that a $1.1 million increase in recordkeeping costs would motivate Edison to restructure its Plan. The Court is not convinced by Dr. Mangiero's speculative and unsupported testimony that Edison may have been cash-strapped, and thus would need to cut a million dollars in administrative costs by relocating the costs to Plan participants. SCE made $2 billion in 2001 alone, and ended the year with $4 billion in cash. *See* ex. 2210 at 112 (Ann. Rep. 104). The Court finds that no prudent fiduciary would purposefully invest in higher cost retail shares out of an unsubstantiated and speculative fear that if the Plan settlor were to pay more administrative costs it may reallocate all such costs to Plan participants. For all 17 mutual funds at issue, a prudent fiduciary would have invested in the lower-cost institutional-class shares.

---

[4] The Court notes that most communication between SCE and its employees was through the Union, which did not represent all employees that participated in the Plan. However, even if the Court presumes that all employees reached the same "understanding" with SCE, Defendants' argument fails.

## B. When Does a Breach of the Duty to Monitor Occur?

Having found that a prudent fiduciary would have invested in the institutional-class shares for each mutual fund, the Court must now decide when the breach actually occurred. Since the statute of limitations precludes Plaintiffs from recovering for the breach that occurred at the time of the investment, Plaintiffs must establish that Defendants breached their ongoing duty to monitor. *See Tibble I* at 1828–29. Applying the guidance from the Supreme Court in *Tibble I*, the Court now finds that Defendants are liable for breaching the duty to monitor from August 16, 2001, onward.[5]

The Court does not suggest that in all duty to monitor cases a fiduciary would breach their duty the day a fund becomes imprudent. Certainly, reasonable fiduciaries are not expected to take a daily accounting of all investments, and thus the reasonable discovery of an imprudent investment may not occur until the systematic consideration of all investments at some regular interval. *See id.* at 1828. However, the facts of this particular case present an extreme situation. Defendants have never disputed that a reasonable fiduciary would be knowledgeable of the existence of the institutional shares for the mutual funds at issue. Thus, there is no credible argument that a reasonable fiduciary only would have discovered these share classes during some later annual review. Defendants always knew, or should have known, institutional share classes existed.[6]

Furthermore, there may be times when a reasonable fiduciary suspects an imprudent investment, but waits until she engages in a regularly scheduled systematic review to confirm her suspicion and properly reinvest the funds elsewhere. This is also not that sort of case. Because the institutional share classes are otherwise *identical* to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the "manner that is reasonable and appropriate to the particular investment action, and strategies involved," *see id.*, in this case would mandate a prudent fiduciary—who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs—to switch share classes immediately.

---

[5] With regards to mutual funds in which an institutional-class shares became available after 2001, the Court finds the breach occurred the day the institutional shares became available.

[6] With regards to mutual funds in which an institutional share class became available after 2001, such share classes are advertised approximately six months before becoming available and therefore a reasonably prudent fiduciary—recognizing that switching share classes would reduce fees without any downside—would have substantial time to prepare a day-one switch.

## C. Reasonable Time to Switch Share Classes

Defendants argue that once a prudent fiduciary decided to switch share classes, 2-5 months were necessary for the Plan to actually make the switch. Defendant relies on the testimony from Diane Kobashigawa, Manager of Benefits Administration and Compliance for SCE from approximately January 1997 to February 2007. Kobashigawa stated there are several steps she understands Hewitt would take before switching share classes.[7] She concluded that Hewitt would need between two to five month to complete these steps, absent unusual circumstances.

The Court does not find Kobashigawa's testimony persuasive. Beyond her specific testimony, the Court notes there was no evidence that it would be more prudent for Hewitt to complete these tasks before switching share classes, and not after making the switch. As for her specific testimony, the Court does not find it comports with other evidence in the record which shows that a change in share class can be accomplished in substantially less time and with the testimony of Dr. Witz that such a change could occur in a day. Further, as a breaching fiduciary, Defendants would be liable in making Plaintiffs whole regardless of how long it takes to cure the breach. Defendants are liable "for any profits that the trust would have accrued in the absence of the breach." *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir.). Absent this breach, the prudent investments would have been made immediately—either on August 16, 2001, or on the day after 2001 that institutional funds became available. Thus, even if Defendants successfully showed it would take months to make the switch, they are nonetheless liable for losses on each mutual fund at issue either beginning on August 16, 2001, or on the day after 2001 that institutional funds became available.

---

[7] These steps are: "1) coding its Total Benefits Administration ("TBA") recordkeeping software and modifying its TBA database to remove the terminated fund, map the assets remaining at termination, and calculate the rate of return for the new fund; 2) updating Hewitt's website for the Plan (which is currently known as the "EIX Benefits Connection" website and is available at www.eixbenefits.com) to alert participants of the pending change and mapping of assets and then, as of the date the change is effective, to remove information about the terminated fund, including its Morningstar fund page, and add information about the new fund, including its Morningstar fund page; 3) updating the Interactive Voice Response system that serves as Hewitt's automated telephone system for the Plan; 4) updating Personal Communications Statements (communications that, generally speaking, are generated by Hewitt's electronic systems and mailed to participants in response to certain participant elections or other developments that impact participant's Plan benefits); 5) testing the aforementioned electronic systems; 6) coordinating with the Plan's trustee regarding trust transmissions, including buy-sell and check and share reporting; 7) coordinating with Financial Engines, which provides electronic investment advice services and makes investment changes for many Plan participants; 8) coordinating with Morningstar to provide the appropriate Morningstar fund page; 9) updating call flows and internal training documentation for the EIX Benefits Connection customer service call center; and 10) working with Edison to prepare and mail communications to Plan participants about the pending fund change and mapping of assets."

The parties stipulate that damages up until January, 2011 is appropriately calculated by calculating the profits that the Plan would have accrued if it invested in the available institutional share classes instead of retail share classes. The parties stipulate this amount is $7,524,424. However, the Plan removed all mutual funds in 2011—thus, the lost investment opportunity from 2011-present cannot be as directly calculated as the losses from 2001-2011. Accordingly, the Court must find another means to calculate damages from 2011 to present.

**D. Damages From 2011 to Present**

"In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985). "When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered." *Cal. Ironworkers, Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001) (citing Sutton v. Earles, 26 F.3d 903, 918 (9th Cir. 1994)). Among several reasonable and alternative investment strategies, "the court should presume that the funds would have been used in the most profitable of these." *Bierwirth*, 754 F.2d at 1056. Any doubt or ambiguity should be resolved against the breaching fiduciaries. *Id.*

The parties propose four methods for determining how to calculate damages from 2011-present: (1) the returns of the S&P 500 index fund, (2) the returns of the Plan as a whole, (3) the returns of the target date funds, and (4) the statutory post-judgment interest rate set out in 28 U.S.C. § 1961. The Court must first determine which of these, if any, constitute a "reasonable approximation" of the damages suffered, *see Cal. Ironworkers, Field Pension Trust*, 259 F.3d at 1047, then choose the most profitable investment strategy among remaining alternatives, *see Bierwirth*, 754 F.2d at 1056.

**i. The S&P 500 Index Fund**

Plaintiff asks this Court to use the returns from the S&P 500 index fund as a reasonable approximation of damages. However, the Court finds that this would not be reasonable. Plaintiffs argue that *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D. Mo. Mar. 31, 2012) is the only other case to be tried to judgment over ERISA fiduciary breaches in a defined contribution plan and that this court used the S&P 500 as a fair estimate for lost investment opportunity. *See id.* at *107. The *Tussey* court does not explain why it found the S&P 500 to be a reasonable approximation, other than accepting Plaintiffs' expert's analysis. *See id.* Regardless

of the circumstances in *Tussey,* the circumstances in this case show that the S&P would not be a reasonable approximation.

The record shows that actual investment in the S&P 500 index fund was a rather small portion of the Plan's assets. *See, e.g.*, Ex. 2344 at 16. There is no evidence that any participant who previously invested in the removed mutual funds in 2011 specifically moved their investment to the BlackRock Equity Index Fund (the index fund that directly tracked the S&P 500). Lastly, it is not a reasonable inference that investors whose investment strategy was to invest in diversified mutual funds would then decide to switch strategies and invest in a pure equity fund, which includes high risk and reward.

The Court understands that any uncertainty must be resolved against the breaching fiduciaries, but the Court finds using the S&P 500 as an approximation of damages—due to evidence that it was a small portion of the Plan's assets and would constitute a dissimilar investment strategy—is unambiguously irrational, especially considering the reasonable alternative discussed below.

### ii. The Plan's Returns

The Court finds that the Plan's returns is a reasonable approximation of lost investment opportunity from 2011 to present. Though the parties did not track precisely where in the Plan participants moved their money once the mutual funds were removed, the money must have stayed in the Plan itself. Thus, though any individual investors money could have moved into equity funds, the money market funds, the brokerage window, etc., the Plan already account for a wide variety of investment strategies and the exact percentage of Plan participants who are invested in each fund. Thus, it is a reasonable approximation that these investors, who already invested in diversified mutual funds, continued to invest in a diversified strategy that approximates the Plan's returns.

The Court will not eliminate individual investments within the Plan for purposes of calculating damages. Plaintiffs' argument that investments in the money market fund and TIPS fund declined in the years since 2011 is not a legitimate argument for eliminating these funds altogether, but rather is already properly calculated by using the Plan's returns—in other words, calculating damages based on the Plan's overall returns includes the fact that these investments declined. Similarly, the Court will also not exclude the Edison stock fund, as again the potential that the mutual fund investors moved their money to such a fund is approximately calculated by the percentage of overall investors in the fund. Lastly, the Court does include the brokerage

22

window, as it was also an option for Plan participants and included the option to continue investing in mutual funds.[8]

### iii. Target Date Funds and Statutory Rate

Since the Court finds that the Plan's returns are a reasonable approximation of lost investment opportunity, and since the Plan's returns during this time were greater than either the returns of the Target Date Funds or the statutory rate, the Court need not consider whether the Target Date Funds or statutory rate are also reasonable as the Court would choose the more profitable option—i.e., the Plan's returns. *see Bierwirth*, 754 F.2d at 1056.

Nonetheless, the Court finds both these options unreasonable. The Target Date Funds were created to roll over the mutual fund investors into age appropriate investments after the Plan decided to discontinue investing in the mutual funds at issue. Investors had a brief roll over period in which they could decide to move their funds elsewhere in the Plan. Over 50% of investors designated for the Target Date Funds deliberately chose to move their money elsewhere during this roll over period. Thus, the Court has direct evidence that over 50% of these investors specifically avoided investing in the Target Date Funds, and concludes it would be unreasonable to bind their lost investment opportunity to the exact investments they consciously chose to avoid. As for the other approximately 50% of investors who did roll over into the Target Date Funds, the parties agree they could have still re-invested their money elsewhere at any time. Whether they did so or not is speculation, but, as already found, it is not speculative to determine they kept their investments in the Plan itself.

The statutory rate is likewise unreasonable. The Court did not find the testimony of Dr. Turki persuasive. This case is not a car accident in which it may be reasonable to place a sum of possible damages in escrow without risk to ensure the injured party gets paid. This case concerns damages specifically to compensate lost investment opportunity. There is no dispute the money at issue would have been invested absent Defendants' breach, the only question is how to reasonably calculate that investment. It is not reasonable to presume that the money would have been invested in the equivalent of the time value of money.

Defendants rely on *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620 (9th Cir. 2007) to argue that the baseline for calculating damages in ERISA cases is the statutory

---

[8] The Court understands that the parties dispute whether the State Street documents properly reflect the Plan's returns due to the potential that they do not include the brokerage window. Regardless of whether these documents

23

post-judgment interest rate from 28 U.S.C. § 1961. This case is inapposite as it does not deal with damages for a breach of fiduciary duties. Further, even considering the case, it does not support Defendants' position. This case concerns a plaintiff who prevailed on a claim of nonpayment of benefits in the amount of $6,093.82 a month. *See id.* at 628. The Court found that had plaintiff received these funds he would have invested an equal amount into a Vanguard mutual fund, which had a 10.01-percent return, because plaintiff provided evidence that he had one half million dollars already invested in that fund. *Id.* The Court found this prior investment to be "substantial evidence" that 10.01-percent, not the statutory rate, should be used to calculate his award of prejudgment interest. *Id.* Similarly, in this case Plaintiffs have made a substantial showing that had the Plan paid lower fees by investing in institutional shares, the money saved would have carried over to the investment. Thus, there is substantial evidence a departure from the statutory rate is required.[9]

**VI.    CONCLUSION**

The Court concludes that Defendants are liable for breaching their fiduciary obligations and are liable beginning on August 16, 2001—or for three funds the later date institutional share classes become available—for the actual loss in excessive fees paid and for the lost of investment opportunity of this breach.

Plaintiffs shall submit a proposed judgment consistent with Order that includes a calculation of the overall damages award within 20 days of the date of this Order. The Court accepts the parties' stipulation that damages equal $7,524,424 from 2001 to January, 2011. Further, the Court finds that from 2011 to present the Plan's overall returns shall be used to calculate damages—including the brokerage window. The Court is unaware if the parties stipulate as to that amount. If so, Plaintiff can include the amount in their proposed judgment. If the parties cannot stipulate to a number, they shall each file a five-page brief explaining the discrepancy in their calculations contemporaneous with the proposed judgment. This is only if there is a dispute in actual calculations and is not an opportunity to re-litigate any issues decided in this case—doing so shall result in sanctions.

---

include the brokerage window has no bearing on the Court's analysis and legal determination that calculation of the Plan's returns should include this window.

[9] Beyond the fact that using the statutory rate to approximate damages is unreasonable, it would also create inappropriate incentives for breaching fiduciaries. A fiduciary on notice that they invested imprudently could pull funds from the imprudent investments, move the money in such a way to make tracing its reinvestment impractical, and rely on the argument that damages are "speculative" and therefore argue for the statutory rate—thereby greatly reducing their potential liability.

Lastly, as recommended by the Ninth Circuit, the Court will reconsider a motion for attorney's fees. Plaintiffs shall file their motion within 60 days of the date of this Order.

Date:   August 16, 2017

HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE